Stephen V. Bomse (State Bar No. 40686)
sbomse@orrick.com
Shannon C. Leong (State Bar No. 268612)
sleong@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105-2669
Tel.:    415.773.5700
Fax:    415.773.5759

Matthew L. Cantor
mcantor@constantinecannon.com
Gordon Schnell
gschnell@constantinecannon.com
Allison F. Sheedy
asheedy@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel.:    212.350.2700
Fax:    212.350.2701
*Pro Hac Vice* Admission Pending

Counsel for Plaintiff StubHub, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STUBHUB, INC.,<br><br>                         Plaintiff,<br><br>       vs.<br><br>GOLDEN STATE WARRIORS, LLC AND TICKETMASTER L.L.C.,<br><br>                         Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF SHERMAN ACT §§ 1-2 (15 U.S.C. §§1-2); CALIFORNIA CARTWRIGHT ACT AND BUSINESS & PROFESSIONS CODE § 17200**<br><br>**JURY TRIAL DEMAND** |

COMPLAINT
Case No.

1     Plaintiff StubHub, Inc. ("StubHub") brings this action under Sections 1 and 2 of the Sherman

2    Act, 15 U.S.C. §§ 1 and 2, and under California state law, against Defendants Golden State

3    Warriors, LLC ("Warriors") and Ticketmaster L.L.C. ("Ticketmaster"), and alleges – upon

4    knowledge with respect to its own acts and those it has witnessed first-hand, and upon information

5    and belief with respect to all other matters – as follows:

6    **I.    INTRODUCTION**

7    1.    This case concerns an anticompetitive scheme designed and employed by the Golden

8    State Warriors and its exclusive ticketing partner Ticketmaster to create and exploit a captured

9    monopoly Secondary Ticket Exchange by illegally excluding competition from providers of

10    Secondary Ticket Exchange services.  The Warriors and Ticketmaster have attempted to effectuate

11    their monopolistic goal by forcing Warriors fans to use only Secondary Ticket Exchange services

12    provided by the Warriors, through Ticketmaster, for the resale of Warriors tickets.  They have set out

13    to achieve this illegal outcome for a single purpose:  to reap service fees and profits that they could

14    not earn in a competitive Secondary Ticket Exchange environment.  These conspiratorial actions

15    have harmed and will continue to substantially harm Warriors fans, Plaintiff StubHub and

16    competition in the market for Secondary Ticket Exchange services for Warriors tickets.

17    2.    The Warriors possess a monopoly over the sale of primary or "first sale" Warriors

18    tickets, all of which are sold through Ticketmaster's dominant primary Ticketing Platform.  If you

19    are a Warriors fan and you want season tickets, you have one choice:  buy them through

20    Ticketmaster.

21    3.    There is, however, a substantial and separate resale market for Warriors tickets

22    which, of necessity, involves the use of Secondary Ticket Exchange services.  To control and profit

23    from the resale of Warriors tickets through such Exchanges, the Warriors and Ticketmaster have

24    cancelled or threatened to cancel fan ticket subscriptions to Warriors season and post-season tickets

25    if fans choose to resell their Warriors tickets over a Secondary Ticketing Exchange that competes

26    with Ticketmaster's, such as the one operated by Plaintiff StubHub.  In short, Defendants have

27    offered a Hobson's Choice to Warriors fans:  use Ticketmaster's Secondary Ticket Exchange

28    exclusively or forfeit your Warriors tickets altogether.  To Warriors fans, this is effectively no choice

COMPLAINT
Case No.

1    at all.  Defendants have reinforced and exacerbated the impact of this exclusionary conduct by

2    misleading consumers about the authenticity of Warriors tickets sold on reputable, competing

3    Secondary Ticket Exchanges and by engaging in other conduct that is intended to, and has had the

4    effect of, artificially raising the costs of competing exchanges for no legitimate competitive purpose.

5           4.      As a result of Defendants' anticompetitive campaign, there has been substantial

6    foreclosure in the market for Secondary Ticket Exchange services, harming consumers, competition

7    and StubHub.  Until recently, StubHub has been a robust competitor in providing efficient

8    Secondary Ticket Exchange services for Warriors tickets.  Numerous Warriors fans historically have

9    chosen to utilize StubHub for Secondary Ticket Exchange services because of its superior customer

10   service, substantial brand equity, competitive pricing, customer protection and guarantees of timely

11   ticket delivery and validity.  However, Defendants' anticompetitive conduct, as more fully alleged

12   herein, has precluded StubHub from continuing to provide Secondary Ticket Exchange services to

13   an ever-expanding number of Warriors fans.  The graph below demonstrates just how substantial the

14   impact of Defendants' anticompetitive practices has been, causing the number of listings for

15   Warriors tickets on StubHub to decrease by approximately **80%** in the last year alone.

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
Case No.



5.      StubHub's listings of Warriors tickets, and the listings of Warriors tickets offered through other Secondary Ticket Exchanges, will drop even further if Defendants' anticompetitive scheme is not stopped.  Indeed, if Defendants are not prevented from continuing their anticompetitive practices, Ticketmaster will become the only Secondary Ticket Exchange through which Warriors tickets will be sold – just as it has been the only Primary Ticket Platform through which Warriors tickets (and tickets to most other large events in the United States) have been sold for years.

6.      What this means for both buyers and sellers of secondary Warriors tickets is fewer and more costly options for Secondary Ticket Exchange services and, ultimately, only a single option for such services – Ticketmaster.  It also means, and has already led to, reduced output for the resale of Golden State Warriors tickets.  And it means, and has already led to, higher Secondary Ticket Exchange service fees imposed on Warriors fans and fewer innovations in the delivery of these services.

7.      Ticketmaster also has engaged in a number of other unfair practices to deprive consumers of access to Secondary Ticket Exchanges other than its own.  It has, for example, refused

-3-

to deliver tickets to fans who have purchased them over Ticketmaster's Primary Ticket Platform until only a few days before the relevant event, delaying the delivery of their tickets for weeks or even months.  Ticketmaster has done this to prevent these fans from reselling their tickets on competing Secondary Ticket Exchanges.

8.    There are no legitimate or offsetting procompetitive benefits that justify Defendants' conduct in harming competition in Secondary Ticket Exchange services.

9.    StubHub challenges this conduct as a violation of Sections 1 and 2 of the Sherman Act and of California's Cartwright Act.  StubHub also challenges it as involving unlawful and/or unfair business acts or practices under California Business and Professions Code Section 17200, as well as tortious interference with prospective economic advantage.  Through this action, StubHub seeks to permanently enjoin Defendants from continuing to engage in this anticompetitive scheme and to recover treble damages for the injuries it has suffered therefrom.

10.    If the anticompetitive actions complained of herein are not stopped, Ticketmaster is likely to seek to replicate them with other teams and entertainment venues throughout the United States, restricting more consumers to a single Secondary Ticket Exchange and forcing competitors and innovators, such as StubHub, to exit the business.  As a result,  millions of Americans will find themselves captive to a monopoly Secondary Ticket Exchange unconstrained in its ability to charge supra-competitive prices for lower quality services.

## II.    JURISDICTION AND VENUE

11.    StubHub brings this action under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

12.    StubHub also brings this action under California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, to obtain restitution, recover statutory damages, and injunctive relief.  And StubHub brings this action under state law prohibiting tortious interference with prospective economic advantage.  This Court has supplemental jurisdiction over these pendant California state law claims under

28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the federal antitrust law claims.

13.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to StubHub's claims occurred in this District, and each Defendant transacts business and/or maintains facilities in this District and thus is subject to personal jurisdiction here.  Defendants are engaged in interstate commerce, and their activities, including those that form the basis of this complaint, substantially impact interstate commerce.

III.     THE PARTIES

        A.     Plaintiff

14.     Plaintiff StubHub is a corporation organized and existing under the laws of Delaware. Its principal place of business is 199 Freemont Street, San Francisco, California 94105.  It is a wholly-owned subsidiary of eBay Inc.

15.     Founded in 2000, StubHub provides Secondary Ticket Exchange services to resellers and purchasers of tickets available by resale.  As discussed more fully below, unlike the sale of primary tickets, which are made by the teams themselves (directly or through agents), exchange services are essential to the functioning of the resale ticket business.  Secondary Ticket Exchanges offer network services that efficiently and reliably "match" holders of tickets to sporting events, concerts and other forms of live entertainment who wish to resell their tickets with individuals looking to purchase such tickets.

16.     StubHub uses an electronic exchange through which the sale and purchase of tickets are made.  It charges competitive services fees for such services, offers efficient and quality delivery mechanisms and other forms of useful customer services both to resellers and buyers as well as a reliable and valuable Fan Protect Guarantee.  It therefore enjoys an extremely positive reputation among both ticket resellers and buyers of tickets available by resale.

17.     Among the types of tickets sold and purchased on StubHub's Secondary Ticket Exchange are tickets for Warriors basketball games at the Oracle Arena in Oakland, California.

COMPLAINT
Case No.

**B.     Defendants**

18.     Defendant Warriors owns the Golden State Warriors NBA professional basketball team.  It is a limited liability company organized and existing under the laws of California with its principal place of business at 1011 Broadway, Oakland, California 94607.  The Warriors is an NBA franchise and has an ownership interest in the NBA.  The team is covered by the Ticketmaster agreements for Primary Ticket Platform and Secondary Ticket Exchange services that were negotiated by the NBA.

19.     Defendant Ticketmaster is a wholly-owned subsidiary of Live Nation Entertainment, Inc.  It is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 7060 Hollywood Boulevard, Hollywood, California 90028. Ticketmaster is the largest ticketing company and the dominant provider of Primary Ticket Platform services in the U.S. with 2014 revenues of approximately $1.55 billion.  Ticketmaster, through its TicketExchange, TicketsNow and TM+ brands, also provides Secondary Ticket Exchange services in the U.S.

20.     Ticketmaster has exclusive, league-wide deals with the NBA, NFL, and NHL for both Primary Ticket Platform and Secondary Ticket Exchange services as well as numerous other exclusive deals for these services at concert venues across the country.  Ticketmaster has been the exclusive provider of Primary Ticket Platform services for the Warriors for many years, and has been the exclusive Secondary Ticket Exchange partner of the Warriors (via Ticketmaster's agreement with the NBA) since August 2012.  As discussed more fully below, as part of the exclusive Secondary Ticket Exchange partnership that Ticketmaster has with the Warriors, the Warriors promote Ticketmaster as their only "official" Secondary Ticket Exchange and refuse to allow any other Secondary Ticket Exchange to integrate technically with the Primary Ticket Platform operated by Ticketmaster and used by the Warriors.  In addition, Ticketmaster is the only "authorized" channel through which Warriors' season ticket holders may sell their tickets.

COMPLAINT
Case No.

### C.       Co-conspirators

21.      Upon information and belief, various persons, firms, corporations, organization and/or other business entities, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of these conspiracies.

## IV.     FACTUAL BACKGROUND

### A.       Primary Ticket Platform Services

22.      Primary Ticket Platform providers, such as Ticketmaster, contract with teams to provide distribution and support services for primary ticket sales.  These are sales made at "face value" directly by the team to fans on a season ticket or individual game basis.  The majority of these sales are made over the Internet, but they may also be made through the phone, mobile devices, ticket outlets, and the box office.  Primary Ticket Platforms are responsible for managing all aspects of the primary ticket sale and distribution process.

23.      Fans who seek to buy Warriors season tickets virtually always buy them through the Ticketmaster Primary Ticket Platform, as it is extremely difficult to find resellers that supply season ticket packages.  Approximately 75% of Warriors tickets are sold as season ticket packages and virtually all of these are sold through Ticketmaster's Primary Ticket Platform.  The remaining Warriors tickets are sold as part of more limited packages, group sales and individual tickets - all through Ticketmaster.

24.      The overall price a consumer pays for a primary Warriors ticket generally includes the face value of the ticket plus any number of "service," "convenience," "processing," and/or "delivery" fees added on by Ticketmaster.  These additional Primary Ticket Platform fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

25.      Primary Ticket Platform providers typically enter into multi-year contracts with the leagues, teams or venues hosting the events.  In return for the right to sell their tickets, the Primary Ticket Platform provider shares with them a portion of the Primary Ticket Platform fees that it collects on the ticket sale.

26.      Ticketmaster, through its participation in a contract negotiated by the NBA on behalf of its members teams, has been the only provider of Primary Ticket Platform services for Warriors

tickets for many years.  Warriors' fans cannot purchase primary tickets to Warriors regular season or playoff games without conducting the transaction through Ticketmaster.  Ticketmaster is also the only provider of Primary Ticket Platform services for 25 other NBA teams; for all 32 NFL teams;[1] for 25 or the 30 NHL teams; and for the majority of major concert venues.

27.    Ticketmaster has had long-standing dominance in Primary Ticket Platform markets. In fact, a principal reason that the U.S., California and sixteen other states sued to block the merger between Ticketmaster and Live Nation in January 2010 was because of Ticketmaster's dominance in providing these services.  In its complaint to enjoin the transaction, the government emphasized that "[f]or over two decades, Ticketmaster has been the dominant [Primary Ticket Platform] service provider in the U.S."  One of the government's chief concerns was that the merged entity would leverage Ticketmaster's market power in Primary Ticket Platform services to large concert venues to require these venues to use Live Nation for concert promotion services.  As part of its agreement to allow the merger to proceed, the government prohibited the merged entity from leveraging Ticketmaster's market power in this way.

28.    This was not the only run-in Ticketmaster has had with the government in connection with Ticketmaster's actual or threatened abuse of its dominance in various Primary Ticket Platform services.  In 2010, the Federal Trade Commission sued Ticketmaster for leveraging its market power in certain Primary Ticket Platform services to unfairly and deceptively steer consumers to use Ticketmaster for overpriced Secondary Ticket Exchange services.  Specifically, when consumers sought to purchase primary tickets from Ticketmaster for certain concerts, Ticketmaster directed them unknowingly to Ticketmaster's Secondary Ticket Exchange site where it sold tickets at substantially higher prices – up to quadruple the face value.  Ticketmaster ultimately settled with the government after, among other things, agreeing to pay refunds to the affected consumers and stop engaging in the challenged "bait and switch" activity.

---

[1]  Ticketmaster only provides Primary Ticket Platform services to the Detroit Lions for season ticket sales.

COMPLAINT
Case No.

### B.    Secondary Ticket Exchange Services

29.    Secondary Ticket Exchange services providers, such as StubHub, Ticketmaster and Vivid Seats—provide network distribution and support services for ticket resales.  Ticket resales are not made by the team or entity hosting the event, but by a person or entity that already has purchased the ticket.  The overall payment made for the resale ticket is based on the price for the ticket – determined by the reseller and not the Exchange, plus any service fees that the Secondary Ticket Exchange charges.   Depending on the popularity of the particular team, game or event, the resale ticket price may be substantially lower or substantially higher than the face value price paid for the primary ticket.

30.    There are many reasons why purchasers of Warriors tickets may want to resell their tickets.  They may be unable to attend the game because of an unexpected scheduling conflict or illness.  They may no longer want to attend the game because of a lack of enthusiasm or interest if the team is performing poorly.  Or they may simply want to resell the tickets to earn a profit or otherwise subsidize or allow for their purchase of additional tickets, as is often the case with season ticket holders.

31.    There are likewise many reasons why consumers choose to purchase Warriors tickets by resale.  The game might be sold out or the desired tickets might otherwise be unavailable from the Primary Ticket Platform.  Or the purchaser might be able to find a better price or seat on the secondary exchange.

32.    Secondary Ticket Exchanges are an essential part of the ticket resale process.  They perform a "matchmaking" function between resellers and resale ticket buyers.  Without such exchanges, it would be extremely costly for prospective resellers and purchasers of resale tickets to locate one another or to assess overall supply and demand for the resale of tickets.  In addition, Secondary Ticket Exchanges are able to effectively eliminate the otherwise high cost and risk incurred by buyers of resale tickets that are involved in determining the legitimacy of the reseller.  Such exchanges, therefore, satisfy the twin demands of resellers and resale ticket purchasers, and make less costly and more efficient the process of putting potential resellers and buyers together.

COMPLAINT
Case No.

1   They do this by offering resellers the widest possible audience of potential purchasers and, at the

2   same time, offering potential purchasers the widest inventory of tickets available for resale.

3       33.    The network services offered by a particular Secondary Ticket Exchange, such as

4   StubHub, becomes more valuable to potential ticket buyers as the number and quality of tickets

5   listed on that Exchange by resellers increases.   Moreover, the network services offered by that

6   Exchange becomes more attractive to resellers to the extent that more potential ticket buyers

7   frequent the Exchange.  Conversely, the network benefits offered both to potential ticket buyers and

8   sellers that utilize a given Secondary Ticket Exchange are reduced when fewer would-be sellers and

9   buyers visit the site, resulting in reduced quantities and varieties of available seats and fewer

10  purchasers interested in obtaining them.

11      34.    The innovations offered by Secondary Ticket Exchanges and StubHub in particular

12  have not always been available to fans.  Prior to the turn of the century, many states had what were

13  referred to as "anti-scalping" laws, which barred the reselling of primary tickets or restricted the

14  terms under which they could be resold.  Virtually all states have since rescinded these rules,

15  recognizing the many consumer benefits of allowing ticket resales.

16      35.    After the repeal of these reseller prohibition laws, the majority of ticket resales were

17  made by small resellers with limited ticket inventory.  Secondary sales, at this time, were not robust

18  because sellers confronted substantial costs for advertising their inventory, and purchasers had to

19  invest substantial costs into finding secondary tickets that they wanted to buy.

20      36.    Then StubHub came along.  StubHub helped to solve these cost issues for buyers and

21  resellers and, in turn, helped to spark substantial growth in secondary sales.  Through StubHub's

22  strong Internet presence, its consumer-oriented approach, and its various innovations that

23  substantially reduce fraud and increase consumer confidence in its Secondary Ticket Exchange

24  transactions, consumers came to trust and rely upon StubHub for Secondary Ticket Exchange

25  services.   StubHub helped to transform reselling from an often unreliable and economically

26  dangerous activity to a legitimate and safe one.

27      37.    With the growing consumer demand for conducting secondary ticket transactions

28  through Secondary Ticket Exchanges that StubHub has been in the forefront of establishing, and

COMPLAINT
Case No.

1   concerned with the threat that StubHub posed to Ticketmaster's longtime control of ticketing,

2   Ticketmaster entered the Secondary Ticket Exchange business during the last decade. Ticketmaster

3   is now a substantial and growing provider of Secondary Ticket Exchange services. However, that

4   growth has not been the result of innovation or price competition. Rather, as explained hereafter,

5   Ticketmaster's growth has come from its efforts to force consumers to use Ticketmaster exclusively

6   for online ticket resale. This is particularly true for Warriors' tickets, where the Warriors and

7   Ticketmaster jointly have engaged in various tactics to foreclose Secondary Ticket Exchange

8   competition.

9   **C. Defendants' Foreclosure of Secondary Ticket Exchange Competition for**
         **Warriors Tickets**

10

11      38.     Since 2012, the Warriors and Ticketmaster have had an exclusive arrangement

12  pursuant to which they share service fees for secondary ticket transactions completed over

13  Ticketmaster's Secondary Ticket Exchange. Hence, Ticketmaster and the Warriors get two bites at

14  collecting services fees associated with Warriors ticket sales – once when the ticket is originally

15  sold, and again when the primary purchaser resells the ticket over the Secondary Ticket Exchange

16  operated by Ticketmaster.

17      39.     The Warriors and Ticketmaster have set out to capture additional supra-competitive

18  profits from their exclusive Secondary Ticket Exchange relationship, but not by offering a superior

19  product or lower prices. Instead, they have taken a series of interconnected, anticompetitive actions

20  with the intended purpose, and resulting effect, of excluding competing Secondary Ticket Exchange

21  providers such as StubHub.

22      40.     In particular, as an integral part of this anticompetitive scheme, Defendants have

23  begun to contractually require that any resale of Warriors season tickets be done only through the

24  Secondary Ticket Exchange operated by Ticketmaster on behalf of the Warriors. To enforce and

25  reinforce that contractual commitment, Defendants have (1) explicitly precluded, or threatened to

26  preclude, season ticket holders from purchasing primary season tickets or playoff tickets unless they

27  agree to resell exclusively on Ticketmaster's Secondary Ticket Exchange; (2) begun monitoring

28  season ticket holders' resales and cancelling season ticket subscriptions for those ticket holders that

COMPLAINT
Case No.

have used competing Secondary Ticket Exchanges, such as StubHub; (3) engaged in a false and misleading advertising campaign designed to cast doubt upon the reliability and authenticity of tickets purchased on competing Secondary Ticket Exchanges, particularly StubHub; and (4) denied competing Secondary Ticket Exchanges, including StubHub, the ability to technologically integrate with Ticketmaster's primary sales platform unnecessarily raising their costs of providing a safe and secure resale exchange.

        1.    *Defendants' Forcing of Ticket Holders to Use Ticketmaster Exclusively for Resale.*

      41.    The Warriors, as part of an agreement with Ticketmaster, have refused to sell or threatened to refuse to sell Warriors season and/or playoff tickets to season ticket holders, unless the season ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services. The Warriors have explicitly forced this contractual provision upon ticket purchasers as part of the "Terms and Conditions" to which every Warriors season ticket holder must agree.  Specifically, the Warriors "Non-Transferability" rule states:  "Sale or resale of any [Warriors] tickets by unauthorized means is prohibited . . . . **Authorized resale of your tickets via online means is limited to [Ticketmaster's] NBAtickets.com**."  [Emphasis added].  Although there is no ambiguity in these restrictions, one season ticket holder asked the Warriors to confirm what they considered an "unauthorized means" of selling secondary tickets.  The Warriors responded:  "Any tickets being resold outside" of Ticketmaster."

      42.    In addition to this explicit contractual restriction, the Warriors also have directly threatened ticket holders with season ticket cancellation on numerous occasions if those ticket holders did not resell their tickets through the Warriors Secondary Ticket Exchange, operated by Ticketmaster.  This has been confirmed by numerous season ticket holders who have been the subject of this retaliatory action for refusing (or at least trying to refuse) to comply with these restrictive sales practices.  As one ticket holder explained:

> Prior to the season, the Golden State Warriors had told us that they were forcing brokers to exclusively list on TM+, the official resale marketplace for the NBA.  We decided not to oblige and see what transpired.  Today (late-December 2014), I got a phone call from the Golden State Warriors concerning this same situation. . . .  For the 11 home games so far this season, our breakdown of TM+ sales were below their standards. . . .  If we followed their request from the beginning of the season, our

numbers should be 100% sold via TM+ across the board. Given this disparity, the Golden State Warriors stated that if this number didn't improve with our remaining inventory to close to 100%, we would not be given playoff invoices and not have the option to renew our seats for the upcoming season; but, if we were to oblige their current request and sell exclusively through TM+, our accounts would be 'all set.' . . . We have stopped listing on StubHub.

43. According to one Warriors sales representative, they have been instructed to "hammer" home the point – sell outside of Ticketmaster, and we will cut you off. In a communication with a season ticket holder, he stated: "I have to make sure I hammer that 'we have the option to offer playoff tickets and a renewal at the end of each season to all ticket holders. Moving forward, we would like you to sell tickets solely through NBAtickets.com [i.e., Ticketmaster's Secondary Ticket Exchange]. Brokers who choose to go this route will be in better standing to continue business with the team.'"

44. In some cases, the Warriors have specifically identified StubHub as being particularly off-limits and have warned season ticket holders even more forcefully that selling through StubHub would result in cancellation of the ticket holder's Warriors ticket subscription.

45. This restrictive resale policy also has been confirmed by numerous other season ticket holders, many of whom have complained to the Warriors that limiting their secondary sales to Ticketmaster significantly hinders their ability to make such sales. As one season ticket holder recounted, when he told a Warriors representative that selling only through Ticketmaster "is tedious and borderline impossible for the amount of seats that I have," the representative pushed back intractably: "Well, you'd better figure out how to get on [Ticketmaster's] Tickets Now quickly." According to the season ticketholder, "it was more of a threat than a suggestion or recommendation."

46. Another season ticket holder recalled a conversation with a Warriors' representative in which he objected to this restrictive sales policy. That ticket holder reported that the Warriors' representative "didn't care very much when I brought up the generally accepted view that their [Ticketmaster] site is a very inferior product, from both the buyer and sellers vantage point." The ticket holder went on to further note that this policy and the conduct enforcing it "seemed more like a Mafia tactic . . . than [that of] a supposedly fan friendly sports franchise."

COMPLAINT
Case No.

47.     Other season ticket holders who similarly complained to the Warriors about its restrictive practices also have confirmed that the Warriors would not agree to rescind the policy when faced with ticket holder complaints.  To the contrary, in these conversations, the Warriors forced season ticket holders to acknowledge that they were complying with this restrictive policy.  Specifically, the Warriors forced ticket holders to confirm that they had removed resale listings for Warriors tickets that they formerly had posted on Secondary Ticket Exchange sites that competed with the Warriors/Ticketmaster Exchange.

2.     *Defendants' Monitoring of Secondary Sales to Enforce Compliance with Their Restrictive Resale Policy.*

48.     In order to ensure that their season ticket holders are complying with these restrictive ticketing practices, the Warriors and Ticketmaster now closely monitor secondary ticket transactions to identify and take action against those selling through StubHub and other competing Secondary Ticket Exchanges.  The Warriors have been very open with their season ticket holders about this new "Big Brother" tactic so they are fully aware that if they sell outside of Ticketmaster, the Warriors and Ticketmaster will know about it and bar them from future transactions.

49.     This open and pervasive monitoring effort has been confirmed by numerous season ticket holders in their communications, including their direct communications with the Warriors.  In those communications, it was stated that the Warriors wanted season ticket holders to resell through the Warriors/Ticketmaster Exchange and that the Warriors did not want to see tickets posted on other sites such as StubHub.  Moreover, the Warriors explicitly informed season ticket holders that both they and Ticketmaster would be monitoring resales throughout the season and again threatened that they "reserve[d] the right" not to offer 2015/16 renewals and 2015 playoff ticket access to ticket holders that did not comply with the Defendants' restrictive sales policy.  For example, ticket holders reported in writing that:

- The Golden State Warriors stated that by using actual seat data from [Ticketmaster's] TM+, where they were able to see exact seat numbers, section, row and the price of tickets that were sold, they were able to see how many tickets we had sold via TM+.  This combined with sales data from StubHub . . . allowed them to cross reference how much inventory had been sold by each account. . . .  [The] Warriors stated that if this number didn't

COMPLAINT
Case No.

improve . . . to close to 100% [Ticketmaster], we would not be given playoff invoices and not have the option to renew our seats for the upcoming season.

- The [Warriors/Ticketmaster] plan was to coerce season ticket holders into listing exclusively on the Warriors Ticketmaster exchange.  Their primary tactic will be to monitor Stubhub and some other exchanges, and when they see tickets on site, they will (and I paraphrase here) "Call the STH with a warning, and should the infractions continue, refuse to sell the STH any playoff tickets, and possibly not renew the following season."

50.     The concerted efforts in which the Warriors and Ticketmaster have engaged to force ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange sales has had a direct and immediate impact on StubHub's ability to compete in the Secondary Ticket Exchange market for Warriors tickets.  There has been an approximate 80 percent drop in StubHub's Warriors inventory since Ticketmaster and the Warriors began imposing – by threats and monitoring and now contract – their exclusionary rule on the majority of their ticket holders.

51.     If this practice is allowed to continue, it likely will force StubHub and other providers of Secondary Ticket Exchange services to exit from the relevant Warriors Secondary Ticket Exchange services market altogether.

3.     *Defendants' Actions That Reinforce the Foreclosing Effect of Their Restrictive Resale Policy.*

52.     Defendants also have taken additional steps to reinforce and exacerbate the exclusionary impact of their restrictive sales policy, including through deceptive communications aimed at competitors and further actions that have artificially inflated their costs of doing business.

53.     Under their exclusive arrangement, Ticketmaster is the only provider of Secondary Ticket Exchange services that the Warriors will market and promote to those seeking to buy or sell secondary tickets.  The marketing and promotion of Ticketmaster's Secondary Ticket Exchange in this regard is substantial.  The official Warriors ticketing website (http://www.nba.com/warriors/tickets/single), states that it contains "the only **100% guaranteed official resale tickets** posted by Warriors Season Ticket Holders in one place" (emphasis in original).

COMPLAINT
Case No.

54.     The Warriors and Ticketmaster have employed their joint marketing activities in an effort to mislead consumers into believing that Ticketmaster is the only safe or effective Secondary Ticket Exchange option they have, or the only one that can be trusted to provide a "guaranteed" or "official" Warriors ticket. For example, on August 13, 2014, the Warriors issued a "fraud alert" for the 2013-14 season "warning fans about the potential dangers of purchasing single-game tickets for the 2014-15 season from a non-verified third party" and advising consumers to use only their "official" resale marketplace—Ticketmaster. These actions reinforce and exacerbate the foreclosing effect of Defendants' consumer forcing, demonstrate their specific intent to monopolize the market for Secondary Ticket Exchange services for Warriors tickets, and make it more likely that Defendants' actions will achieve their illegal ends.

55.     The Warriors agreement with Ticketmaster also provides that the Warriors will allow only Ticketmaster's Secondary Ticket Exchange to technically integrate with their Primary Ticket Platform provider (which is also Ticketmaster). Defendants have established this limitation not for any legitimate purpose designed to facilitate the efficient operation of primary or secondary sales. Rather, they have done it to further disadvantage equally-efficient or more efficient Secondary Ticket Exchange competitors by raising their costs of protecting against fraudulent sales.

56.     StubHub, in fact, utilizes substantial and reliable mechanisms to protect purchasers on its site. It is a moderated marketplace that ensures that resellers who have previously engaged in deception are blocked from using the StubHub site. StubHub also provides kiosks at or near the venues where ticket purchasers can obtain alternative inventory if they encounter a problem. Moreover, through its robust Fan Protect Guarantee, StubHub ensures that all buyers receive the ticket they purchased or their money back. As a result of StubHub's consumer friendly practices, incidences of fraud on StubHub's are extremely minimal and consumers suffer the consequences of a fraud sale in only the rarest of cases.

57.     Defendants, however, suggest that their fraud protections are superior to those offered by Secondary Ticket Exchanges, such as StubHub. They rely on their refusal to allow technical integration between Ticketmaster's Primary Ticket Platform and competitive Secondary Ticket Exchanges willing to integrate, such as StubHub, to buttress their invalid claims of heightened

COMPLAINT
Case No.

security.  Were the Warriors genuinely concerned with security and authenticity issues, they could and would take steps to allow other networks to integrate technologically with its primary ticket platform.  But they do not.  Instead, they have agreed with Ticketmaster to leverage Ticketmaster's position as the Primary Ticket Platform for the Warriors solely for the purpose of raising their rivals' costs of providing these security services.

## V.   RELEVANT MARKETS

58.     There are two relevant antitrust markets in this case:  the market for Warriors tickets sold through Primary Ticket Platforms, and the market for Secondary Ticket Exchange services for the resale of Warriors tickets.  Defendants have used their control over the former market to exclude competition and raise prices and reduce output in the latter market.

### A.  Warriors Tickets Sold Through Primary Ticket Platforms

59.     The sale of Warriors tickets through Primary Ticket Platforms is a relevant market in this case.  There are no economic substitutes for Warriors tickets for Warriors fans, as these tickets provide entry into NBA games featuring the Warriors that are held at Oracle Arena.  Warriors' fans who root for the likes of particular Warriors players – such as Stephen Curry, David Lee, or Klay Thompson – do not deem other NBA team tickets, such as tickets for the Sacramento Kings, to be a substitute for Warriors tickets, as those fans primarily root for the success of the Warriors.  Warriors fans would pay (and have paid) a small, but significant, non-transitory increase in price for Warriors tickets.  Indeed, the Warriors have increased season ticket prices by approximately 30% for next season, evidencing their confidence in the fact that Warriors fans will not substitute Warriors tickets for other entertainment products.

60.     Moreover, there are no economic substitutes for buying or selling Warriors tickets through Primary Ticket Platforms.  Primary Ticket Platforms offer a convenient medium through which fans purchase tickets directly from the Warriors.  Notably, all sales of Warriors season ticket packages are conducted through Ticketmaster's Primary Ticket Platform.  And many consumers seek to purchase individual Warriors tickets via Ticketmaster's Primary Ticket Platform because these tickets generally become available on that Primary Ticket Platform well before these tickets appear on Secondary Ticket Exchanges.

COMPLAINT
Case No.

61.     In addition, from the Warriors' perspective, Primary Ticket Platforms offer the only cost-effective way to reasonably manage and support the sale and distribution of primary Warriors tickets.  This is especially so given the volume of tickets and ticketholders associated with the typical Warriors game and season, the technology and hardware involved in running and maintaining the ticketing system, and the significant level of customer support necessary to handle problems, complaints, and inquiries from the thousands of ticketholders per game.

62.     Accordingly, both the Warriors selling the tickets, and the fans buying the tickets, have no reasonable alternative to which they could turn to buy or sell primary Warriors tickets.  In particular, there are no economic substitutes for Warriors tickets sold on a Primary Ticket Platform for Warriors fans.  A small, but significant, non-transitory price increase in Warriors tickets sold through a Primary Ticket Platform would not cause any significant amount of consumers to purchase Warriors tickets on a Secondary Ticket Exchange.  Consequently, a monopolist of Warriors tickets sold through Primary Platform Services (*i.e.*, the Warriors) can profitably impose and has profitably imposed a small, but significant, non-transitory increase in the prices that it charges for such Warriors tickets.

63.     The geographic dimension of the sale of Warriors tickets through Primary Ticket Platforms is the San Francisco – Oakland – Fremont Metropolitan Statistical Area (MSA).  It is in this area that most Warriors fans who purchase Warriors tickets through Primary Ticket Platforms reside.  And it is in this area that the Warriors and Ticketmaster have the greatest ability to increase the prices of Warriors tickets sold over Primary Ticket Platforms.   Indeed, the Warriors could profitably impose (and have profitably imposed) a small, but significant, non-transitory increase in price of Warriors tickets sold over Primary Ticket Platforms to residents in the San Francisco – Oakland – Fremont MSA.

64.     Primary Ticket Platforms, like Ticketmaster, offer consumers the ability to purchase Warriors tickets anywhere in the United States.  Accordingly, an alternative geographic scope of the market for the sale of Warriors tickets through Primary Ticket Platforms is the U.S.  Regardless of whether the geographic dimension of this market is considered local or national, the Warriors wield market power in it.

COMPLAINT
Case No.

**B.  Secondary Ticket Exchange Services for Warriors Tickets**

65.     The provision of Secondary Ticket Exchange services for Warriors tickets is also a relevant market in this case.

66.     From the standpoint of both the seller of the secondary ticket and the purchaser of the resale ticket, there are no economic substitutes for Secondary Ticket Exchange services for Warriors tickets.

67.     From the reseller's perspective, Secondary Ticket Exchange services provide the most, if not the only, efficient, cost-effective, and secure way to offer resale tickets to potential purchasers.   They likewise offer resellers and purchasers of resale tickets, respectively, the largest audience of prospective purchasers and the largest quantity and variety of tickets available for resale. In fact, because of search costs, concerns over reliability and economies of scale and scope, it would not be feasible to create or operate a meaningful secondary market in ticket resales without the intermediating presence of Secondary Ticket Exchanges.

68.     There are no economic substitutes for Secondary Ticket Exchange services both to the Warriors ticket holder reselling the ticket and the Warriors fan purchasing the resale ticket.  As with primary ticket purchasers, from the perspective of a Warriors resale ticket purchaser, there is no reasonable substitute for tickets to a Warriors game.  In other words, a price increase in Warriors tickets purchased by resale will not cause any significant number of consumers to purchase a Sacramento Kings (or any other NBA) tickets instead.  Thus, a hypothetical monopolist of Secondary Ticket Exchange services for Warriors tickets could profitably impose a small, but significant, non-transitory increase in the fees it charges for the distribution of Warriors tickets purchased by resale.

69.     There are several additional factors that further support the separate and distinct nature of the Primary Ticket Platform and Secondary Ticket Exchange services markets for Warriors tickets:

- There is distinct demand for Primary Ticket Platform and Secondary Ticket Exchange services, which allow for suppliers to provide one of them but not the other.  On the one hand, Paciolan (a competitor of Ticketmaster) provides only Primary Ticket Platform services, and not Secondary Ticket Exchange services, to certain NBA teams.  On the other hand, StubHub sells only

COMPLAINT
Case No.

Secondary Ticket Exchange services, and not Primary Ticket Platform services, to NBA teams.

- Primary Ticket Platform services and Secondary Ticket Exchange services for Warriors tickets are subject to distinct customer demand and pricing based on the inherent differences between primary tickets and tickets purchased by resale. Primary tickets are sold by the team and priced by the team. Resale tickets are sold by ticketholders and priced according to agreement between the reseller and buyer. Furthermore, resale ticket purchases are often made because the primary tickets are sold out or otherwise unavailable at the desired price and location.

- The Antitrust Division of the Department of Justice recognized the existence of relevant and distinct Primary Ticket Platform and Secondary Ticket Exchange services markets in its action to block the 2010 merger of Ticketmaster and Live Nation. Indeed, the principal basis for the government's action was that the proposed transaction was likely "to lessen competition substantially for primary ticketing services to major concert venues located in the United States . . . ." The government separately identified a "secondary ticketing market" there, noting that "[s]econdary ticketing companies provide services that facilitate the resale of tickets . . . ."

- The Federal Trade Commission likewise recognized a relevant and distinct market for Secondary Ticket Exchange services in its action against Ticketmaster for engaging in deceptive "bait-and-switch" steering of consumers to its Secondary Ticket Exchange platform. The agency noted that, in addition to Ticketmaster's business of providing "primary ticketing services," it also provides "a ticket resale marketplace where consumers can buy event tickets that are being offered by resellers . . . on the so-called 'secondary market.'"

- Ticketmaster also recognizes the distinct nature of these two markets. In its 2014 SEC Form 10-K, Ticketmaster/Live Nation identified the existence of a "secondary ticket sales market."

70. The geographic scope of the Secondary Ticket Exchange services market for Warriors tickets is the San Francisco – Oakland – Fremont MSA. The majority of Warriors fans who purchase Warriors tickets through Secondary Ticket Exchanges reside in this area. Moreover, a hypothetical monopolist of Secondary Ticket Exchange services could profitably impose a small, but significant, non-transitory increase in the fees charged to residents in the San Francisco – Oakland – Fremont MSA that use Secondary Ticket Exchange services both for the resale and the repurchase of Warriors tickets.

71. Alternatively, the geographic dimension of the Secondary Ticket Exchange services market for Warriors tickets is the United States, inasmuch as some resellers of Warriors tickets on Secondary Ticket Exchanges reside throughout the United States. Regardless of whether the

COMPLAINT
Case No.

geographic dimension of this market is local or national, Defendants' conduct has caused substantial anticompetitive effects, including the significant foreclosure of competition, reduced output and increased prices.

## VI.   MARKET POWER

72.   The Warriors wield substantial market power over consumers seeking to purchase Warriors tickets sold through Primary Platform Services, including season ticket subscriptions.

73.   The Warriors – the issuer of all Warriors tickets and the entity responsible for putting the Warriors basketball team on the court – has substantial market power over the sale of Warriors tickets through Primary Ticket Platforms.  As stated above, there are no economic substitutes for Warriors games for fans of the Warriors.  This is particularly true, as there is no NBA franchise other than the Warriors in the San Francisco Bay area:  for Bay area residents to see live NBA action, they must attend Warriors games or otherwise travel significant distances.  Accordingly, the Warriors have substantial power over the prices charged for Warriors tickets.  And the Warriors have exercised this power historically by raising price, including by raising the price of Warriors season ticket packages for the 2015-2016 season by 30%.

74.   The Warriors economic power is also evidenced by its ability to force consumers to resell their Warriors tickets only on Ticketmaster's Secondary Ticket Exchange.  As stated above, the Warriors have agreed with Ticketmaster – its exclusive Primary Ticket Platform and Secondary Ticket Exchange partner – to require Warriors season ticket holders to use Ticketmaster Secondary Ticket Exchange services exclusively.  The penalty for violating this policy is forfeiture of future season and playoff ticket packages to Warriors games.  As a result of this policy, numerous Warriors ticket holders have forgone using competitive Secondary Ticket Exchanges, such as StubHub, and have, instead, only used Ticketmaster.  This forcing is direct evidence of the market power of the Warriors.

## VII.   HARM TO CONSUMERS, COMPETITION AND STUBHUB

75.   Defendants' coordinated efforts to control the market for Secondary Ticket Exchange services for Warriors tickets – based on their forcing of season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services; their monitoring of resale exchanges to ensure

COMPLAINT
Case No.

compliance with their exclusive arrangement; their deceptive marketing and promotion; and their exclusive marketing, promotion and technical integration – has harmed competition, and threatens to harm competition even further.

76.     Defendants' conduct has significantly limited, and threatens to significantly limit even further, the number of Secondary Ticket Exchange providers through which Warriors ticket holders can resell their tickets.  In the words of one season ticket holder whom the Warriors "forced [] to sell on the TM exchange only . . . [t]his is of course an attempt to control the market."

77.     If Defendants have their way, there will be only one Secondary Ticket Exchange – Ticketmaster.  By reducing the Secondary Ticket Exchanges on which their Warriors ticket inventory may be listed, the Defendants are significantly limiting the ability of resellers to sell their tickets:  far fewer eyeballs review a reseller's inventory when it is limited to posting such inventory on one, as opposed to, multiple exchanges.  Resellers have reported that they have suffered substantial, adverse economic consequences as a result of having their ticket inventory available only to potential buyers that visit Ticketmaster's single (and inferior) Secondary Ticket Exchange.

78.     Indeed, by precluding resellers from using competitive Secondary Ticket Exchanges to sell their tickets – particularly, by limiting resellers from using StubHub, a trusted and superior distribution source – Defendants have caused resellers of Warriors tickets to lose sales altogether.  This has reduced the output of Warriors ticket resales, including Warriors ticket resales that are completed through Secondary Ticket Exchanges.

79.     The reduced or complete lack of competition resulting from Defendants' misconduct also subjects Warriors season ticket holders and other secondary ticket sellers to Ticketmaster's supra-competitive Secondary Ticket Exchange service fees and associated charges.  As one season ticket holder, whom the Warriors cut off for selling through StubHub, so starkly put it:  "This is creating a very scary monopoly and eliminating competition that will only drive prices higher for the consumer."

80.     This is especially true when one considers StubHub's efforts to compete on price in order to attract resellers to its Secondary Ticket Exchange.  As *The Wall Street Journal* reported on March 25, 2014, StubHub has "lowered the fee it charges sellers."  Due to Defendants' forcing,

COMPLAINT
Case No.

Warriors season ticket holders and other resellers cannot take advantage of StubHub's lower fees, but must pay the artificially high Ticketmaster fees that are unconstrained by competition.

81.     This conduct also has harmed buyers of secondary Warriors tickets. Defendants' conduct has significantly limited, and threatens to significantly limit even further, the number of Secondary Ticket Exchange providers through which buyers of secondary Warriors tickets can make their secondary ticket purchases. Again, if Defendants have their way, there will be only one such source of resale tickets – Ticketmaster. Like the resellers of these tickets, purchasers of Warriors resale tickets are also subject to increased Secondary Ticket Exchange service fees and associated charges because of the reduced or complete lack of competition resulting from Defendants' misconduct. StubHub, on the other hand, attempts to vigorously compete on price in order to attract purchasers of secondary tickets to its Secondary Ticket Exchange. In this regard, the *Wall Street Journal* article noted above stated that "StubHub has slashed buyer's fees to as little as 2% from 10% of the base ticket price." Due to Defendants' forcing, purchasers of Warriors resale tickets cannot take advantage of StubHub's lower fees, but rather must pay Ticketmaster's substantially higher fees that are unconstrained by competition.

82.     Not only has Defendants' exclusionary conduct harmed and distorted network competition in general, it also has harmed StubHub and other Secondary Ticket Exchange services providers specifically. Defendants have foreclosed them from competing against Ticketmaster on the merits and have substantially increased their costs of attempting to compete on a level playing field.

83.     The benefits of the network "matchmaking" services that StubHub is able to provide to prospective resellers and buyers have been artificially diminished as a result of Defendants' conduct. This conduct has caused resellers to list a substantially smaller number of Warriors tickets on StubHub despite its superior pricing, service and reputation for offering a wide and desirable range of choices to purchasers. This, in turn, has caused potential purchasers of Warriors tickets to frequent Stub Hub less often since these purchasers now find a substantially smaller volume and variety of Warriors tickets on the StubHub exchange. In other words, Secondary Ticket Exchanges, such as StubHub, have incurred substantial harm as a direct result of the negative network effects

COMPLAINT
Case No.

flowing from Defendants' restrictive conduct. These negative network effects will render it increasingly difficult, and ultimately impossible, for competing Secondary Ticket Exchanges to compete in offering Secondary Ticket Exchange services for Warriors tickets. The spillover effects of these negative network effects will, in addition, make it increasingly difficult over time for them to compete in offering Exchange services for other types of tickets as well.

84. Defendants' conduct has had a substantial effect on StubHub's business. Its inventory of Warriors tickets has decreased by approximately 80% compared to last year and the number of Warriors tickets sold through StubHub has decreased by more than 40%. Defendants' conduct threatens StubHub (and other Secondary Ticket Exchanges) with potentially even greater harm in the future.

85. Defendants' consumer forcing and foreclosure of competitive Secondary Ticket Exchange Services has artificially increased Defendants' share of Warriors tickets sold through Secondary Ticket Exchanges to, at a minimum, in excess of 50%.

86. This is not just a problem for Warriors fans. It is a looming threat for all sports fans. If Defendants' misconduct is allowed to continue, Ticketmaster and other sports franchises will have the economic incentive to engage in similar anticompetitive efforts to artificially reduce competition in the Secondary Ticket Exchange services for their respective teams' tickets. These franchises will do this in order to secure additional profits that they could not obtain in a competitive resale market. The network effects that would likely be caused by repetition of this conduct will substantially exacerbate the harm to Secondary Ticket Exchanges, such as StubHub, potentially causing the market to tip irrevocably in favor of Ticketmaster thereby enabling it to exercise unconstrained power over service fees and quality of service, resulting in significant harm both to resellers and purchasers of tickets on Secondary Ticket Exchanges.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM

#### Section 1 Unlawful Tying (*Per Se* or Rule of Reason)

87. StubHub repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

88.     Defendants' conduct in foreclosing competition in Secondary Ticket Exchange services for Warriors tickets constitutes an illegal tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

89.     Warriors tickets sold over Primary Ticket Platforms and Secondary Ticket Exchange services for Warriors tickets are distinct and separate products that compete in distinct and separate markets.

90.     The Warriors possess substantial market power over the sale of Warriors tickets sold through Primary Ticket Platforms.  For those seeking to purchase primary Warriors tickets, there is no other option but to make these purchases through Ticketmaster's Primary Ticket Platform.

91.     The Warriors and Ticketmaster have agreed to unlawfully tie the use of Ticketmaster's Secondary Ticket Exchange to the sale of Warriors tickets through Ticketmaster's Primary Ticket Platform.  Defendants have actually cancelled or threatened to cancel season ticket subscriptions to the Warriors – which make up a large percentage of the Warriors' primary ticket purchasers – unless season ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services.  Defendants have also revoked, or threatened to revoke, their continued sale of Warriors primary tickets to season ticket holders if they are identified as reselling their primary tickets through any Secondary Ticket Exchange provider other than Ticketmaster.  As a result of this tying arrangement, ticket holders of the Warriors have been forced to use Ticketmaster for Secondary Ticket Exchange services.

92.     This tying arrangement – which has been reinforced and strengthened by the Warrior's exclusive marketing, promotion and integration of Ticketmaster for Secondary Ticket Exchange services – has substantially foreclosed StubHub and other Secondary Ticket Exchange providers from competing in the Secondary Ticket Exchange services market for Warriors tickets.  It has harmed and will continue to harm competition in that market by forcing Secondary Ticket Exchange buyers and sellers to pay artificially high fees for Secondary Ticket Exchange services and by reducing the quantity and quality of secondary Warriors tickets available for sale.  It has reduced output in that market as well.

COMPLAINT
Case No.

93.    There are no legitimate business justifications or efficiencies for Defendants' tying arrangements that counterbalance their demonstrated anticompetitive effects.

94.    This tying arrangement constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *per se*, under a "quick look" standard, and under the rule of reason.

95.    As a result of Defendants' illegal tying arrangement, the fees on both the buyer and seller side for Warriors Secondary Ticket Exchange services as well as ticket prices for Warriors resale tickets have been artificially raised above competitive levels.

96.    As a result of Defendants' illegal tying arrangement, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## SECOND CLAIM

### Section 1 Restraint of Trade
### (*Per se or* Rule of Reason)

97.    StubHub repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

98.    Defendants have restrained trade through a series of coordinated agreements and acts, including:  Defendants' actions to force Warriors season ticket holders to exclusively use Ticketmaster Secondary Ticket Exchange services and Defendants' agreement to exclusively market and promote Ticketmaster for Secondary Ticket Exchange services for Warriors tickets and for Ticketmaster to be the exclusive integrated provider of Secondary Ticket Exchange services to the Warriors.

99.    There are no legitimate business justifications or efficiencies for Defendants' coordinated agreements and acts that would counterbalance their demonstrated anticompetitive effects.

100.    Defendants' coordinated agreements and acts are being undertaken with the common design to exclude and eliminate competing Secondary Ticket Exchange providers, such as StubHub, and entrench Ticketmaster as the sole source of secondary Warriors tickets.  They are also for the

COMPLAINT
Case No.

purpose of controlling the supply and prices of Warriors tickets available by resale and the fees that are charged for Secondary Ticket Exchange services.

101.     These coordinated agreements and acts of Defendants constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, *per se*, under a "quick look" standard, and under the rule of reason.

102.     As a result of Defendants' coordinated agreements and acts, competition in the market for Secondary Ticket Exchange services for Warriors tickets has been diminished and eliminated.

103.     As a result of Defendants' coordinated agreements and acts, the fees on both the buyer and seller side for Warriors Secondary Ticket Exchange services have been artificially raised above competitive levels.

104.     As a result of Defendants' coordinated agreements and acts, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

### THIRD CLAIM

### Conspiracy to Monopolize

105.     StubHub repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

106.     Defendants' conduct in foreclosing competition in the Secondary Ticket Exchange services market for Warriors tickets constitutes a conspiracy to monopolize the Secondary Ticket Exchange services market for Warriors tickets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

107.     To foreclose competition in the market for Warriors tickets sold through Secondary Ticket Exchange services, Defendants have coordinated their efforts to force season ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services; monitor compliance with their restrictive policies; exclusively and deceptively market and promote Ticketmaster; and/or preclude competitor Secondary Ticket Exchanges from integrating with the Warriors' Primary Ticket Platform (i.e., Ticketmaster).  Defendants have willfully, knowingly and

1   with specific intent to do so, combined or conspired to monopolize the Warriors Secondary Ticket

2   Exchange services market.

3          108.    If Defendants' exclusionary conduct is not enjoined, there is a dangerous likelihood

4   that defendants will monopolize the market for Secondary Ticket Exchange services for Warriors

5   tickets.

6          109.    There are no legitimate efficiency benefits that counterbalance the demonstrated

7   anticompetitive effects of these overt acts, including their foreclosure of competition in the Warriors

8   Secondary Ticket Exchange services market.

9          110.    As a result of Defendants' violation of Section 2, StubHub has been and will continue

10   to be injured in its business and property in an amount not presently known with precision but which

11   is, at minimum, millions of dollars prior to trebling.

12                                **FOURTH CLAIM**

13                          **Violation of the Cartwright Act**

14          111.    StubHub repeats and realleges each and every allegation of this Complaint as if fully

15   set forth herein.

16          112.    Defendant's coordinated efforts to foreclose competition in the market for Secondary

17   Ticket Exchange services for Warriors tickets constitute a violation of the Cartwright Act.

18          113.    Defendants have been able to accomplish this violation because of the individual and

19   collective market power that the Warriors and Ticketmaster wield over the sale of Warriors tickets

20   through Primary Ticket Platforms.

21          114.    Defendants' coordinated efforts to force season ticket holders to use Ticketmaster as

22   their exclusive provider of Secondary Ticket Exchange services; monitor compliance with their

23   restrictive policies; exclusively market and promote Ticketmaster; and/or preclude competitor

24   Secondary Ticket Exchanges from integrating with the Warriors' Primary Ticket Platform (i.e.,

25   Ticketmaster) has achieved and will achieve no legitimate efficiency benefits to counterbalance their

26   demonstrated anticompetitive effects, including the foreclosure of competition in the Warriors

27   Secondary Ticket Exchange services market.

28

COMPLAINT
Case No.

115. Defendants' conspiracy to monopolize the Secondary Ticket Exchange services market for Warriors tickets also constitutes a violation of the Cartwright Act.

116. As a result of Defendants' violation of the Cartwright Act, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## FIFTH CLAIM

### Violation of California UCL Section 17200

117. StubHub repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

118. Ticketmaster has used additional, unfair practices to make it difficult for ticket holders to sell their tickets on competitive Secondary Ticket Exchanges, such as StubHub. Ticketmaster has done this by levering its position as a dominant provider of Primary Ticket Platform

119. As found by the Department of Justice, Ticketmaster has historically dominated Primary Ticket Platform services. It has maintained its dominance in this business by entering into numerous multi-year, exclusive contracts with leagues, teams, and venues. Indeed, Ticketmaster's market power in Primary Ticket Platform services is evidenced by the high fees that it has charged and continues to charge for Primary Platform services – fees that are substantially higher than fees charged by other Primary Ticket Platform competitors.

120. Moreover, Ticketmaster's market power in Primary Ticket Platform services is buttressed by high barriers to entry and expansion in this business, including barriers created by Ticketmaster threats to enforce its multi-year, exclusive agreements. Ticketmaster has, for example, threatened action against StubHub for even approaching Ticketmaster business partners with offers to sell additional, unsold ticket inventory, claiming that such overtures would constitute tortiously interfering with Ticketmaster's exclusive contracts. Specifically, Ticketmaster cautioned StubHub that: "It has come to our attention that StubHub is approaching Ticketmaster clients seeking to sell our client's primary tickets. As is well known in the industry. . . Ticketmaster's client ticketing contracts are generally exclusive and therefore contain contractual commitments by our clients not to

COMPLAINT
Case No.

sell primary tickets through any third-party."  Ticketmaster has likewise imposed contractual restrictions in its Primary Ticket Platform contracts that preclude teams, leagues, and venues from distributing any of their ticket inventory via actual or potential competitors.

121.    Specifically, Ticketmaster exercised its dominance in Primary Ticket Platform services by delaying the delivery of the electronic copy of the originally purchased, primary ticket or the barcode associated with that ticket to the primary ticket purchaser.   Ticketmaster has chosen to delay the delivery of PDF images or barcodes associated with original, primary tickets for numerous sporting events and musical concerts until weeks or months after the ticket was purchased and only a few days before the relevant event.

122.    This practice makes it extremely difficult for a primary ticket purchaser to resell his or her ticket on competitive non-Ticketmaster Secondary Ticket Exchanges.  Indeed, the delaying of the delivery of these tickets or bar codes effectively bars the reseller from selling that ticket on a competitive Secondary Ticket Exchange.  This is because ticket purchasers are reluctant to purchase a ticket on a Secondary Ticket Exchange from a stranger (with no brand recognition) on the hope that the reseller will transfer the tickets weeks or months after a secondary ticket purchase occurs.

123.    Of course, Ticketmaster facilitates secondary purchases on its own Secondary Ticket Exchange even before delivering the primary ticket to the reseller:  it guarantees that it will directly deliver the ticket to the secondary purchaser at the designated delivery time, likely a few days before the event, if a secondary transaction is made.  StubHub and other competitive Secondary Ticket Exchanges cannot provide this same direct delivery guarantee because they are barred from electronically integrating with Ticketmaster's Primary Ticket Platform.

124.    Accordingly, this Ticketmaster practice of delaying delivery of primary tickets has caused ticket holders to incur consumer harm and has caused competitive foreclosure to Secondary Ticket Exchanges.

125.    At a recent sports analytics conference held at the Massachusetts Institute of Technology Sloan School of Business, representatives of Ticketmaster stated that Ticketmaster will be rolling out these ticket and barcode delivery delay tactics even more expansively in the near future.

COMPLAINT
Case No.

126.    Another tactic in which Ticketmaster has engaged to leverage its dominance in Primary Ticket Platform services is its increased issuance of so-called paperless tickets.  These virtual tickets allow entry to the game or event only upon showing at the gate picture identification and the credit card used for the purchase.  Transferring or reselling these tickets is only possible through Ticketmaster's Secondary Ticket Exchange platform.  According to the independent American Antitrust Institute, "[i]nstead of benefiting consumers, the trend favoring paperless tickets appears to be motivated by a desire of the dominant primary ticket provider to block out competition in the secondary ticket (resale) market."

127.    These practices are unlawful business acts or practices within the meaning of Section 17200 of California's Unfair Competition Law ("UCL").

128.    Moreover, Defendants' (i) entering into an agreement under which Ticketmaster is the exclusive provider of Secondary Ticket Exchange services which the Warriors market and promote and which are technically integrated with the Primary Ticket Platform services that the Warriors use;  (ii) forcing Warriors season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services, and threatening to retaliate against those that do not comply; and (iii) monitoring compliance with their restrictive policies are all unfair business acts or practices within the meaning of Section 17200 of California's Unfair Competition Law.

129.    Such unfair competitive practices are ongoing and continue to date.

130.    Defendants' unfair business practices have caused substantial economic injury to StubHub in an amount not presently known with precision but which is, at minimum, hundreds of thousands of dollars.

131.    Such unlawful or unfair business practices are continuing and will continue unless relief enjoining these practices is granted under Section 17204 of the UCL.  StubHub has no adequate remedy at law.

## SIXTH CLAIM

### Tortious Interference With Prospective Economic Advantage

132.    StubHub repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

133.   StubHub provides Secondary Ticket Exchange services to buyers and sellers of secondary Warriors tickets.

134.   Defendants have knowingly and intentionally interfered with StubHub's prospective economic advantage by improperly and illegally engaging in the conspiratorial conduct described above.  In particular, Defendants have forced Warriors season ticket holders, who regularly use StubHub for Secondary Ticket Exchange services, to stop using StubHub for these services and exclusively use the Secondary Ticket Exchange services of Ticketmaster instead.  Defendants have done this by withholding or threatening to withhold season ticket or playoff ticket subscriptions if Warriors season ticket holders choose to sell through StubHub.  Defendant Ticketmaster has also delayed delivery of PDF-imaged tickets or ticket barcodes to interfere with StubHub's prospective business relations with resellers and buyers of secondary tickets.  And Defendant Ticketmaster has issued paperless tickets to events that cannot be transferred through competitive Second Ticket Exchanges.

135.   StubHub has been and will be harmed in its business and property as a result of Defendants' tortious interference, losing sales and profits from its regular customers that it otherwise would have received but for Defendants' tortious interference with these prospective sales.

136.   Defendants' conduct is malicious, oppressive, and done with the sole intent of harming StubHub.

137.   Defendants' conduct is without justification or privilege.

138.   As a result of Defendants' tortious interference with StubHub's prospective economic advantage, StubHub has been injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## IX.   PRAYER FOR RELIEF

WHEREFORE, StubHub requests the following relief:

139.   That the Court declare, adjudge and decree that Defendants have committed the violations of the Sherman Act, the Cartwright Act, the UCL and state law against tortious interference with prospective economic advantage alleged herein;

COMPLAINT
Case No.

140. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or conduct having a similar purpose or effect;

141. That the Court enter an order enjoining Defendants from continuing to implement their coordinated efforts to foreclose competition in the market for Secondary Ticket Exchange services for Warriors tickets, and specifically enjoining them from taking any actions which force Warriors season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services for Warriors tickets or punish season ticket holders for using StubHub or any other Secondary Ticket Exchange provider for these services, or from entering into any contracts or agreements having a similar purpose or effect;

142. That StubHub be awarded money damages, in an amount to be proven at trial and to be trebled according to law, plus interest, to compensate StubHub for Defendants' violations of federal and state antitrust law;

143. That StubHub recover its cost of suit, including a reasonable attorneys' fee, and for such other and further relief as this Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

144. Plaintiff demands a trial by jury.

Dated: March 29, 2015

Respectfully submitted,

Stephen V. Bomse
Shannon C. Leong
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
sbomse@orrick.com
sleong@orrick.com

/s/ Stephen V. Bomse
STEPHEN V. BOMSE
Attorneys for Plaintiff
StubHub, Inc.

COMPLAINT
Case No.

1 | Dated:  March 29, 2015

Matthew L. Cantor
Gordon Schnell
Allison F. Sheedy
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
(212) 350-2738
(212) 350-2701 (fax)
mcantor@constantinecannon.com
gschnell@constantinecannon.com
asheedy@constantinecannon.com

Attorneys for Plaintiff StubHub, Inc.
(*Pro Hac Vice* Admission Pending)

COMPLAINT
Case No.