Stephen V. Bomse (State Bar No. 40686)
sbomse@orrick.com
Shannon C. Leong (State Bar No. 268612)
sleong@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105-2669
Tel.: 415.773.5700
Fax: 415.773.5759

Matthew L. Cantor (admitted *Pro Hac Vice*)
mcantor@constantinecannon.com
Gordon Schnell (admitted *Pro Hac Vice*)
gschnell@constantinecannon.com
Allison F. Sheedy (admitted *Pro Hac Vice*)
asheedy@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel.: 212.350.2700
Fax: 212.350.2701

Kevin J. Arquit (NY State Bar No. 1674811)
karquit@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: 212.455.2000
Fax: 212.455.2502

Matthew J. Reilly (*Pro Hac Vice* admission pending)
matt.reilly@stblaw.com
Abram J. Ellis (*Pro Hac Vice* admission pending)
aellis@stblaw.com
SIMPSON THACHER & BARTLETT LLP
1155 F Street NW
Washington, DC 20004
Tel.: 202.636.5500
Fax: 202.636.5502

Counsel for Plaintiff StubHub, Inc.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STUBHUB, INC., | Case No. 3:15-cv-01436-MMC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR VIOLATION OF SHERMAN ACT §§ 1-2 (15 U.S.C. §§ 1-2), CALIFORNIA CARTWRIGHT ACT, AND BUSINESS & PROFESSIONS CODE § 17200; INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| v. | |
| GOLDEN STATE WARRIORS, LLC AND TICKETMASTER L.L.C., | |
| Defendants. | **JURY TRIAL DEMAND** |

Plaintiff StubHub, Inc. ("StubHub") brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and under California state law, against Defendants Golden State Warriors, LLC ("Golden State") and Ticketmaster L.L.C. ("Ticketmaster"), and alleges – upon knowledge with respect to its own acts and thirstose it has witnessed first-hand, and upon information and belief with respect to all other matters – as follows:

**I.      INTRODUCTION**

1.      This case concerns the anticompetitive conduct of Golden State and its exclusive ticketing partner, Ticketmaster, to impose higher prices on basketball fans in the resale market for professional basketball tickets in the Bay Area.  Golden State and Ticketmaster have effectuated this anticompetitive scheme by forcing fans of Golden State's professional basketball team, the Golden State Warriors (the "Warriors"),[1] to exclusively use Ticketmaster's "Secondary Ticket Exchange"—*i.e.*, the platform Ticketmaster operates for the resale of professional basketball tickets—for the resale of Warriors tickets.  Defendants have undertaken this anticompetitive conduct for the purpose of obtaining service fees and profits that they could not

[1]      References to "Golden State" are to the Defendant who has engaged in unlawful activity, and references to the "Warriors" are to the NBA professional basketball team.

earn in a competitive market for secondary ticket services, referred to herein as the "Secondary Ticket Services Market." Defendants' anticompetitive behavior has substantially harmed and will continue to substantially harm Warriors fans, Plaintiff StubHub and competition in the Secondary Ticket Services Market.

2.     Before Defendants' unlawful conduct caused harm in the Secondary Ticket Services Market, Defendants had been active principally in the sale of primary or first-sale Warriors tickets. The term "Primary Ticket Market" refers to the market for primary or first-sale professional basketball tickets in the Bay Area, and a "Primary Ticket Platform" is the platform for selling and distributing professional basketball tickets in the Bay Area.

3.     Defendant Golden State owns the Warriors, the only professional basketball team in the Bay Area, and sells the only professional basketball tickets in the Bay Area. Only Golden State is licensed to host NBA games in the Bay Area, and no other entity will be licensed to do so in the foreseeable future. Golden State sells virtually all of its tickets in the Primary Ticket Market through Ticketmaster's Primary Ticket Platform.

4.     Golden State does not buy or sell tickets in the secondary ticket market, and therefore historically did not profit from the sale or purchase of Warriors tickets in the secondary ticket market. However, as a result of the anticompetitive conduct described herein, Golden State has found a way to unlawfully extract additional income from buyers and sellers in the secondary ticket market: Golden State now forces purchasers of Warriors tickets in the Primary Ticket Market to use only Ticketmaster's Secondary Ticket Exchange for resale of those tickets. Golden State and Ticketmaster share the higher fees paid by fans who have no choice but to pay for the "right" to use the Ticketmaster Secondary Ticket Exchange platform.

5.     Ticketmaster is the country's dominant distributor of first-sale tickets, including first-sale professional basketball tickets. It has been able to monopolize services for the Primary Ticket Market for Bay Area professional basketball tickets by entering into an exclusive agreement with Golden State. More recently, Ticketmaster followed previous innovators, like StubHub, by entering the Secondary Ticket Services Market and offering a Secondary Ticket Exchange for those who sought to buy or re-sell Warriors tickets. Upon entry, Ticketmaster faced

stiff competition—on price, quality, and services—from StubHub and other operators of Secondary Ticket Exchanges.

6. Ticketmaster was not content with the robust competition in the Secondary Ticket Services Market, and Golden State was not content with collecting no revenue from secondary sales. They therefore collectively devised a scheme to avoid competition in the Secondary Ticket Services Market and gain inflated revenues otherwise unavailable to them. Instead of competing, Ticketmaster and Golden State conspired to force Warriors ticket holders to use the Secondary Ticket Exchange services provided by Ticketmaster.

7. The central components of Defendants' scheme are as follows. First, Golden State contractually requires that the resale of Warriors tickets be effectuated only through Ticketmaster's Secondary Ticket Exchange. Golden State has enforced and continues to enforce this requirement by cancelling or threatening to cancel ticket subscriptions for regular season and post-season tickets if fans choose to resell their Warriors tickets on a Secondary Ticket Exchange that competes with Ticketmaster's, such as the one operated by StubHub. Thus, Defendants' scheme begins with a Hobson's Choice to Warriors fans: use Ticketmaster's Secondary Ticket Exchange exclusively or forfeit your Warriors tickets altogether. To Warriors fans, this is effectively no choice at all.

8. Second, Golden State and Ticketmaster have reinforced and exacerbated the impact of this anticompetitive and exclusionary conduct by misleading consumers about the authenticity of Warriors tickets sold on reputable, competing Secondary Ticket Exchanges and by engaging in other conduct that is intended to, and has had the effect of, artificially suppressing competition. Golden State and Ticketmaster have undertaken these misleading communications specifically to effectuate their anticompetitive desire and ensure that Warriors ticket holders use only Ticketmaster's Secondary Ticket Exchange.

9. Third, Ticketmaster provides the infrastructure and other means to effectuate the scheme, and shares the revenues from all ticket sales with Golden State. For example, Ticketmaster polices ticket holder behavior to provide information to Golden State and to ensure that Golden State penalizes Warriors ticket holders who fail to comply with Golden

State's exclusionary restrictions. Ticketmaster advises Golden State when particular resellers do not resell their tickets on Ticketmaster's Secondary Ticket Exchange, and supports Golden State's cancellation of those tickets or other coercive tactics by Golden State.

10. More and more Warriors ticket holders have succumbed to the Defendants' practices, causing economic distortions and consumer harm in the Secondary Ticket Services Market. In particular, as a result of these practices, Warriors ticket holders have been forced into a Secondary Ticket Exchange that charges both ticket buyers and sellers higher prices than they would pay if they had competitive choices. Moreover, because of these tactics, Warriors ticket holders have been unable, at times, to resell their Warriors tickets at all since significantly fewer buyers have use Ticketmaster's Secondary Ticket Exchange. Sellers of Warriors tickets have therefore been unable to find sufficient demand on Ticketmaster's Secondary Ticket Exchange, and have been unable, at times, to sell their tickets. This has resulted in fewer Warriors tickets being resold and reduced output in the Secondary Ticket Services Market. Although there has been reduced output in the Secondary Ticket Services Market, Ticketmaster has gained a dominant position in that market.

11. In addition to contributing to inefficiency in the Secondary Ticket Services Market, illiquidity in the Secondary Ticket Market, and rising prices for fans, Defendants' anticompetitive conduct has cut StubHub, and other Secondary Ticket Exchange service providers, out of the Secondary Ticket Services Market—ensuring that, among other things, the already-inflated servicing fees will remain artificially high, that consumers will lack competitive choices, and these inefficiencies will continue.

12. These recent changes by Ticketmaster and Golden State in the Secondary Ticket Services Market are unprecedented and reflect a fundamental shift in the industry. The graph below demonstrates just how substantial the impact of Defendants' anticompetitive practices has been, causing the number of listings for Warriors tickets on StubHub to decrease by approximately **80%** during the period that corresponds to and reflects the results of Defendants' anticompetitive conduct:





13.     Moreover, in the last year, the daily number of Warriors tickets sold on StubHub has declined (on a seven day rolling sum basis) by approximately 45% in aggregate.

14.     This dramatic shift in the market is not the result of evolving industry practice, or competitive fervor.  Rather, Ticketmaster's conduct arises out of and has been undertaken to eliminate StubHub because Ticketmaster has not been able to compete with StubHub on the merits.  Ticketmaster had every chance to compete in the Secondary Ticket Services Market and tried to do so:  it entered the Secondary Ticket Services Market after establishing a relationship with Golden State, it had expertise in the commercial realities of the industry, and it had more than sufficient resources to compete for and attract new customers.  And yet, Ticketmaster still failed to attract the business it desired because it failed to provide competitive prices, quality or services.

15.     Ticketmaster's failure to attract customers in the Secondary Ticket Services Market was largely a result of StubHub's competitive response to Ticketmaster's entry.  When Ticketmaster entered the market, StubHub lowered its fees, revised and improved its services, and

never suffered any reduction in quality. StubHub was rewarded for its competitive response by continuing to attract consumers who valued low prices, high quality, important customer services, and the ability to transact ticket resales over a more efficient, user-friendly exchange.

16. There are no legitimate or offsetting procompetitive benefits that justify Defendants' conduct in harming competition in the Secondary Ticket Services Market.

17. StubHub challenges this conduct as a violation of Sections 1 and 2 of the Sherman Act and of California's Cartwright Act. StubHub also challenges this conduct as involving unlawful and/or unfair business acts or practices under California Business and Professions Code Section 17200, as well as tortious interference with prospective economic advantage. Through this action, StubHub seeks to permanently enjoin Defendants from continuing to engage in this anticompetitive conduct and to recover treble damages for the injuries it has suffered therefrom.

## II. JURISDICTION AND VENUE

18. StubHub brings this action under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

19. StubHub also brings this action under California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq*. and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*., to obtain restitution, recover statutory damages, and injunctive relief. And StubHub brings this action under state law prohibiting tortious interference with prospective economic advantage. This Court has supplemental jurisdiction over these pendant California state law claims under 28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the federal antitrust law claims.

20. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to StubHub's claims occurred in this District, and each Defendant transacts business and/or

maintains facilities in this District and thus is subject to personal jurisdiction here. Defendants are engaged in interstate commerce, and their activities, including those that form the basis of this First Amended Complaint, substantially impact interstate commerce.

## III.    THE PARTIES

### A.    Plaintiff

21.    Plaintiff StubHub is a corporation organized and existing under the laws of Delaware. Its principal place of business is 199 Fremont Street, San Francisco, California 94105. It is a wholly-owned subsidiary of eBay Inc.

22.    Founded in 2000, StubHub operates a Secondary Ticket Exchange for resellers and purchasers of tickets in the Secondary Ticket Services Market. Unlike the sale of primary tickets, which are made by the teams themselves (directly or through agreements with others), exchange services are essential to the functioning of the Secondary Ticket Services Market. Secondary Ticket Exchanges offer network services that efficiently and reliably "match" holders of tickets to sporting events, concerts and other forms of live entertainment who wish to resell their tickets with individuals looking to purchase such tickets.

23.    StubHub provides fans a safe, convenient online marketplace for selling and buying tickets. On StubHub's exchange platform, the laws of supply and demand reign and natural market forces spur competition. In managing this marketplace, StubHub charges competitive services fees for exchange services, offers efficient and quality delivery mechanisms and other useful customer services as well as a reliable and valuable Fan Protect Guarantee. As a result of these offerings, StubHub enjoys an extremely favorable reputation among both ticket resellers and buyers of tickets available by resale.

24.    In contrast to Ticketmaster, StubHub has a history of innovating, including being the first to:

- Create an open marketplace for fans dedicated to tickets. When it launched, StubHub was the first and only system entirely automating the process by which individual sellers shipped tickets to buyers and were paid in return.
- Launch a system allowing a seller's proceeds to benefit charities and universities;

- Conduct the first fair market value auction for an entire concert performance; and

- Launch a "PriceMapper" seller tool, enabling users to compare prices of sold tickets with currently listed tickets resulting in an accurate pricing picture for sellers on StubHub.com.

25.     These are just a few examples of StubHub's commitment to continually finding new and improved ways of providing more convenient, secure, and competitive offerings to ticket sellers and buyers alike.

26.     Among the types of tickets sold and purchased on StubHub's Secondary Ticket Exchange are tickets for Warriors basketball games at the Oracle Arena in Oakland, California.

**B.     Defendants**

27.     Defendant Golden State owns the Golden State Warriors NBA professional basketball team.

28.     Defendant Golden State is a limited liability company organized and existing under the laws of California with its principal place of business at 1011 Broadway, Oakland, California 94607.  Historically, Golden State derived revenue from the sale of primary or "first sale" tickets to Warriors games hosted at Oracle Arena, but (until recently) did not generate revenues from the resale of Warriors tickets on Secondary Ticket Exchanges.

29.     Defendant Ticketmaster is a wholly-owned subsidiary of Live Nation Entertainment, Inc.  It is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 7060 Hollywood Boulevard, Hollywood, California 90028.  Ticketmaster is the largest ticketing company and the dominant provider of Primary Ticket Platform services in the U.S. with 2014 revenues of approximately $1.55 billion. Ticketmaster, through its TicketExchange, TicketsNow and TM+ brands, also provides Secondary Ticket Exchange services in the U.S.

30.     Ticketmaster has been the exclusive provider of Primary Ticket Platform services for Golden State for many years, and has been the exclusive Secondary Ticket Exchange partner of Golden State since August 2012.  As discussed more fully below, as part of the

exclusive Secondary Ticket Exchange partnership that Ticketmaster has with Golden State, Golden State promotes Ticketmaster as its only "official" Secondary Ticket Exchange and refuses to allow any other Secondary Ticket Exchange to integrate technically with Ticketmaster's Primary Ticket Platform.  In addition, Ticketmaster is the only "authorized" channel through which Warriors season ticket holders may sell their tickets.

### C.      Co-conspirators

31.      Upon information and belief, various persons, firms, corporations, organizations and/or other business entities, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of these conspiracies.

## IV.      INDUSTRY BACKGROUND

### A.      Warriors Tickets Are a Unique Product without Substitutes

32.      Warriors tickets have no economic substitutes because they are the only tickets that provide entry to professional basketball games that take place in the Bay Area.  Golden State enjoys an exclusive license from the NBA to host NBA games in the Bay Area.  No other team has ever been licensed to host such games and there is no entity that will be so licensed in the foreseeable future.  Moreover, Oracle Arena, the venue where the Warriors play, has a limited amount of seats and, thus, only a limited amount of tickets are sold to each NBA game played in the Bay Area.  Because of this inherent limitation, it is not possible for Golden State to sell more tickets in response to rising demand.

33.      Fans have strong allegiances to their local teams, and the Warriors are no exception.  Warriors fans who root for the likes of particular Warriors players – such as Stephen Curry, Klay Thompson, or Draymond Green – do not consider other NBA team tickets to be a substitute for Warriors tickets.  These fans primarily root for the success of the Warriors and watch the game itself specifically to see the Warriors perform.  Fan preference for the Warriors is so great that the process for obtaining season tickets involves not only a waiting list, but a non-refundable deposit of $100 per full season ticket just to join the waiting list.  According to press reports, as of March 2015, more than 10,000 fans were on the waiting list, and the season ticket renewal rate was over 92% for each of the last three seasons.

34.     Because of the foregoing facts, there is virtually no cross-elasticity of demand between Warriors tickets and tickets to other entertainment events, including tickets to other professional basketball games. The Warriors' closest geographic competitor in professional basketball is the Sacramento Kings, but StubHub sales data show that marginal changes in the prices of Warriors tickets have no correlation to the prices charged for Sacramento Kings tickets, indicating that a Kings ticket is not a substitute for a Warriors ticket. Moreover, the price of a Kings ticket in the primary market is set by the Kings' owners independently and without reference to the price of a Warriors ticket, and Golden State sets the price of a first-sale Warriors ticket independently and without reference to the price of a Kings ticket.

35.     Purchasing behavior on StubHub reflects no material correlation between the price of a Warriors ticket and the price of tickets to any other entertainment events in the Bay Area, suggesting there is no correlation in purchasing behavior for Warriors tickets and, *inter alia*:

a. Tickets to Wrestlemania (professional wrestling);

b. Tickets for University of California-Berkeley Bears basketball and Stanford University Cardinal basketball games (amateur basketball);

c. Tickets for a Kenny Chesney concert (country music);

d. Tickets for Oakland Athletics and San Francisco Giants games (professional baseball);

e. Tickets for Oakland Raiders and San Francisco 49ers games (professional football);

f. Tickets for San Jose Sharks games (professional hockey);

g. Tickets for The Book of Mormon musical production (theater); and

h. Tickets to Sacramento Kings games (professional basketball).

36.     Similarly, StubHub's tracking data reflect that the scarcity of Warriors tickets does not influence ticket prices to events other than to Warriors games.

37.     Moreover, of those StubHub customers who purchased a Warriors ticket between June 2014 and June 2015, 51% **purchased only Warriors tickets**—meaning they purchased no other entertainment ticket through StubHub during the entire year. They did not buy tickets to other professional sports; they did not buy tickets to other country music concerts or

wrestling events; they did not even buy tickets to other forms of basketball, such as collegiate basketball in the Bay Area or tickets to other professional basketball games. In addition, another 25% of those who purchased Warriors tickets during that same period purchased from only one other event category—for example, they purchased only Warriors tickets and a concert ticket, or only Warriors tickets and tickets to another professional sporting event, such as a Giants baseball game. Thus, 75% of all Warriors ticket buyers on StubHub do not buy tickets to a variety of events, but instead are buying exclusively, or almost exclusively, Warriors tickets. This exclusive purchasing behavior reflects that Warriors tickets cannot be substituted with other event tickets because Warriors ticket buyers do not want any other tickets.

38.     This lack of substitutability is also reflected by the fact that Warriors fans would pay and have paid a small, but significant, non-transitory increase in price for Warriors tickets. Indeed, recently Golden State, well before the Warriors won the 2015 NBA Championship, imposed a 30% increase in prices for Warriors season tickets for the 2015-2016 season. Notwithstanding this price increase, consumers still clamored for Warriors tickets: there is a more than 10,000 person waiting list for consumers that seek to purchase season tickets to Warriors games.

39.     Sales of Warriors tickets are not responsive to price changes in tickets to other events. While the price of a Warriors ticket is affected by which opponent the Warriors are playing—whether, for example, the team is playing the Cleveland Cavaliers or the Los Angeles Lakers—the price of a Warriors tickets is not affected when superstar musicians and other entertainers perform in the Bay Area. Thus, a Warriors tickets is not interchangeable with a ticket to another entertainment event. There are no economically realistic substitutes available for Warriors tickets.

**B.     Primary Ticket Platform Services**

40.     Primary Ticket Platform providers, such as Ticketmaster, contract with teams (and other entertainment providers and venues) to provide distribution and support services for primary ticket sales. These are sales made at "face value" directly by the team to fans on a

season ticket, block game, or individual game basis. The majority of these sales are made over the Internet, but they may also be made through the phone, mobile devices, ticket outlets, or the box office. Primary Ticket Platforms are responsible for managing all aspects of the primary ticket sale and distribution process.

41. Fans who seek to buy Warriors season tickets virtually always buy them through the Ticketmaster Primary Ticket Platform, as it is extremely difficult to find resellers that supply season ticket packages. Approximately 75% of Warriors tickets are sold as season ticket packages and virtually all of these are sold through Ticketmaster's Primary Ticket Platform. The remaining Warriors tickets are sold as part of more limited packages, group sales and individual tickets—all through Ticketmaster.

42. The overall price a consumer pays for a primary Warriors ticket generally includes the face value of the ticket plus any number of "service," "convenience," "processing," and/or "delivery" fees added on by Ticketmaster. These additional Primary Ticket Platform fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

43. Primary Ticket Platform providers typically enter into multi-year contracts with the leagues, teams or venues hosting the events. In return for the right to sell their tickets, the Primary Ticket Platform provider shares with them a portion of the Primary Ticket Platform fees collected on the ticket sale.

44. Ticketmaster has been the only provider of Primary Ticket Platform services for Warriors tickets for many years. Warriors fans cannot purchase primary tickets to Warriors regular season or playoff games without conducting the transaction through Ticketmaster.

45. Ticketmaster's long-standing dominance in other primary ticket markets has been acknowledged by antitrust regulators. In fact, a principal reason that the U.S., California and sixteen other states sued to block the merger between Ticketmaster and Live Nation in January 2010 was because of Ticketmaster's dominance in providing Primary Ticket Platform services for musical entertainment events (*i.e.*, concerts). In its complaint to enjoin the Live Nation / Ticketmaster merger, the government emphasized that "[f]or over two decades, Ticketmaster has

been the dominant [Primary Ticket Platform] service provider in the U.S." One of the government's chief concerns was that the merged entity would leverage Ticketmaster's market power over large concert venues to require these venues to use Live Nation for concert promotion services. As part of its agreement to allow the merger to proceed, the government prohibited the merged entity from leveraging Ticketmaster's market power in this way.

46. This was not the only run-in Ticketmaster has had with the government in connection with Ticketmaster's actual or threatened abuse of its dominance in various primary ticket markets. In 2010, the Federal Trade Commission sued Ticketmaster for using its market power in certain primary ticket markets to unfairly and deceptively steer consumers to use Ticketmaster for overpriced services in the related secondary ticket services markets. Specifically, when consumers sought to purchase primary tickets from Ticketmaster for certain concerts, Ticketmaster directed them unknowingly to Ticketmaster's Secondary Ticket Exchange site where it sold tickets at substantially higher prices – up to quadruple the face value. Ticketmaster ultimately settled with the government after, among other things, agreeing to pay refunds to the affected consumers and to stop engaging in the challenged "bait and switch" activity.

### C. Secondary Ticket Exchange Services

47. Secondary Ticket Exchange services providers, such as StubHub and Vivid Seats—provide network distribution and support services for ticket resales. Ticket resales are not made by the team or entity hosting the event, but by a person or entity that already has purchased the ticket. As a result, in most cases, the team or the host entity does not typically obtain income or profits from the resale market. The overall payment made for the resale ticket sold on a Secondary Ticket Exchange is based on the price for the ticket—determined by the reseller and the buyer, and not by the Exchange—plus any service fees that the Secondary Ticket Exchange charges to the buyer and/or seller.

48. Depending on the popularity of the particular team, game or event, the resale ticket price may vary from face value. The variance in price reflects competitive pressures relevant to any specific ticket at the time that the resale transaction takes place. That this variance in price is generated by competitive supply and demand characteristics reflects that tickets sold

through a Secondary Ticket Exchange are sensitive to supply and demand conditions, setting them apart from tickets sold through a Primary Ticket Exchange, which are typically sold universally at face value or at some universally discounted rate.

49.     The following pricing data for Warriors tickets sold through StubHub in September, November, and December of 2013 and 2014 demonstrate how ticket prices on StubHub's Secondary Ticket Exchange are susceptible to market forces and are therefore constantly changing. These data show, for example, that on September 4, 2013, the daily average price of a Warriors ticket sold on StubHub was $35, and, a mere six days later, on September 10, 2013, the price increased substantially to $129, the highest average daily price for a Warriors ticket sold in September 2013. Similarly, in November 2014 the daily average price of a Warriors ticket ranged from $73 on November 14, 2014, to $155 on November 1, 2014. Daily transaction and inventory data also show the highly variable nature of StubHub's marketplace.

|  | September 2013 | September 2014 |
|---|---|---|
| **Daily Transactions** | High: 248 on Sept. 12<br>Low: 28 on Sept. 1 | High: 162 Sept. 10<br>Low: 32 on Sept. 1 |
| **Daily Inventory** | High: 164,306 on Sept. 30<br>Low: 123, 139 on Sept. 1 | High: 22,512 on Sept. 5<br>Low: 34,955 on Sept. 29 |
| **Daily Average Price** | High: $129 on Sept. 10<br>Low: $35 on Sept. 4 | High: $192 on Sept. 10<br>Low: $66 on Sept. 6 |
|  | **November 2013** | **November 2014** |
| **Daily Transactions** | High: 1,976 on Nov. 12<br>Low: 417 on Nov. 28 | High: 1,193 on Nov. 13<br>Low: 275 on Nov. 23 |
| **Daily Inventory** | High: 164,504 on Nov. 1<br>Low: 140,415 on Nov. 30 | High: 50,604 on Nov. 3<br>Low: 41,612 on Nov. 17 |
| **Daily Average Price** | High: 117 on Nov. 23<br>Low: $56 on Nov. 12 | High: $155 on Nov. 1<br>Low: $73 on Nov. 14 |
|  | **December 2013** | **December 2014** |
| **Daily Transactions** | High: 2,151 on Dec. 18<br>Low: 328 on Dec. 29 | High: 1,362 on Dec. 2<br>Low: 376 on Dec. 26 |

| | | |
|---|---|---|
| **Daily Inventory** | High: 139,874 on Dec. 1<br>Low: 99,177 on Dec. 31 | High: 43,660 on Dec. 1<br>Low: 23,751 on Dec. 29 |
| **Daily Average Price** | High: $112 on Dec. 25<br>Low: $53 on Dec. 3 | High: $183 on Dec. 19<br>Low: $84 on Dec. 2 |

50.     One would expect that if other events constrained the prices of Warriors tickets sold in the Secondary Ticket Services Market, there would not be such varied pricing. Indeed, such variation in pricing is anticipated only when the price is not constrained by supply and demand for tickets to a multitude of other events, but instead by the supply and demand of only that event.

51.     There are many reasons why purchasers of Warriors tickets may want to resell their tickets on a Secondary Ticket Exchange.  Out of the 41 Warriors games held at Oracle Arena each season, fans may be unable to attend a few because of an unexpected scheduling conflict or illness.  They may no longer want to attend a particular game because of a lack of enthusiasm or interest if the team is performing poorly.  Or they may simply want to resell the tickets to earn a profit or otherwise subsidize or allow for their purchase of additional tickets, as is often the case with season ticket holders.

52.     There are likewise many reasons why consumers choose to purchase Warriors tickets by resale through a Secondary Ticket Exchange.  The game might be sold out or the desired tickets might otherwise be unavailable from the Primary Ticket Platform.  Or the purchaser might be able to find a better price or seat on the Secondary Ticket Exchange.

53.     Secondary Ticket Exchanges are an essential part of the ticket resale process. They perform a "matchmaking" function between resellers and resale ticket buyers. Without such exchanges, it would be extremely costly for prospective resellers and purchasers of resale tickets to locate one another or to assess overall supply and demand for the resale of tickets. In addition, Secondary Ticket Exchanges are able to effectively eliminate the otherwise high cost and risk incurred by buyers of resale tickets that are involved in determining the legitimacy of the reseller. Such exchanges, therefore, satisfy the distinct demands of resellers and resale ticket

purchasers, and make less costly and more efficient the process of putting potential resellers and buyers together. They do this by offering resellers the widest possible audience of potential purchasers and, at the same time, offering potential purchasers the widest inventory of tickets available for resale.

54.     The network services offered by a particular Secondary Ticket Exchange, such as StubHub, become more valuable to potential ticket buyers as the number and quality of tickets listed on that Exchange by resellers increases.  Moreover, the network services offered by that Exchange become more attractive to resellers in proportion to the number of potential ticket buyers frequenting the Exchange.  Conversely, the network benefits offered both to potential ticket buyers and sellers that utilize a given Secondary Ticket Exchange are reduced when fewer would-be sellers and buyers visit the site, resulting in reduced quantities and varieties of available seats and fewer purchasers interested in obtaining them.  These benefits—often referred to as network effects—are common in two-sided markets[2] like Secondary Ticket Exchanges, and reflect a distinguishing characteristic of Secondary Ticket Exchange services.

55.     The innovations offered by Secondary Ticket Exchanges and StubHub in particular have not always been available to fans.  Prior to the turn of the century, many states had what were referred to as "anti-scalping" laws, which barred the reselling of primary tickets or restricted the terms under which they could be resold.  Virtually all states have since rescinded these rules, recognizing the many consumer benefits of allowing ticket resales.

56.     After the repeal of these reseller prohibition laws, the majority of ticket resales were made by small resellers with limited ticket inventory.  Secondary sales, at this time, were not robust because sellers confronted substantial costs for advertising their inventory, and purchasers had to invest substantial costs into finding secondary tickets that they wanted to buy.

---

[2] A two-sided market is an economic platform with two distinct user groups—in this case buyers and sellers of secondary Warriors tickets—that provide each other with network benefits.

57.     Then StubHub came along.  StubHub helped to solve these cost issues for buyers and resellers and, in turn, helped to spark substantial growth in secondary sales.  Through StubHub's strong Internet presence, its consumer-oriented approach, and its various innovations that substantially reduce fraud and increase consumer confidence in its Secondary Ticket Exchange transactions, consumers came to trust and rely upon StubHub for Secondary Ticket Exchange services.  StubHub helped to transform reselling from an often unreliable and economically dangerous activity to a legitimate and safe one.

58.     With the growing consumer demand for conducting ticket transactions through Secondary Ticket Exchanges that StubHub has been in the forefront of establishing, and concerned with the threat that StubHub posed to Ticketmaster's longtime control of ticketing, Ticketmaster entered the Secondary Ticket Services Market during the last decade.

59.     As reported in the media, Ticketmaster followed StubHub's leading innovation by creating a Secondary Ticket Exchange in an attempt to replicate the functions of StubHub's offerings.

60.     After Ticketmaster's entry, StubHub, in a widely publicized move, slashed buyers' fees from 10 percent to around 2 percent—a drastic reduction designed to appeal to consumers and improve sales.  Such a move shows competition at its best, with consumers benefiting in the form of more choice and lower prices.

61.     Electing not to compete on price, Ticketmaster did not follow StubHub's price reduction.  Instead, Ticketmaster sought to protect and even increase its fees by engaging in anticompetitive behavior.  Ticketmaster secured exclusive arrangements with Golden State to become the exclusive provider of Secondary Ticket Exchange services for Warriors tickets.

62.     In doing so, Ticketmaster's anticompetitive conduct does not reflect the evolution of an industry, the emergence of a new form of competition, or innovation.  Instead, by forcing consumers to use Ticketmaster's Secondary Ticket Exchange services, Ticketmaster is classically anticompetitive, ensuring less choice at higher prices.

63.     Ticketmaster has publicly defended its anticompetitive practices by arguing that primary ticket suppliers benefit because, if ticket buyers see listings for primary tickets next to listings for secondary tickets, buyers are purportedly more likely to purchase the primary tickets. Such a justification has no application to Warriors tickets, however.  Indeed, rather than buttressing Ticketmaster's justification, it instead shows the anticompetitive intentions of its agreement with Golden State.  Golden State consistently sells out of primary tickets and therefore there are no primary ticket sales to boost.  In this instance, therefore, the defense is inapposite. Rather, Ticketmaster is seeking to exclude competition so that it can earn monopoly profits in the resale of tickets on its Secondary Exchange—profits that it is willing to share with Golden State because of the essential role played by Golden State in enabling Ticketmaster to successfully implement the anticompetitive scheme.

## V.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.     Defendants' Foreclosure of Competition in the Secondary Ticket Services Market

64.     Since 2012, Golden State and Ticketmaster have had an exclusive arrangement pursuant to which they share service fees for Warriors ticket sales completed over Ticketmaster's Secondary Ticket Exchange.  Hence, Ticketmaster and Golden State get two bites at collecting services fees associated with Warriors ticket sales – once when the ticket is originally sold in the Primary Ticket Market, and again when the primary purchaser resells the ticket through the Secondary Ticket Services Market using Ticketmaster's Secondary Ticket Exchange.  Through this arrangement Golden State began to realize revenue from the previously untapped Secondary Ticket Services Market.

65.     Given this relationship, Golden State and Ticketmaster are driven by the common goal to capture additional sales from their exclusive Secondary Ticket Exchange relationship, but not by offering a superior product or lower prices.  Indeed, Ticketmaster's Secondary Ticket Exchange for Warriors tickets has been reported as charging a 33 percent higher

service fee than competing platforms.  Instead of competing lawfully, Ticketmaster and Golden State have taken a series of interconnected, anticompetitive actions with the intended purpose, and resulting effect, of excluding competing Secondary Ticket Exchange providers such as StubHub.

66.     In particular, as an integral part of this anticompetitive conduct, Defendants contractually mandate that any resale of Warriors season tickets be done only through the Secondary Ticket Exchange operated by Ticketmaster.  To enforce and reinforce that contractual commitment, Defendants have (1) explicitly precluded, or threatened to preclude, season ticket holders from purchasing primary season tickets or playoff tickets unless they agree to resell exclusively on Ticketmaster's Secondary Ticket Exchange; (2) monitored season ticket holders' resales and cancelling season ticket subscriptions for those ticket holders that have used competing Secondary Ticket Exchanges, such as StubHub; (3) engaged in a false and misleading advertising campaign designed to cast doubt upon the reliability and authenticity of tickets purchased on competing Secondary Ticket Exchanges, particularly StubHub; and (4) denied competing Secondary Ticket Exchanges, including StubHub, the ability to technologically integrate with Ticketmaster's Primary Ticket Platform, unnecessarily raising the costs of providing a safe and secure resale exchange.

1.     *Defendants' Forcing of Ticket Holders to Use Ticketmaster Exclusively for Resale.*

67.     Golden State, as part of an agreement with Ticketmaster, has refused to sell or threatened to refuse to sell Warriors season and/or playoff tickets to season ticket holders, unless the season ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services.  Golden State has explicitly forced this contractual provision upon ticket purchasers as part of the "Terms and Conditions" to which every Warriors season ticket holder must agree. Specifically, the Warriors "Non-Transferability" rule states: "Sale or resale of any [Warriors] tickets by unauthorized means is prohibited . . . . **Authorized resale of your tickets via online means is limited to [Ticketmaster's] NBAtickets.com**." [Emphasis added].  Although there is no ambiguity in these restrictions, one season ticket holder asked Golden State to confirm what it considered an "unauthorized means" of selling secondary tickets.  Golden State responded: "Any tickets being resold outside" of Ticketmaster.

68.     In addition to this explicit contractual restriction, Golden State also has directly threatened ticket holders with season ticket cancellation on numerous occasions if those ticket holders did not resell their tickets through the Secondary Ticket Exchange operated by Ticketmaster. This has been confirmed by numerous season ticket holders who have been the subject of this retaliatory action for refusing (or at least trying to refuse) to comply with these restrictive sales practices. As one ticket holder explained:

> Prior to the season, the Golden State Warriors had told us that they were forcing brokers to exclusively list on TM+, the official resale marketplace for the NBA. We decided not to oblige and see what transpired. Today (late-December 2014), I got a phone call from the Golden State Warriors concerning this same situation. . . . For the 11 home games so far this season, our breakdown of TM+ sales were below their standards. . . . If we followed their request from the beginning of the season, our numbers should be 100% sold via TM+ across the board. Given this disparity, the Golden State Warriors stated that if this number didn't improve with our remaining inventory to close to 100%, we would not be given playoff invoices and not have the option to renew our seats for the upcoming season; but, if we were to oblige their current request and sell exclusively through TM+, our accounts would be 'all set.' . . . We have stopped listing on StubHub.

69.     According to one Golden State sales representative, they have been instructed to "hammer" home the point – sell outside of Ticketmaster, and we will cut you off.  In a communication with a season ticket holder, he stated: "I have to make sure I hammer that 'we have the option to offer playoff tickets and a renewal at the end of each season to all ticket holders. Moving forward, we would like you to sell tickets solely through NBAtickets.com [*i.e.*, Ticketmaster's Secondary Ticket Exchange].  Brokers who choose to go this route will be in better standing to continue business with the team.'"

70.     In some cases, Golden State has specifically identified StubHub as being particularly off-limits and has warned season ticket holders even more forcefully that selling through StubHub would result in cancellation of the ticket holder's Warriors ticket subscription.

71.     This restrictive resale policy also has been confirmed by numerous other season ticket holders, many of whom have complained to Golden State that limiting their secondary sales to Ticketmaster significantly hinders their ability to make such sales.  As one season ticket holder recounted, when he told a Golden State representative that selling only

through Ticketmaster "is tedious and borderline impossible for the amount of seats that I have," the representative pushed back intractably: "Well, you'd better figure out how to get on [Ticketmaster's] Tickets Now quickly." According to the season ticket holder, "it was more of a threat than a suggestion or recommendation."

72. Another season ticket holder recalled a conversation with a Golden State representative in which he objected to this restrictive sales policy. That ticket holder reported that the Golden State representative "didn't care very much when I brought up the generally accepted view that their [Ticketmaster] site is a very inferior product, from both the buyer and sellers vantage point." The ticket holder went on to further note that this policy and the conduct enforcing it "seemed more like a Mafia tactic . . . than [that of] a supposedly fan friendly sports franchise."

73. Other season ticket holders who similarly complained to Golden State about its restrictive practices also have confirmed that Golden State would not agree to rescind the policy when faced with ticket holder complaints. To the contrary, in these conversations, Golden State required season ticket holders to acknowledge that they were complying with this restrictive policy. Specifically, Golden State forced ticket holders to confirm that they had removed resale listings for Warriors tickets that they formerly had posted on Secondary Ticket Exchange sites that competed with the Golden State/Ticketmaster Exchange.

74. Through these coercive measures Golden State is leveraging its monopoly power over the sale of primary Warriors' tickets to control and capture revenue from the last place in the industry where it has not previously seen revenue from its operations—the secondary ticket market. Warriors fans with deep allegiances to their team and a fervent, yet simple desire to see the team play, are at the behest of this dominant market power and, when faced with these exploitive tactics, have no choice but to use Ticketmaster's Secondary Ticket Exchange. This absence of meaningful choice harms consumers through higher prices, lower product quality and less choice.

2.    *Defendants' Monitoring of Secondary Sales to Enforce Compliance with Their Restrictive Resale Policy.*

75.    In order to ensure that their season ticket holders are complying with these restrictive ticketing practices, Golden State and Ticketmaster now closely monitor secondary ticket transactions to identify and take action against those selling through StubHub and other competing Secondary Ticket Exchanges. Golden State has been very open about this tactic to make season ticket holders fully aware that if a season ticket holder sells outside of Ticketmaster, Golden State and Ticketmaster will know about it and will bar that ticket holder from future transactions. The practice of monitoring and threatening ticket holders with cancellation is particularly effective in enforcing Defendants' exclusionary scheme because it is unnecessary for Golden State to actually take action against all ticket holders for it to be effective. The perceived risk of such punitive action is sufficient to obtain widespread compliance.

76.    This open and pervasive monitoring effort has been confirmed by numerous season ticket holders in their communications with Golden State. In those communications, it was stated that Golden State wanted season ticket holders to resell through Ticketmaster's Secondary Ticket Exchange and that Golden State did not want to see tickets posted on other sites such as StubHub. Moreover, Golden State explicitly informed season ticket holders that both it and Ticketmaster would be monitoring resales throughout the season and again threatened that it "reserve[d] the right" not to offer 2015-2016 renewals and 2015 playoff ticket access to ticket holders that did not comply with the Defendants' restrictive sales policy. For example, ticket holders reported in writing that:

- The Golden State Warriors stated that by using actual seat data from [Ticketmaster's] TM+, where they were able to see exact seat numbers, section, row and the price of tickets that were sold, they were able to see how many tickets we had sold via TM+. This combined with sales data from StubHub . . . allowed them to cross reference how much inventory had been sold by each account. . . . [The] Warriors stated that if this number didn't improve . . . to close to 100% [Ticketmaster], we would not be given playoff invoices and not have the option to renew our seats for the upcoming season.

- The [Warriors/Ticketmaster] plan was to coerce season ticket holders into listing exclusively on the Warriors Ticketmaster exchange. Their primary tactic will be to monitor Stubhub and some other exchanges, and when they see tickets on site, they will (and I paraphrase here) "Call the STH with a warning, and should the infractions continue, refuse to sell the STH any playoff tickets, and possibly not renew the following season."

77. The concerted efforts in which Golden State and Ticketmaster have engaged to force ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange sales has had a direct and immediate impact on StubHub's ability to compete in the Secondary Ticket Services Market. There has been an approximate 80 percent drop in StubHub's Warriors inventory since Ticketmaster and Golden State began imposing – by threats and monitoring and now contract – their exclusionary rule on the majority of their ticket holders.

3. *Defendants' Actions Reinforce the Foreclosing Effect of Their Restrictive Resale Policy.*

78. Defendants also have taken additional steps to reinforce and exacerbate the exclusionary impact of their restrictive sales policy, including through deceptive communications aimed at competitors and further actions that have artificially inflated their costs of doing business.

79. Under their exclusive arrangement, Ticketmaster is the only provider of Secondary Ticket Exchange services that Golden State will market and promote to consumers seeking to buy or sell secondary tickets. The marketing and promotion of Ticketmaster's Secondary Ticket Exchange in this regard is substantial. The official Warriors ticketing website (http://www.nba.com/warriors/tickets/single), states that it contains "the only **100% guaranteed official resale tickets** posted by Warriors Season Ticket Holders in one place" (emphasis in original).

80. Golden State and Ticketmaster have employed their joint marketing activities in an effort to mislead consumers into believing that Ticketmaster is the only safe or effective Secondary Ticket Exchange option they have, or the only one that can be trusted to provide a "guaranteed" or "official" Warriors ticket. For example, on August 13, 2014, Golden State issued a "fraud alert" for the 2014-2015 season "warning fans about the potential dangers of purchasing single-game tickets for the 2014-15 season from a non-verified third party" and

advising consumers to use only their "official" resale ticketing partner—Ticketmaster. These actions reinforce and exacerbate the foreclosing effect of Defendants' conduct, demonstrate their specific intent to monopolize the Secondary Ticket Services Market, and make it more likely that Defendants' actions will achieve their illegal ends.

81.     The Golden State agreement with Ticketmaster also provides that Golden State will allow only Ticketmaster's Secondary Ticket Exchange to technically integrate with its Primary Ticket Platform provider, which is also Ticketmaster.  Defendants have established this limitation not for any legitimate purpose designed to facilitate the efficient operation of primary or secondary sales.  Rather, they have done it to further disadvantage equally-efficient or more efficient Secondary Ticket Exchange competitors by raising their costs of protecting against fraudulent sales.

82.     StubHub, in fact, utilizes substantial and reliable mechanisms to protect purchasers on its site.  It is a moderated marketplace which ensures that resellers who have previously engaged in deception are blocked from using the StubHub site.  StubHub also provides kiosks at or near the venues where ticket purchasers can obtain alternative inventory if they encounter a problem.  Moreover, through its robust Fan Protect Guarantee, StubHub ensures that all buyers receive the ticket they purchased or their money back.  As a result of StubHub's consumer friendly practices, incidences of fraud on StubHub's are extremely minimal and consumers suffer any consequences of fraudulent sale in only the rarest of cases.

83.     Defendants, however, suggest that their fraud protections are superior to those offered by other Secondary Ticket Exchanges, such as StubHub.  They rely on their refusal to allow technical integration between Ticketmaster's Primary Ticket Platform and competitive Secondary Ticket Exchanges willing to integrate, such as StubHub, to buttress their invalid claims of heightened security.  Were Golden State genuinely concerned with security and authenticity issues, it could take and would have taken steps to allow other networks to integrate technologically with its Primary Ticket Platform.  But it does not and it has not.  This is

particularly notable since StubHub was the primary venue for reselling Warriors tickets in the Secondary Ticket Services Market prior to the Defendants' anticompetitive activity. If Golden State were truly worried about security and authenticity concerns, it would have offered—or perhaps insisted—that StubHub be integrated.

84.     These tactics are further evidence of Golden State and Ticketmaster's concerted efforts to impose higher prices on their customers to reap service fees and profits that they could not earn in a competitive Secondary Ticket Services Market. This conduct is harmful to competition and consumers alike.

## VI.     RELEVANT MARKETS

85.     There are two relevant antitrust markets in this case: (1) the primary market for the sale of tickets to professional basketball games in the Bay Area (the "Primary Ticket Market") and (2) the market for the sale of Secondary Ticket Exchange services for tickets to professional basketball games in the Bay Area (the "Secondary Ticket Services Market"). Defendants have used their control over the Primary Ticket Market to exclude competition, raise prices and reduce output in the Secondary Ticket Services Market.

### A.     The Primary Ticket Market

86. The Primary Ticket Market is a relevant antitrust market in this case. This distinct and relevant market consists of the sale of "primary" or fist-sale professional basketball tickets by Golden State through a primary distribution network, or a Primary Ticket Platform. There are no economic substitutes for Warriors tickets for Warriors fans. The Warriors have a strong local fan base in the Bay Area, and Warriors fans have demonstrated team loyalty that is well above-average, as observed by the media and opposing teams' coaches and players.

87.     Moreover, there are no economic substitutes for buying or selling Warriors tickets through Primary Ticket Platforms. Primary Ticket Platforms offer a convenient medium through which fans purchase tickets directly from Golden State. Notably, virtually all sales of Warriors season ticket packages are conducted through Ticketmaster's Primary Ticket Platform.

Consumers seek to purchase individual Warriors tickets via Ticketmaster's Primary Ticket Platform because: (i) these tickets generally become available on that Primary Ticket Platform well before they appear on Secondary Ticket Exchanges; and (ii) face value tickets are often priced lower than resale tickets.

88.     Accordingly, both Golden State selling the tickets, and the fans buying the tickets, have no reasonable alternative to which they could turn to buy or sell primary Warriors tickets. In particular, there are no economic substitutes for Warriors season tickets sold on a Primary Ticket Platform for Warriors fans. Even a significant, non-transitory price increase in Warriors season tickets sold through a Primary Ticket Platform would not cause any significant amount of consumers to purchase Warriors tickets on a Secondary Ticket Exchange. Consequently, a monopolist of Warriors tickets sold through a Primary Ticket Platform (*i.e.*, Golden State) can profitably impose a significant, non-transitory increase in the prices that it charges for such Warriors tickets. In fact, Golden State has done just that when it increased ticket prices for the 2015-2016 season by 30% without any drop in demand for Warriors season tickets.

89.     The geographic dimension of the Primary Ticket Market is the San Francisco – Oakland – Fremont Metropolitan Statistical Area (MSA), or the Bay Area. It is in this geographic area that Golden State could profitably impose, and has profitably imposed, a significant, non-transitory increase in price of Warriors tickets sold over Primary Ticket Platforms.

**B.     The Secondary Ticket Services Market**

90.     The Secondary Ticket Services Market is also a relevant market in this case.

91.     Tickets purchased through a Secondary Ticket Exchange are distinct from those purchased on a Primary Ticket Platform. Tickets purchased on the Primary Ticket Platform are always bought at face value. Naturally, there are differences in price based upon the quality of the seat being offered, *e.g.*, its proximity to the floor, access to certain stadium amenities, etc. However, the ultimate price paid is not subject to the same fluctuations that occur over time in the price of tickets sold in the Secondary Ticket Services Market.

92. In the Secondary Ticket Services Market, a ticket's value is not only influenced by those factors that contribute to face value pricing, but also the potentially ephemeral demand for viewing a particular game and the supply of other tickets to the same game. For example, the prices for Warriors tickets sold in the Secondary Ticket Services Market are higher for dates when nationally known players like LeBron James, Kevin Durant, and James Harden are in town.

93. There are no economic substitutes for professional basketball tickets sold through a Secondary Ticket Exchange to the Warriors fan purchasing the resale ticket. As with primary ticket purchasers, from the perspective of a Warriors resale ticket purchaser, there is no reasonable substitute for tickets to a Warriors game.

94. StubHub, Ticketmaster and other operators of Secondary Ticket Exchanges compete to provide services for the resale of Warriors tickets in the Secondary Ticket Services Market. Primary Ticket Platforms do not compete with Secondary Ticket Exchanges, and cannot substitute for Secondary Ticket Exchanges.

95. As described above, Primary Ticket Platforms and Secondary Ticket Exchanges are very different and the sellers in the two platforms are entirely distinct. Only Golden State sells tickets through Primary Ticket Platforms and the only way to become a seller on a Secondary Ticket Exchange is to have previously purchased a ticket to attend a Warriors game in the primary market.

96. Moreover, there are significant network effects in Secondary Ticket Exchanges that make the Primary Ticket Platforms and Secondary Ticket Exchanges poor substitutes for one another. For example, as with most networks, as the number of buyers and sellers increase in a Secondary Ticket Exchange, there is greater liquidity and lower transaction costs. A larger number of buyers are connected with a larger number of sellers, which facilitates efficient transactions in the market. The network effects of a Secondary Ticket Exchange are unique and different from any effects exhibited in Primary Ticket Platforms, and thus buyers of tickets in the Secondary Ticket Services Market do not consider the Primary Ticket Market to be a substitute.

97.     Moreover, resellers of Warriors tickets are precluded from using the Primary Ticket Platform to sell tickets because Primary Ticket Platforms are the exclusive tool of Golden State for distributing Warriors tickets.

98.     There are several additional factors that further support the separate and distinct nature of the Secondary Ticket Services Market:

- There is distinct demand for Primary Ticket Platform and Secondary Ticket Exchange services, which allow for suppliers to provide one of them but not the other. On the one hand, Paciolan (a competitor of Ticketmaster) provides only Primary Ticket Platform services, and not Secondary Ticket Exchange services, to certain NBA teams. On the other hand, StubHub sells only Secondary Ticket Exchange services, and not Primary Ticket Platform services, for NBA tickets.

- Primary Ticket Platform services and Secondary Ticket Exchange services for Warriors tickets are subject to distinct customer demand and pricing based on the inherent differences between primary tickets and tickets purchased by resale. Primary tickets are sold by the team and priced by the team. Resale tickets are sold by ticket holders and priced according to agreement between the reseller and buyer. Furthermore, resale ticket purchases are often made because the primary tickets are sold out or otherwise unavailable at the desired price and location.

- The Antitrust Division of the Department of Justice recognized the existence of relevant and distinct markets in its action to block the 2010 merger of Ticketmaster and Live Nation. Indeed, the principal basis for the government's action was that the proposed transaction was likely "to lessen competition substantially for primary ticketing services to major concert venues located in the United States . . . ." The government separately identified a "secondary ticketing market" there, noting that "[s]econdary ticketing companies provide services that facilitate the resale of tickets . . . ."

- The Federal Trade Commission likewise recognized a relevant and distinct market for a Secondary Ticket Services Market in its action against Ticketmaster for engaging in deceptive "bait-and-switch" steering of consumers to its Secondary Ticket Exchange platform. The agency noted that, in addition to Ticketmaster's business of providing "primary ticketing services," it also provides "a ticket resale marketplace where consumers can buy event tickets that are being offered by resellers . . . on the so-called 'secondary market.'"

- Ticketmaster also recognizes the distinct nature of these two markets. In its 2014 SEC Form 10-K, Ticketmaster/Live Nation identified the existence of a "secondary ticket sales market."

- The NBA has acknowledged the distinction between the two markets, including in its press release announcing a new deal with Ticketmaster, where it noted that Ticketmaster had solutions for both the primary and resale markets.

99.     The geographic dimension of the Secondary Ticket Services Market is the San Francisco – Oakland – Fremont Metropolitan Statistical Area (MSA), or the Bay Area. The vast majority of all purchases of Warriors tickets through a Secondary Ticket Exchange are made by consumers located in the Bay Area.

## VII.   MARKET POWER

100.    Golden State wields substantial market power over consumers seeking to purchase Warriors tickets, including season ticket subscriptions, in the Primary Ticket Market.

101.    Golden State – the issuer of all Warriors tickets in the Primary Ticket Market and the entity responsible for putting the Warriors basketball team on the court – has monopoly power over the Primary Ticket Market.  As described above, there are no economic substitutes for Warriors games for fans of the Warriors.  This is particularly true, as there is no NBA franchise other than the Warriors in the Bay Area:  for Bay Area residents to see live NBA action, they must attend Warriors games or otherwise travel significant distances.  In addition, because of loyalty, fans of the Warriors are not interested in substituting other products, including but not limited to other NBA games or other forms of live entertainment.  Accordingly, Golden State has substantial power over the prices charged for Warriors tickets.  And Golden State has exercised this power historically by raising price, including by raising the price of Warriors season ticket packages for the 2015-2016 season by 30%.

102.    Golden State's economic power is also evidenced by its ability to force consumers to resell their Warriors tickets only on Ticketmaster's Secondary Ticket Exchange. As stated above, as part of its anticompetitive practices along with Ticketmaster, its exclusive Primary Ticket Platform and Secondary Ticket Exchange partner, Golden State coerces Warriors season ticket holders and other wholesale ticket purchasers to use Ticketmaster Secondary Ticket Exchange services exclusively.  Golden State has a vested interested in this arrangement because it generates revenues from the fees levied on Warriors tickets sold through Ticketmaster's secondary platform.  To protect this vested interest, Golden State has delivered on its threats that the penalty for violating the Golden State resale policy is the potential forfeiture of future season and playoff

ticket packages to Warriors games. As a result of this policy, and the fear of reprisal, numerous Warriors ticket holders have forgone using competitive Secondary Ticket Exchanges, such as StubHub, and have, instead, only used Ticketmaster. This forcing is direct evidence of the market power of Golden State.

103. Based on its participation in the anticompetitive scheme, Ticketmaster has obtained a significant share of the Secondary Ticket Services Market and, upon information and belief, has sold more than 50% of all Warriors tickets sold in the Secondary Ticket Services Market since Defendants began their anticompetitive scheme. Moreover, given the exclusionary nature of Defendants' conduct and Ticketmaster's share of sales in the Secondary Ticket Services Market, Ticketmaster has a dangerous probability of successfully monopolizing the Secondary Ticket Services Market.

## VIII. HARM TO CONSUMERS, COMPETITION AND STUBHUB

104. Defendants' coordinated efforts to control the Secondary Ticket Services Market—based on forcing of season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services; their monitoring of resale exchanges to ensure compliance with their exclusive arrangement; their deceptive marketing and promotion; and their exclusive marketing, promotion and technical integration—has harmed competition, and threatens to harm competition even further.

105. Defendants' conduct has significantly limited, and threatens to significantly limit even further, the number of Secondary Ticket Exchange providers through which Warriors ticket holders can resell their tickets. In the words of one season ticket holder whom Golden State "forced [] to sell on the TM exchange only . . . [t]his is of course an attempt to control the market."

106. If Defendants have their way, there will be only one Secondary Ticket Exchange – Ticketmaster's. By reducing the Secondary Ticket Exchanges on which their Warriors ticket inventory may be listed, the Defendants are significantly limiting the ability of resellers to sell their tickets: far fewer eyeballs review a reseller's inventory when it is limited to posting such inventory on one, as opposed to multiple, exchanges. Resellers have reported that

they have suffered substantial, adverse economic consequences as a result of having their ticket inventory available only to potential buyers that visit Ticketmaster's single (and inferior) Secondary Ticket Exchange, including adverse consequences in terms of price, services and quality.

107. Indeed, by precluding resellers from using competitive Secondary Ticket Exchanges to sell their tickets—particularly, by limiting resellers from using StubHub, a trusted and superior distribution source—Defendants have caused resellers of Warriors tickets to lose sales altogether. This has reduced output in the Secondary Ticket Services Market.

108. The reduced or complete lack of competition resulting from Defendants' misconduct also subjects Warriors season ticket holders and other secondary ticket sellers to Ticketmaster's supra-competitive Secondary Ticket Exchange service fees and associated charges. As one season ticket holder, whom Golden State cut off for selling through StubHub, so starkly put it: "This is creating a very scary monopoly and eliminating competition that will only drive prices higher for the consumer."

109. This is especially true when one considers StubHub's efforts to compete as an efficient Secondary Ticket Exchange through innovation, ease and service to consumers, choice, authenticity, and price. For example, StubHub has, in the past, lowered seller fees to attract resellers. However, due to Defendants' forcing, Warriors season ticket holders and other resellers cannot take advantage of StubHub's lower fees, but must pay the artificially high Ticketmaster fees that are unconstrained by competition.

110. This conduct also has harmed buyers of secondary Warriors tickets. Defendants' conduct has significantly limited, and threatens to significantly limit even further, the number of Secondary Ticket Exchange providers through which buyers of secondary Warriors tickets can purchase tickets in the Secondary Ticket Services Market. Again, if Defendants have their way, there will be only one such source of resale tickets – Ticketmaster. Like the resellers of these tickets, purchasers of Warriors resale tickets are also subject to increased Secondary Ticket Exchange service fees and associated charges because of the reduced or complete lack of competition resulting from Defendants' misconduct. StubHub, on the other hand, attempts to

vigorously compete on innovation, convenience, service, selection, authenticity and price in order to attract purchasers of secondary tickets to its Secondary Ticket Exchange. For example, the *Wall Street Journal* article noted above stated that "StubHub has slashed buyer's fees to as little as 2% from 10% of the base ticket price." Due to Defendants' forcing, purchasers of Warriors resale tickets cannot take advantage of StubHub's lower fees, but rather must pay Ticketmaster's substantially higher fees that are unconstrained by competition.

111. Not only has Defendants' exclusionary conduct harmed and distorted network competition in general, it also has harmed StubHub and other Secondary Ticket Exchange services providers specifically. Defendants have foreclosed them from competing against Ticketmaster on the merits and have substantially increased their costs of attempting to compete on a level playing field.

112. The benefits of the network "matchmaking" services that StubHub is able to provide to prospective resellers and buyers have been artificially diminished as a result of Defendants' conduct. This conduct has caused resellers to list a substantially smaller number of Warriors tickets on StubHub despite its superior pricing, service and reputation for offering a wide and desirable range of choices to purchasers. This, in turn, has caused potential purchasers of Warriors tickets to frequent StubHub less often since these purchasers now find a substantially smaller volume and selection of Warriors tickets on the StubHub Exchange. In other words, Secondary Ticket Exchanges, such as StubHub, have incurred substantial harm as a direct result of the negative network effects flowing from Defendants' restrictive conduct. These negative network effects will render it increasingly difficult, and ultimately impossible, for competing Secondary Ticket Exchanges to compete in the Secondary Ticket Services Market. The spillover effects of these negative network effects will, in addition, make it increasingly difficult over time for them to compete in offering Exchange services for other types of tickets as well.

113. In addition to harming consumers, Defendants' conduct has had a substantial effect on StubHub's business. Its inventory of Warriors tickets has decreased by approximately 80% compared to last year and the number of Warriors tickets sold through

StubHub has decreased by approximately 45%. Defendants' conduct threatens StubHub (and other Secondary Ticket Exchanges) with potentially even greater harm in the future.

114. Defendants' conduct has artificially increased the share of Warriors tickets sold through Ticketmaster's Secondary Ticket Exchange to, at a minimum, in excess of 50%.

## IX. CLAIMS FOR RELIEF

### FIRST CLAIM

**Section 1 Unlawful Tying (*Per Se* or Rule of Reason)**
**(Golden State and Ticketmaster)**

115. StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

116. Defendants' conduct in foreclosing competition in Secondary Ticket Services Market for Warriors tickets constitutes an illegal tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

117. The Primary Ticket Market and the Secondary Ticket Services Market are distinct and separate markets. Warriors tickets sold in the Primary Ticket Market and Secondary Ticket Exchange services are distinct products.

118. Golden State possesses substantial market power over the sale of Warriors tickets in the Primary Ticket Market. For those seeking to purchase primary Warriors tickets, there is no other option but to make these purchases through Ticketmaster's Primary Ticket Platform, at the price set by Golden State, and on Golden State's terms.

119. Golden State and Ticketmaster have agreed to and do mandate that all Warriors tickets sold in the Primary Ticket Market not be resold in the Secondary Ticket Services Market other than through Ticketmaster's Secondary Ticket Exchange. Defendants have actually cancelled or threatened to cancel season ticket subscriptions to the Warriors – through which 75% or more of all Warriors tickets are sold – unless season ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services. Defendants have also revoked, or threatened to revoke, their continued sale of Warriors primary tickets to season ticket holders who are identified as reselling their primary tickets through any Secondary Ticket Exchange provider other

than Ticketmaster. Thus, Defendants are tying the sale of Warriors tickets sold in the Primary Market to Ticketmasters' Secondary Ticket Exchange services for the resale of Warriors tickets. As a result of this tying arrangement, Warriors ticket holders, who would otherwise prefer the Secondary Ticket Exchange services of providers other than Ticketmaster, including those offered by StubHub, have been forced to use Ticketmaster for Secondary Ticket Exchange services.

120. This tying arrangement – which has been reinforced and strengthened by Golden State's exclusive marketing, promotion and integration of Ticketmaster for Secondary Ticket Exchange services – has substantially foreclosed StubHub and other Secondary Ticket Exchange providers from competing in the Secondary Ticket Services Market, thereby affecting a not insubstantial volume of commerce. It has harmed and will continue to harm competition in that market by forcing Warriors ticket buyers and sellers in the Secondary Ticket Services Market to pay artificially high fees and by reducing the quantity and quality of secondary Warriors tickets available for sale in the Secondary Ticket Services Market, and has reduced the quantity of tickets actually sold in the Secondary Ticket Services Market.

121. There are no legitimate business justifications or efficiencies for Defendants' tying arrangement that counterbalance their demonstrated anticompetitive effects.

122. This tying arrangement constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *per se*, under a "quick look" standard, and under the rule of reason.

123. As a result of Defendants' illegal tying arrangement, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## SECOND CLAIM

### Section 1 Restraint of Trade (*Per Se* or Rule of Reason)
### (Golden State and Ticketmaster)

124. StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

125. Defendants have unreasonably restrained trade through a series of coordinated agreements and acts to limit competition in the distinct and relevant Secondary Ticket

Services Market.  Defendants' agreements and acts, which show a conscious commitment to a common scheme, include:  Defendants' actions to force Warriors season ticket holders to exclusively use Ticketmaster Secondary Ticket Exchange services and Defendants' agreement to exclusively market and promote Ticketmaster for Secondary Ticket Exchange services for Warriors tickets and for Ticketmaster to be the exclusive integrated provider of Secondary Ticket Exchange services to Golden State.

126.    There are no legitimate business justifications or efficiencies for Defendants' coordinated agreements and acts that would counterbalance their demonstrated anticompetitive effects.

127.    Defendants' coordinated agreements and acts are being undertaken with the common design to exclude and eliminate competition in the Secondary Ticket Services Market, and for the purpose of controlling the supply and prices of Warriors tickets available by resale and the fees that are charged for Secondary Ticket Exchange services.

128.    These coordinated agreements and acts of Defendants constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, *per se*, under a "quick look" standard, and under the rule of reason.

129.    As a result of Defendants' coordinated agreements and acts, competition in the Secondary Ticket Services Market has been diminished and eliminated.

130.    As a result of Defendants' coordinated agreements and acts, the fees on both the buyer and seller side for Warriors Secondary Ticket Exchange services have been artificially raised above competitive levels.

131.    As a result of Defendants' coordinated agreements and acts, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## THIRD CLAIM

### Conspiracy to Monopolize
### (Golden State and Ticketmaster)

132.    StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

133.    Defendants' conduct in foreclosing competition in the distinct and relevant Secondary Ticket Services Market constitutes a conspiracy to monopolize the Secondary Ticket Services Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

134.    To foreclose competition in the Secondary Ticket Services Market, Defendants have coordinated their efforts to force season ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services; monitor, enforce and/or coerce compliance with their restrictive policies; exclusively and deceptively market and promote Ticketmaster; and/or preclude competitor Secondary Ticket Exchanges from integrating with Golden State's Primary Ticket Platform (*i.e.*, Ticketmaster).  Defendants have willfully, knowingly and with specific intent to do so, combined or conspired to monopolize the Secondary Ticket Services Market.

135.    If Defendants' exclusionary conduct is not enjoined, there is a dangerous likelihood that defendants will monopolize the Secondary Ticket Services Market.

136.    There are no legitimate efficiency benefits that counterbalance the demonstrated anticompetitive effects of these overt acts, including their foreclosure of competition in the Secondary Ticket Services Market.

137.    As a result of Defendants' violation of Section 2, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

# FOURTH CLAIM

## Attempted Monopolization
### (Ticketmaster)

138.     StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

139.     Ticketmaster's conduct in foreclosing competition in the distinct and relevant Secondary Ticket Services Market constitutes an attempt to monopolize the Secondary Ticket Services Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

140.     To foreclose competition in the Secondary Ticket Services Market, Ticketmaster has engaged in overt, exclusionary acts to encourage or to ensure that all Warriors ticket holders buy or sell tickets only through Ticketmaster in the Secondary Ticket Services Market, including: monitoring compliance with their restrictive policies; exclusively and deceptively marketing and promoting Ticketmaster; and/or precluding competitor Secondary Ticket Exchanges from integrating with Golden State's Primary Ticket Platform (*i.e.*, Ticketmaster).  Ticketmaster has willfully, knowingly and with specific intent to do so, attempted to monopolize the Secondary Ticket Services Market.

141.     If Ticketmaster's exclusionary conduct is not enjoined, there is a dangerous likelihood that Ticketmaster will monopolize the Secondary Ticket Services Market.

142.     There are no legitimate efficiency benefits that counterbalance the demonstrated anticompetitive effects of these overt acts, including their foreclosure of competition in the Secondary Ticket Services Market.

143.     As a result of Defendants' violation of Section 2, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

# FIFTH CLAIM

## Section 1 Exclusive Dealing
## (Golden State and Ticketmaster)

144.    StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

145.    Defendants have entered into exclusive dealing arrangements with respect to the Secondary Ticket Services Market.

146.    Golden State and Ticketmaster have entered into exclusive agreements in the Primary Ticket Market.

147.    Golden State has also entered into exclusive agreements with purchasers of Warriors tickets sold in the Primary Ticket Market.  Through these agreements, the purchasers are forced to sell their tickets only through Ticketmaster's Secondary Ticket Exchange.

148.    Part and parcel of the exclusive arrangements between Defendants in the Secondary Ticket Services Market is that Golden State and Ticketmaster split the revenue generated by the fees levied on Ticketmaster's Secondary Ticket Exchange for resale of Warriors tickets.  This allows Golden State to gain revenue from the sale of Warriors tickets in the Secondary Ticket Services Market.

149.    These exclusive dealing relationships have foreclosed competition in a substantial share of the line of commerce affected by excluding StubHub and other Secondary Ticket Exchange services providers from the Secondary Ticket Services Market.

150.    There are no legitimate efficiency benefits that counterbalance the demonstrated anticompetitive effects of this conduct.

151.    The foreclosure of competition has led to increased prices and/or decreased output and has harmed competition.

152.    As a result of Defendants' exclusive dealing, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at a minimum, millions of dollars prior to trebling.

## SIXTH CLAIM

### Violation of the Cartwright Act
### (Golden State and Ticketmaster)

153.    StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

154.    Defendants' coordinated efforts to foreclose competition in the Secondary Ticket Services Market constitute a violation of the Cartwright Act.

155.    Defendants have been able to accomplish this violation because of the individual and collective market power that Golden State and Ticketmaster wield over the sale of Warriors tickets through Primary Ticket Platforms.

156.    Defendants' coordinated illegal acts and efforts to force season ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services; monitor, enforce and/or coerce compliance with their restrictive policies; exclusively market and promote Ticketmaster; and/or preclude competitor Secondary Ticket Exchanges from integrating with Golden State's Primary Ticket Platform (*i.e.*, Ticketmaster) has achieved and will achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition in the Secondary Ticket Services Market.

157.    Defendants' conspiracy to monopolize the Secondary Ticket Services Market, Defendants illegal exclusive dealing arrangements, Ticketmaster's attempted monopolization of the Secondary Ticket Services Market, and other illegal acts in furtherance thereof each also constitute a violation of the Cartwright Act.

158.    As a result of Defendants' violation of the Cartwright Act, StubHub has been and will continue to be injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

# SEVENTH CLAIM

## Violation of California UCL Section 17200
## (Golden State and Ticketmaster)

159.    StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

160.    Ticketmaster has used additional, unfair practices to make it difficult for ticket holders to sell their tickets on competitive Secondary Ticket Exchanges, such as StubHub. Ticketmaster has done this by leveraging its position as a dominant provider of Primary Ticket Platforms.

161.    As found by the Department of Justice, Ticketmaster has historically dominated Primary Ticket Platform services. It has maintained its dominance in this business by entering into numerous multi-year, exclusive contracts with leagues, teams, and venues. Indeed, Ticketmaster's market power in the Primary Ticket Platform services is evidenced by the high fees that it has charged and continues to charge for Primary Ticket Platform services – fees that are substantially higher than fees charged by other Primary Ticket Platform competitors.

162.    Moreover, Ticketmaster's market power in Primary Ticket Platform services is buttressed by high barriers to entry and expansion in this business, including barriers created by Ticketmaster's threats to enforce its multi-year, exclusive agreements.  Ticketmaster has, for example, threatened action against StubHub for even approaching Ticketmaster business partners with offers to sell additional, unsold ticket inventory, claiming that such overtures would constitute tortious interference with Ticketmaster's exclusive contracts. Specifically, Ticketmaster cautioned StubHub that: "It has come to our attention that StubHub is approaching Ticketmaster clients seeking to sell our client's primary tickets. As is well known in the industry. . . Ticketmaster's client ticketing contracts are generally exclusive and therefore contain contractual commitments by our clients not to sell primary tickets through any third-party." Ticketmaster has likewise imposed contractual restrictions in its Primary Ticket Platform contracts that preclude teams, leagues, and venues from distributing any of their ticket inventory via actual or potential competitors.

163.     Specifically, Ticketmaster exercised its dominance in Primary Ticket Platform services by delaying the delivery of the electronic copy of the originally purchased, primary ticket or the barcode associated with that ticket to the primary ticket purchaser. Ticketmaster has chosen to delay the delivery of PDF images or barcodes associated with original, primary tickets for numerous sporting events and musical concerts until weeks or months after the ticket was purchased and only a few days before the relevant event.

164.     This practice makes it extremely difficult for a primary ticket purchaser to resell his or her ticket on competitive non-Ticketmaster Secondary Ticket Exchanges. Indeed, the delaying of the delivery of these tickets or bar codes effectively bars the reseller from selling that ticket on a competitive Secondary Ticket Exchange. This is because ticket purchasers are reluctant to purchase a ticket on a Secondary Ticket Exchange from a stranger (with no brand recognition) on the hope that the reseller will transfer the tickets weeks or months after a secondary ticket purchase occurs.

165.     Of course, Ticketmaster facilitates secondary purchases on its own Secondary Ticket Exchange even before delivering the primary ticket to the reseller: it guarantees that it will directly deliver the ticket to the secondary purchaser at the designated delivery time, likely a few days before the event, if a secondary transaction is made. StubHub and other competitive Secondary Ticket Exchanges cannot provide this same direct delivery guarantee because they are barred from electronically integrating with Ticketmaster's Primary Ticket Platform.

166.     Accordingly, this Ticketmaster practice of delaying delivery of primary tickets has caused ticket holders to incur consumer harm and has caused competitive foreclosure to Secondary Ticket Exchanges.

167.     At a recent sports analytics conference held at the Massachusetts Institute of Technology Sloan School of Business, representatives of Ticketmaster stated that Ticketmaster will be rolling out these ticket and barcode delivery delay tactics even more expansively in the near future.

168. Another tactic in which Ticketmaster has engaged to leverage its dominance in Primary Ticket Platform services is its increased issuance of so-called paperless tickets. These virtual tickets allow entry to the game or event only upon showing at the gate picture identification and the credit card used for the purchase. Transferring or reselling these tickets is only possible through Ticketmaster's Secondary Ticket Exchange platform. According to the independent American Antitrust Institute, "[i]nstead of benefiting consumers, the trend favoring paperless tickets appears to be motivated by a desire of the dominant primary ticket provider to block out competition in the secondary ticket (resale) market."

169. These practices are unlawful business acts or practices within the meaning of Section 17200 of California's Unfair Competition Law ("UCL").

170. Moreover, Defendants' (i) entering into an agreement under which Ticketmaster is the exclusive provider of Secondary Ticket Exchange services which Golden State markets and promotes and which are technically integrated with the Primary Ticket Platform services that Golden State uses; (ii) forcing Warriors season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services, and threatening to retaliate against those that do not comply; and (iii) monitoring, enforcing and/or coercing compliance with their restrictive policies are all unfair business acts or practices within the meaning of Section 17200 of California's Unfair Competition Law.

171. Defendants have also made deceptive and/or false statements intended to mislead consumers about the reliability of StubHub's Secondary Ticket Exchange, the authenticity of Warriors tickets sold on StubHub's Secondary Ticket Exchange, and the ability of purchasers to obtain secondary Warriors tickets from sources other than Ticketmaster.

172. Such unlawful, unfair and deceptive practices are ongoing and continue to date.

173. Defendants' unlawful, unfair and deceptive business practices have caused substantial economic injury to StubHub in an amount not presently known with precision but which is, at minimum, hundreds of thousands of dollars.

174. Such unlawful, unfair or deceptive business practices are continuing and will continue unless relief enjoining these practices is granted under Section 17204 of the UCL. StubHub has no adequate remedy at law.

## EIGHTH CLAIM

### Tortious Interference With Prospective Economic Advantage
### (Golden State and Ticketmaster)

175. StubHub repeats and realleges each and every allegation of this First Amended Complaint as if fully set forth herein.

176. StubHub provides Secondary Ticket Exchange services to buyers and sellers of secondary Warriors tickets.

177. Defendants have knowingly and intentionally interfered with StubHub's prospective economic advantage by improperly and illegally engaging in the anticompetitive conduct described above. In particular, Defendants have forced Warriors season ticket holders, who Defendants knew regularly had used and regularly do use StubHub for Secondary Ticket Exchange services, to stop using StubHub for these services and exclusively use the Secondary Ticket Exchange services of Ticketmaster instead. Defendants have done this by withholding or threatening to withhold season ticket or playoff ticket subscriptions if Warriors season ticket holders choose to sell through StubHub. Defendant Ticketmaster has also delayed delivery of PDF-imaged tickets or ticket barcodes to interfere with StubHub's prospective business relations with resellers and buyers of secondary tickets. And Defendant Ticketmaster has issued paperless tickets to events that cannot be transferred through competitive Secondary Ticket Exchanges. These actions have resulted in an actual disruption of StubHub's relationships with its users.

178. StubHub has been and will be harmed in its business and property as a result of Defendants' tortious interference, losing sales and profits from its regular customers that it had been receiving and otherwise would have received but for Defendants' tortious interference with these prospective sales.

179. Defendants' conduct is malicious, oppressive, and done with the sole intent of harming StubHub.

180. Defendants' conduct is without justification or privilege.

181. As a result of Defendants' tortious interference with StubHub's prospective economic advantage, StubHub has been injured in its business and property in an amount not presently known with precision but which is, at minimum, millions of dollars prior to trebling.

## X. PRAYER FOR RELIEF

WHEREFORE, StubHub requests the following relief:

182. That the Court declare, adjudge and decree that Defendants have committed the violations of the Sherman Act, the Cartwright Act, the UCL and state law against tortious interference with prospective economic advantage alleged herein;

183. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or conduct having a similar purpose or effect;

184. That the Court enter an order enjoining Defendants from continuing to implement their coordinated efforts to foreclose competition in the Secondary Ticket Services Market, and specifically enjoining them from taking any actions which force Warriors season ticket holders to use Ticketmaster exclusively for Secondary Ticket Exchange services for Warriors tickets or punish season ticket holders for using StubHub or any other Secondary Ticket Exchange provider for these services, or from entering into any contracts or agreements having a similar purpose or effect;

185. That StubHub be awarded monetary damages, in an amount to be proven at trial and to be trebled according to law, plus interest, to compensate StubHub for Defendants' violations of federal and state antitrust law;

186. That StubHub recover its cost of suit, including reasonable attorneys' fees, and for such other and further relief as this Court may deem just and proper.

# XI. DEMAND FOR JURY TRIAL

187. Plaintiff demands a trial by jury.

Dated: June 30, 2015

Respectfully submitted,
Stephen V. Bomse
Shannon C. Leong
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
sbomse@orrick.com
sleong@orrick.com

_/s/ Stephen V. Bomse_____
STEPHEN V. BOMSE
Attorneys for Plaintiff
StubHub, Inc.

Dated: June 30, 2015

Matthew L. Cantor (admitted *Pro Hac Vice*)
Gordon Schnell (admitted *Pro Hac Vice*)
Allison F. Sheedy (admitted *Pro Hac Vice*)
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
(212) 350-2738
(212) 350-2701 (fax)
mcantor@constantinecannon.com
gschnell@constantinecannon.com
asheedy@constantinecannon.com

Dated: June 30, 2015

Kevin J. Arquit
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
(212) 455-2502 (fax)
karquit@stblaw.com

Matthew J. Reilly (*Pro Hac Vice* admission pending)
Abram J. Ellis (*Pro Hac Vice* admission pending)
SIMPSON THACHER & BARTLETT LLP
1155 F Street NW
Washington, DC 20004
(202) 636-5500
(202) 636-5502 (fax)
matt.reilly@stblaw.com
aellis@stblaw.com

Attorneys for Plaintiff StubHub, Inc.