1  LATHAM & WATKINS LLP
      Daniel M. Wall (Bar No. 102580)
2     Timothy L. O'Mara (Bar No. 212731)
      Sadik Huseny (Bar No. 224659)
3     Andrew M. Gass (Bar No. 259694)
   505 Montgomery Street, Suite 2000
4  San Francisco, California  94111-6538
   Telephone:  +1.415.391.0600
5  Facsimile:  +1.415.395.8095
   Email: dan.wall@lw.com
6  Email: tim.o'mara@lw.com
   Email: sadik.huseny@lw.com
7  Email: andrew.gass@lw.com

8  Attorneys for Defendant
   Ticketmaster L.L.C.
9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  STUBHUB, INC.,                         CASE NO. 3:15-cv-01436-MMC

14              Plaintiff,                 **TICKETMASTER L.L.C.'S NOTICE OF
                                           MOTION AND MOTION TO DISMISS THE
15         v.                              FIRST AMENDED COMPLAINT;
                                           MEMORANDUM OF POINTS AND
16  GOLDEN STATE WARRIORS, LLC AND         AUTHORITIES IN SUPPORT THEREOF**
    TICKETMASTER L.L.C.,
17                                         **Date:**          October 16, 2015
              Defendants.                  **Time:**          9:00 A.M.
18                                         **Place:**         Courtroom 7, 19th Floor
                                           **Action Filed:**  March 29, 2015
19
20                                         **Assigned To:**
                                           The Honorable Maxine M. Chesney
21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   RELEVANT FACTS ALLEGED .......................................................................... 4

    A.    Both StubHub And Ticketmaster Provide Ticket Services Across Sports, Leagues, Venues, And Events ..................................................... 4

    B.    The Defendants' Alleged Dominance Of Warriors-Specific "Markets" ....................................................................................................... 6

    C.    Defendants' Allegedly Unlawful Conduct ....................................................... 7

III.  ARGUMENT .......................................................................................................... 8

    A.    The Court Should Dismiss All Of StubHub's Antitrust Claims Because The Allegedly Restrained Product Market Is Not A Relevant Antitrust Market As A Matter Of Law ........................................ 9

    B.    The Alleged Tying Product Market Also Fails Because It Is A Legally Impermissibly Defined Single Brand Market ......................................... 13

    C.    StubHub's Conduct Allegations Do Not State A Claim .............................. 18

        1.    The "Tying" Claim Fails Because It Involves Only One Product, And Not Two ......................................................................... 19

        2.    Each Claim Fails To The Extent It Asserts Liability From "Refusal To Ingrate" And "False-Advertising" Conduct ...................... 21

            a.    Ticketmaster Has No Duty To Let StubHub Integrate With Its Primary Ticketing System ............................. 21

            b.    The FAC's Allegations About Defendants' "Deceptive Advertising" Campaign Fail As A Matter Of Law ........................................................................ 23

IV.  CONCLUSION ..................................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acri v. Varian Assocs., Inc.,*
114 F.3d 999 (9th Cir. 1997) (en banc) ...........................................................................3

*Adidas Am., Inc. v. Nat'l Coll. Athletic Ass'n,*
64 F. Supp. 2d 1097 (D. Kan. 1999) ..............................................................................10

*Am. Airlines v. Christensen,*
967 F.2d 410 (10th Cir. 1992) ........................................................................................19

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,*
*Inc.,*
108 F.3d 1147 (9th Cir. 1997) ....................................................................4, 23, 24, 25

*Apple, Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................3, 9, 10, 15

*In re Apple iPod Antitrust Litig.,*
796 F. Supp. 2d 1137 (N.D. Cal. 2011) ..........................................................................25

*In re ATM Fee Antitrust Litig.,*
768 F. Supp. 2d 984 (N.D. Cal. 2009) ............................................................................15

*Barry Wright Corp. v. ITT Grinnell Corp.,*
724 F.2d 227 (1st Cir. 1983) ..........................................................................................12

*In re Bay Foods Antitrust Litig.,*
166 F.3d 112 (3rd Cir. 1999) ............................................................................................5

*Belfiore v. N.Y. Times Co.,*
826 F.2d 177 (2nd Cir. 1987) ..........................................................................................13

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..........................................................................................4, 9, 13, 24

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC,*
941 F. Supp. 2d 1227 (C.D. Cal. 2013) .....................................................................15, 16

*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (9th Cir. 2012) ....................................................................................13, 19

*Bridges v. MacLean-Stevens Studios, Inc.,*
35 F. Supp. 2d 20 (D. Me. 1998), *aff'd*, 201 F.3d 6 (1st Cir. 2000) ..............................12

ii

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

*Brown Shoe Co., Inc. v. United States*,
   370 U.S. 294 (1962)................................................................................16

*Burns v. Cover Studios, Inc.*,
   818 F. Supp. 888 (W.D. Pa. 1993)..........................................................12

*Clairol, Inc. v. Boston Disc. Ctr. of Berkley, Inc.*,
   608 F.2d 1114 (6th Cir. 1979) ................................................................20

*Coca-Cola Co. v. Omni Pac. Co., Inc.*,
   2000 WL 33194867 (N.D. Cal. Sept. 27, 2000) .....................................20

*Cole v. Sunnyvale*,
   2010 WL 532428 (N.D. Cal. Feb. 9, 2010) ............................................11

*Duty Free Ams. v. Estée Lauder Cos., Inc.*,
   2014 WL 1329359 (S.D. Fla. Mar. 31, 2014)..........................................24

*Fasugbe v. Willms*,
   2011 WL 2119128 (E.D. Cal. May 25, 2011) .........................................11

*Formula One Licensing, B.V., v. Purple Interactive Ltd. et al.*,
   2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ........................................14

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
   699 F.2d 965 (9th Cir. 1983) ..............................................................3, 10

*In re Gorodess*,
   2001 WL 1676939 (D. Co. Dec. 31, 2001)..............................................19

*Gough v. Rossmoor Corp.*,
   585 F.2d 381 (9th Cir. 1978) ..................................................................10

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
   371 F.3d 1275 (10th Cir. 2004) ..............................................................16

*In re Harrell*,
   73 F.3d 218 (9th Cir. 1996) ....................................................................19

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010)....................................................................................8

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006)..................................................................................14

*Invacare Corp. v. Respironics, Inc.*,
   2006 WL 3022968 (N.D. Ohio Oct. 23, 2006) .......................................11

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
   509 F. Supp. 357 (N.D. Cal. 1981), *aff'd*, 698 F.2d 1011 (9th Cir. 1983)..............................20

iii

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984).............................................................................................19

*Kramer v. Pollock-Krasner Found.,*
    890 F. Supp. 250 (S.D.N.Y. 1995)..................................................................12

*LiveUniverse, Inc. v. MySpace, Inc.,*
    304 F. App'x 554 (9th Cir. 2008) ..............................................................21, 22

*McGlinchy v. Shell Chem. Co.,*
    845 F.2d 802 (9th Cir. 1988) ...........................................................................19

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.,*
    354 F.3d 661 (7th Cir. 2004) ...........................................................................12

*MetroNet Servs. Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004) ....................................................................21, 23

*Newcal Indus. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008) ..............................................................13, 14, 16

*Nicsand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) (en banc) ...........................................................12

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) .......................................................................22

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
    127 F.3d 1157 (9th Cir. 1997) ......................................................................2, 12

*Paladin Assocs., Inc. v. Mont. Power Co.,*
    328 F.3d 1145 (9th Cir. 2003) ...................................................................13, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997).............................................................................8

*Redmond v. Mo. W. State Coll.,*
    1988 WL 142119 (W.D. Mo. Nov. 2, 1988).................................................3, 10

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
    532 F.3d 963 (9th Cir. 2008) ...........................................................................14

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.,*
    1995 WL 150089 (N.D. Cal. Mar. 28, 1995)...................................................21

*Sheridan v. Marathon Petroleum Co., LLC.,*
    530 F.3d 590 (7th Cir. 2008) ...........................................................................14

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993).........................................................................................10

iv

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

*Spinelli v. Nat'l Football League*,
    2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015) .......................................................15

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .................................................................9, 15, 16

*Tate v. Pac. Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2012) ..............................................................21

*Ticketmaster LLC v. RMG Techs., Inc.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) ..............................................................18

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953)..................................................................................19, 20

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992)..............................................................................15

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966)..........................................................................................8

*United States v. Aluminum Co. of America*,
    148 F.2d 416 (2d Cir. 1945)..............................................................................16

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)........................................................................................14

*United States v Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ..........................................................13, 19

*USA Petroleum Co. v. Atl. Richfield, Co.*,
    577 F. Supp. 1296 (C.D. Cal. 1983) ..................................................................21

*Venzie Corp. v. U.S. Mineral Prods. Co.*,
    521 F.2d 1309 (3d Cir. 1975)............................................................................20

*Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................4, 21, 22, 23

*Whitney v. California*,
    274 U.S. 357 (1927)........................................................................................23

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ..............................................................................9

*Williams v. Nat'l Football League*,
    2014 WL 5514378 (W.D. Wash. Oct 31, 2014) ....................................................15

v

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

**STATUTES**

28 U.S.C. § 1332(a) ................................................................................................8

28 U.S.C. § 1367(c)(3)........................................................................................3, 8

**RULES**

Fed. R. Civ. P. 12(b)(1)...........................................................................................8

Fed. R. Civ. P. 12(b)(6)......................................................................................8, 21

**OTHER AUTHORITIES**

American Bar Association Antitrust Section, Antitrust Law Developments (7th
    ed.) ......................................................................................................23, 24

Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
    Their Application §18.01b (2014) ................................................................19

P. Areeda & D. Turner, Antitrust Law ¶ 737b (1978) ............................................23, 24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1

## NOTICE OF MOTION AND MOTION

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE, that on October 16, 2015, at 9:00 a.m., or as soon thereafter as

4    the matter maybe heard, in the United States District Court, Northern District of California,

5    Courtroom 7, 19th Floor, at 450 Golden Gate Ave., San Francisco, California 94102, before the

6    Honorable Maxine M. Chesney, Defendant Ticketmaster L.L.C. will and hereby does move the

7    Court for an order dismissing Plaintiff's First Amended Complaint pursuant to Rules 12(b)(1)

8    and 12(b)(6) of the Federal Rules of Civil Procedure.

9    This motion is based on the Notice of Motion and Motion, the accompanying

10    Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, all other

11    papers submitted in support of the Motion, the record on file in this action, and such other

12    written and oral argument as may be presented to the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1                        <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.      INTRODUCTION**

3         This is an antitrust action by Plaintiff StubHub, Inc. ("StubHub") asserting five claims

4 under the federal Sherman Act and three more under California state law against Defendants

5 Golden State Warriors, LLC ("Golden State" or the "Warriors") and Ticketmaster L.L.C.

6 ("Ticketmaster").  StubHub's principal allegation is that the Warriors, with Ticketmaster's

7 assistance, have started contractually precluding season ticket holders from reselling Warriors

8 tickets on StubHub, in order to force them to use the Warriors' resale platform

9 (NBATickets.com), which is operated by Ticketmaster.  First Amended Complaint ("FAC")

10 ¶¶ 7, 67-74.  In reality, that is not an antitrust problem at all.  It is a narrow dispute about how one

11 professional basketball team gets to have tickets to its own games distributed.  In legal terms,

12 nothing about the conduct at issue implicates an antitrust "relevant market," so all the claims fail.

13         In response to the initial Complaint, Ticketmaster and the Warriors filed motions to

14 dismiss, arguing *inter alia* that the market definitions that StubHub alleged for its antitrust claims

15 violated long-established rules against "single-brand markets."  StubHub claimed, for example,

16 that the Warriors "monopolize" or have "market power" over the sale of *Warriors tickets*—a

17 tautology courts reject.  Likewise, StubHub alleged harm to a "market" that just constituted the

18 business of facilitating the resale of Warriors tickets, a tiny slice of its actual business.

19         StubHub responded by amending its Complaint.  The resulting FAC pleads an

20 assortment of new and different facts, along with a collection of confusingly defined terms, to try

21 to bolster the argument that the Warriors monopolize their own tickets.  As explained below,

22 those changes are to no avail.  But StubHub could not, and made no effort to, address its most

23 serious problem.

24         All antitrust claims other than *per se* offenses like price fixing require the plaintiff to

25 identify a "relevant market" in which competition has allegedly been injured.  Here, that

26 market—in each of StubHub's five Sherman Act claims—is the "Secondary Ticket Services

27 Market."  *Id.* ¶85.  That is different terminology than StubHub used in its original complaint, but

28 according to the FAC's definition of that term, it still consists of the service of providing a ticket

1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

resale exchange service *for Warriors home games*—and nothing more. But that does not describe either StubHub's or Ticketmaster's ticket resale business, which the FAC admits includes the resale of tickets for many types of "sporting events, concerts and other forms of live entertainment." *Id.* ¶ 22; *see also* www.stubhub.com. Tickets to Warriors home games are just one of many "[a]mong the types of tickets sold and purchased on StubHub's Secondary Ticket Exchange." *Id.* ¶ 26.

As a matter of law, the relevant market in an antitrust case like this "includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Here, the FAC acknowledges that StubHub and Ticketmaster compete across a range of ticketing opportunities to "match" buyers who want to attend a live entertainment event with sellers who have tickets to that event. "[T]he full range of [ticket resale] opportunities" defines the market. *Omega*, 127 F.3d at 1162.

StubHub's efforts to circumvent this rule are positively dangerous to the free and open competition that antitrust law protects. As Ticketmaster's deal with the National Basketball Association ("NBA") and the Warriors shows, an important form of competition in the secondary ticketing market is to be the "official" or "authorized" resale site for a team or league. StubHub has its own deal with Major League Baseball's "Advanced Media" unit, pursuant to which it is the authorized online ticket resale platform for some 28 participating baseball teams (including the Giants and A's). *See* Request for Judicial Notice ("RJN") Ex. A at 1. That does not and certainly should not mean that StubHub "monopolizes" any market for Giants and A's tickets (or Bay Area baseball teams collectively) while Ticketmaster "monopolizes" the Warriors and Sharks. That is an irrational way to look at a competitive dynamic that is plainly broader in scope.

And yet this market definition method is essential to StubHub's effort to turn a narrow controversy concerning the Warriors into an antitrust case. StubHub neither tries to allege, nor could it ever plausibly allege, that the loss of some or even all of the opportunities to resell Warriors tickets is a threat to its overall secondary ticketing business. To the contrary, the resale

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  of Warriors tickets obviously constitutes only a tiny sliver of the real-world market for secondary

2  ticket exchange services in which StubHub and Ticketmaster actually compete—a market where

3  StubHub is in fact the well-entrenched incumbent, and Ticketmaster is a relatively new

4  entrant.  In essence, StubHub has zoomed in on one small slice of that competition to make it

5  appear as if Ticketmaster has attempted to *monopolize* a market—the gravamen of an antitrust

6  claim—by defining that "market" to be exactly co-extensive with the particular tickets StubHub

7  claims to have been blocked from selling.  That is not permitted.  *See, e.g.*, *Redmond v. Mo. W.

8  State Coll.*, 1988 WL 142119, at *2 (W.D. Mo. Nov. 2, 1988) ("Antitrust plaintiffs cannot . . .

9  artificially define a market so as to cover only the practice complained of; this would be circular

10  or at least result-oriented reasoning.") (citing *Gen. Bus. Sys. v. N. Am. Philips Corp.,* 699 F.2d

11  965, 975 (9th Cir. 1983)).

12      The antitrust claims in the FAC thus fail across the board, and the Court should dismiss

13  the entire action.  *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195-1200 (N.D. Cal.

14  2008) (granting motion to dismiss antitrust claims due to faulty product market definition).[1]

15      If the Court allows the case to move forward, however, it should nevertheless dismiss

16  several portions of the FAC for independent reasons.  First, StubHub's "tying" claim is legally

17  defective because it invokes and depends on yet another purported market whose definition is

18  impermissibly narrow.  This is the "market" the FAC calls the "Primary Ticket Market," which is

19  another confusingly defined term that in substance includes nothing but Warriors tickets sold by

20  the Warriors, themselves.  Despite the changes StubHub made in amending its complaint, this

21  remains a paradigmatic "single-product" market, which is a non-starter as a matter of law.

22      Second, a "tying" claim also requires *two separate products*—but here, the challenged

23  commercial arrangement is just a restriction on the sale of one single product.  So the "tying"

24  claim fails on this ground as well.

25

26  [1] The only claims arising under federal law are the five Sherman Act claims; without those, the
   Court should not exercise supplemental jurisdiction over StubHub's state law claims.  *See* 28
27  U.S.C. § 1367(c)(3); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc)
   ("[S]tate law claims should be dismissed if federal claims are dismissed before trial[.]")
28  (emphasis and quotation marks omitted).  In the event the Court chooses to reach the state law
   claims, Ticketmaster joins in the Warriors' arguments to dismiss those claims.

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

Third, StubHub claims that Ticketmaster has violated antitrust law *inter alia* by refusing to allow StubHub's secondary ticket exchange to technologically integrate with Ticketmaster's primary ticketing platform.  Refusing to deal with a competitor in this manner is, however, perfectly permissible under the Sherman Act.  *See Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 411 (2004) (stating "as a general matter" that businesses are free to choose the parties with whom they will deal, and have "no duty to aid competitors").

Fourth, StubHub also says that Ticketmaster's illegal conduct here includes falsely impugning the reliability and trustworthiness of tickets purchased on StubHub's platform.  But such "false advertising"-based antitrust claims can succeed only in the rarest of circumstances, and never on facts like those alleged in the FAC.  *See Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151-52 (9th Cir. 1997) (establishing a six-part conjunctive test for such claims).

"The costs of modern federal antitrust litigation . . . counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  In view of the logical and legal flaws in the FAC, this case falls well below that standard.

## II.   RELEVANT FACTS ALLEGED

### A.   Both StubHub And Ticketmaster Provide Ticket Services Across Sports, Leagues, Venues, And Events

StubHub operates the internet marketplace found at www.stubhub.com.  It describes its business as providing "Secondary Ticket Exchange" services to resellers and purchasers of tickets available by resale.  FAC ¶ 22-23.  According to the FAC, those services include the resale of individual tickets for "sporting events, concerts and other forms of live entertainment."  *Id.* ¶ 22.  Tickets to Golden State Warriors home games are just one of many "[a]mong the types of tickets sold and purchased on StubHub's Secondary Ticket Exchange."  *Id.* ¶ 26.  All of those different types of tickets are bought and sold on one single StubHub "online marketplace."  *Id.* ¶ 23.

Defendant Ticketmaster also provides teams, leagues, and venues with "Secondary Ticket Exchange" services.  *Id.* ¶ 59.  Ticketmaster's online ticket exchange service, like StubHub's,

4

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  includes but is not limited to resale of Warriors game tickets. *Id.* ¶ 22. For NBA games,

2  Ticketmaster has a league-wide deal that makes it the only official or "authorized" platform on

3  which to buy or sell resale tickets for all thirty NBA teams. *See* RJN Ex. B at 1.[2] According to

4  the FAC, Ticketmaster and the Warriors also have an additional agreement of some sort to

5  preclude a subset of Warriors ticketholders from reselling their tickets on any other secondary

6  exchange. FAC ¶ 61. That is false—and self-evidently so, in view of the thousands of Warriors

7  tickets available on StubHub and other platforms—but for the purpose of this motion, we treat it

8  as if it were true.[3]

9         Unlike StubHub, Ticketmaster has an additional business in which it contracts with

10  leagues, teams, artists, and venues to sell their tickets to the public in the first instance—what the

11  FAC calls "Primary Ticket Platform services." *Id.* ¶¶ 40. In the context of live sports, this

12  business typically involves "multi-year contracts with the leagues" that host the events—like the

13  NBA, the National Football League, and the National Hockey League—and corollary

14  agreements with the teams that make up those leagues. *Id.* ¶ 43. Offering tickets directly to

15  consumers from one of these initial sources requires interfacing between the seller and the public

16  to ensure, *inter alia*, that no more than one of each seat gets sold for a given event. *Id.* ¶ 40

17  ("Primary Ticket Platforms are responsible for managing all aspects of the primary ticket sale

18  and distribution process."). Ticketmaster's "primary" software is the tool the Warriors use for

19  this purpose, under a single league-wide deal entered in 2012. *Id.* ¶ 43; RJN Ex. B at 1.

20         Both "primary" and "secondary" Warriors tickets are typically available for purchase at

21  the same time. FAC ¶ 52. In fact, both are often displayed on the same "seat map" on the same

22  website. *Id.* ¶¶ 52, 98; RJN Ex. B at 1. As the FAC points out, this means consumers often

23

24  [2] StubHub actually referenced this in the original Complaint. *See* Compl. ¶ 20, ECF No. 1.
    Though the FAC omits this fact, apparently in the interest of shielding it from the Court's view,
    StubHub still cannot help but acknowledge that Ticketmaster's relevant "Secondary Ticket

25  Exchange" is located online at the *league's* site—www.NBAtickets.com. FAC ¶¶ 67, 69.

26  [3] The FAC also avers that to "enforce" this alleged scheme, Ticketmaster "closely monitor[s]"
    secondary ticket transactions" on competing resale platforms. *Id.* ¶¶ 66, 75-77. That

27  competitors "monitor" one another should hardly be shocking, since that is ordinary and often
    procompetitive behavior. *See In re Bay Foods Antitrust Lit.,* 166 F.3d 112, 126 (3rd Cir. 1999)
    ("Gathering competitors' price information can be consistent with independent competitor

28  behavior."). StubHub undoubtedly monitors Ticketmaster as well.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   compare both "primary" and "secondary" tickets to the same event and "find a better price or

2   seat" by buying either a first-sale or a resale ticket, depending upon their budgets and

3   preferences.  FAC ¶ 52.

4         **B.**      **The Defendants' Alleged Dominance Of Warriors-Specific "Markets"**

5         The FAC dedicates considerable attention to the allegation that "Ticketmaster has had

6   long-standing dominance in Primary Ticket Platform markets" *in general—i.e.*, not just for

7   Warriors tickets.  *See, e.g.*, *id.* ¶¶ 29, 30, 45.  But other than rhetorically, that alleged dominance

8   does not matter to StubHub's theory of the case.  Primary ticketing *in general* is neither the

9   "tying market" for the tying claim, nor the restrained market for any of StubHub's antitrust

10  claims.  With respect to the overall *secondary* ticket exchange business, StubHub does not

11  contend that Ticketmaster has any dominance at all.

12        Instead, StubHub's case depends on an antitrust theory built upon "markets" involving

13  tickets for home games for one particular team in one particular league:  the NBA's Golden State

14  Warriors.  For those forty-odd games per year, StubHub alleges the existence of two different

15  markets.

16      •   ***First***, a "primary" market for "the sale of tickets to professional basketball games in

17          the Bay Area."  *Id.* ¶ 85.  Because "for Bay Area residents to see live NBA action,

18          they must attend Warriors games," *id.* ¶ 101, this necessarily means sales *by Golden*

19          *State*, *id.* ¶¶ 3, 32.  StubHub claims this means that Golden State "has monopoly

20          power over the Primary Ticket Market."  *Id.* ¶ 101.  Of course that is an *a priori* truth

21          *if one presumes Warriors tickets face no competition*, just as Apple would

22          monopolize the sale of iPhones, Toyota would monopolize the sale of Corollas, etc.

23      •   ***Second***, a market for "Secondary Ticket Exchange *Services* for tickets to professional

24          basketball games in the Bay Area."  *Id.* ¶ 85 (emphasis added).  This captures services

25          provided by the StubHub and Ticketmaster exchange platforms (as well as others)—

26          but for resold Warriors tickets and nothing else.  *Id.* ¶¶ 3, 32, 101.  Notably, however,

27          the FAC nowhere alleges that StubHub or Ticketmaster provides any resale service

28          for Warriors tickets that differs from the resale service they provide for other tickets

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    on their platforms.  There is nothing in the FAC that contradicts the common

2    knowledge, repeatedly acknowledged in the FAC, *see id.* ¶ 35, that the StubHub and

3    Ticketmaster resale sites have tickets for all kinds of live entertainment events.

4    **C.     Defendants' Allegedly Unlawful Conduct**

5         The main claim in the FAC is that Ticketmaster and the Warriors have started

6    contractually precluding people from reselling Warriors tickets on StubHub, in order to force

7    them to use an NBA-branded version of Ticketmaster's resale platform instead.  *Id.* ¶¶ 7, 67-74.

8    This practice allegedly violates the federal antitrust laws in three principal ways:  as an unlawful

9    "tying" arrangement; an unlawful restraint of trade or form of exclusive dealing; and an attempt

10   or conspiracy to monopolize the "market" for "Secondary Ticket Services" for Warriors tickets.

11   *Id.* ¶¶ 115-152.

12        The FAC also asserts that the Defendants have done two other things wrong.  First,

13   StubHub says, Defendants have "denied competing secondary exchanges, including StubHub,

14   the ability to *technologically integrate* with Ticketmaster's primary sales platform unnecessarily

15   raising their costs of providing a safe and secure resale exchange."  *Id.* ¶ 66 (emphasis added).

16   The FAC does not allege any prior history of technological integration between StubHub and the

17   Ticketmaster-operated primary sales platform, as is legally essential.  *See infra* § III.C.2.a.  But

18   regardless, StubHub's argument is that Ticketmaster's unique ability to have its secondary

19   exchange interoperate with its primary exchange gives Ticketmaster some kind of unfair

20   advantage in preventing fraud in the alleged secondary market.  StubHub essentially admits that

21   integration promotes security, yet complains that "[w]ere the Warriors genuinely concerned with

22   security" they would share their competitive advantages with StubHub.  *Id.* ¶ 83.

23        Second, StubHub says that Ticketmaster and the Warriors have engaged in a false and

24   deceptive marketing campaign by suggesting to consumers that Ticketmaster's secondary

25   exchange platform is safer and more secure than its competitors'.  According to this allegation,

26   the Defendants have misled consumers into believing that Ticketmaster is the only safe,

27   "'guaranteed' or 'official'" source for Warriors tickets, *id.* ¶ 80, even though StubHub admits

28   that Ticketmaster actually *is* the Warriors' "official" secondary exchange partner.  *Id.* ¶ 30.  The

7

LATHAM&WATKINS┴┴┴
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  FAC says it is an antitrust violation for the Defendants to impugn the safety or security of

2  unofficial secondary exchanges in the marketplace of ideas, since allegedly StubHub typically

3  provides elaborate support for many of the customers that do in fact get swindled on its website.

4  *Id*. ¶ 82 (contending that StubHub has set up physical kiosks at some venues where defrauded

5  ticket purchasers can go to try to "obtain alternative inventory" each time "they encounter a

6  problem").

7  **III.   ARGUMENT**

8      Ticketmaster's argument proceeds in three parts.  *First*, in section A, we address

9  infirmities in StubHub's definition of the market in which competition has allegedly been

10  injured—a market definition that is essential to all of StubHub's antitrust claims.  The Warriors-

11  only "ticket exchange services" market supposedly harmed in these five causes of action—the

12  "Secondary Ticket Services Market," as the FAC defines that term—fails as a matter of law

13  because it covers only a sliver of the actual competition in the broader real-world market for

14  secondary ticket exchanges.  If the Court agrees, then it should dismiss the entire FAC because

15  there is no independent basis for subject matter jurisdiction over the remaining causes of

16  action—each of which arises under state rather than federal law.  *See Queen City Pizza, Inc. v.*

17  *Domino's Pizza, Inc.*, 124 F.3d 430, 433 (3d Cir. 1997) (affirming dismissal of pendant state law

18  claims under Rule 12(b)(1) where Sherman Act claims were properly dismissed under Rule

19  12(b)(6)); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if

20  the federal claims are dismissed before trial . . . the state claims should be dismissed as well.");

21  *see also* 28 U.S.C. § 1367(c)(3) (district court authority to dismiss state law claims where federal

22  claims fail as a matter of law).[4]

23      *Second*, in section B, we address the flip side of the Warriors-only market problem,

24

25  ───────────────
   [4] There is no "diversity" jurisdiction over Plaintiff's state law claims, because the FAC alleges
   that all parties have their principal places of business in California—which means they are all

26  "citizens" of the same state for subject matter jurisdiction purposes.  *See* FAC ¶¶ 21, 28, 29; 28
   U.S.C. § 1332(a) (granting federal courts subject matter jurisdiction over certain actions between

27  "citizens of *different* states") (emphasis added); *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010)
   ("The federal diversity jurisdiction statute provides that a corporation shall be deemed a citizen

28  of . . . *the State where it has its principal place of business*.") (emphasis in original).

8

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   explaining that the alleged "tying market" for "tickets to professional basketball games in the

2   Bay Area," an indirect way of saying *Warriors tickets*, violates rules against single-brand

3   markets.  If the Court agrees, StubHub's tying claim fails.

4         Third, in Section C, we address flaws in StubHub's *conduct* allegations that warrant

5   dismissal.  In section C.1, we explain that another reason the tying cause of action fails is

6   because a *resale restriction* (what StubHub actually pleads) is not "tying."  In section C.2.a, we

7   show that Ticketmaster's alleged refusal to allow StubHub to technically integrate with

8   Ticketmaster's infrastructure is perfectly lawful under the Sherman Act.  And finally in Section

9   C.2.b, we show that StubHub's advertising-related allegations fail to state an antitrust claim.  We

10   thus ask the Court to dismiss StubHub's claims to the extent they are predicated on these actions.

11
       **A.**     **The Court Should Dismiss All Of StubHub's Antitrust Claims Because The Allegedly Restrained Product Market Is Not A Relevant Antitrust Market As A Matter Of Law**
12

13         The key issues in antitrust cases subject to the Rule of Reason under Section 1 of the

14   Sherman Act, or monopolization under Section 2, are assessed in relation to the legal construct

15   of a "relevant market."  As a result, the "[f]ailure to identify a relevant market is a proper ground

16   for dismissing a Sherman Act claim."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir.

17   2001).  The well-known *Twombly* pleading standard applies to market definition allegations.

18   *Psystar Corp.*, 586 F. Supp. 2d. at 1198.[5]

19         A fundamental flaw in StubHub's claims, even after amendment, is that in order to allege

20   both market power and adverse competitive effects in the allegedly restrained "Secondary Ticket

21   Services Market," FAC ¶ 85, StubHub tries to recast its competition with Ticketmaster as

22   occurring in an artificial *Warriors-only* market,  *id*. ¶¶ 3, 32, 101.  This alleged market underlies

23   and is therefore essential to each of StubHub's Sherman Act claims, to wit:  **Claim 1**, its tying

24   claim, *see Tanaka*, 252 F.3d at 1063; **Claims 2 & 5**, its Section 1 claims, both of which rely

25   upon allegations of "exclusive dealing," *see Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th

26
     [5] Under that standard, a plaintiff must allege "plausible grounds" for its complaint, rather than

27   the mere "possibility" of relief, *i.e.*, "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the specific harm alleged. *Twombly*, 550 U.S. at 556.  "[A] court must

28   determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

1   Cir. 1978) ("[U]nder the rule of reason market definition is required to establish a § 1

2   violation[.]"); and **Claims 3 & 4**, its Section 2 claims for conspiracy and attempt to monopolize

3   the market, *see Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("In order to

4   determine whether there is a dangerous probability of monopolization, courts have found it

5   necessary to consider the relevant market[.]").  *See also Psystar*, 586 F. Supp. 2d at 1196 ("The

6   relevant-market inquiry does not differ for the[se] three claims in any material respect.").

7        The allegedly restrained "Secondary Ticket Services Market" is gerrymandered to cover

8   only a narrow slice of Ticketmaster's competition with StubHub:  the resale of tickets to

9   Warriors home games.  "Antitrust plaintiffs cannot, however, artificially define a market so as to

10  cover only the practice complained of; this would be circular or at least result-oriented

11  reasoning."  *Redmond*, 1988 WL 142119, at *2 (citing *Gen. Bus. Sys. v. N. Am. Philips Corp.*,

12  699 F.2d 965, 975 (9th Cir. 1983)); *Adidas Am., Inc. v. Nat'l Coll. Athletic Ass'n*, 64 F. Supp. 2d

13  1097, 1102 (D. Kan. 1999) (same, quoting *Redmond*).  The FAC clearly violates that principle.

14       Ticket resale platforms are, as StubHub acknowledges, a national, multi-event business.

15  StubHub's includes tickets for hundreds or thousands of events other than Warriors' home games,

16  and so does Ticketmaster's.  Everything about the FAC other than a few conclusory assertions

17  describing the market allegedly harmed reveals that competition between StubHub and

18  Ticketmaster takes place at the level of their secondary exchange platforms *as a whole*.  The FAC

19  states that ticket resale services include the resale of individual tickets for "sporting events,

20  concerts and other forms of live entertainment."  *Id.* ¶ 22.  In fact, StubHub's principal description

21  of secondary exchanges is that "[t]hey perform a 'matchmaking' function between resellers and

22  resale ticket buyers."  *Id.* ¶ 53.  That is about matching *all kinds of content* to *all kinds of fans*.  It

23  has nothing to do with the Warriors *per se*.

24       The FAC repeatedly references and describes this broader competitive dynamic.  StubHub

25  sells tickets for (among many other events) Wrestlemania (professional wrestling); University of

26  California-Berkeley Bears and Stanford University Cardinal basketball games (amateur

27  basketball); Oakland Athletics and San Francisco Giants games (professional baseball); Oakland

28  Raiders and San Francisco 49ers games (professional football); San Jose Sharks games

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   (professional hockey); Sacramento Kings games (professional basketball); The Book of Mormon

2   musical production (theater); and a Kenny Chesney concert (country music).  FAC ¶ 35.  StubHub

3   acknowledges in the FAC that Ticketmaster has won "official" resale platform status for the NBA

4   (not just the Warriors) and StubHub's original complaint acknowledged "Ticketmaster has

5   exclusive, league-wide deals with the NBA, NFL, and NHL for both Primary Ticket Platform and

6   Secondary Ticket Exchange services."  Compl. ¶ 20, ECF No. 1.[6]  StubHub holds itself out as

7   having an exclusive deal for Major League Baseball ("MLB"), *see* RJN Ex. A at 1.  And StubHub

8   even acknowledges that the real concern here is not about Warriors tickets, alone; it is about what

9   will happen across a *broader* segment of "Exchange services for *other* types of tickets," teams,

10  and leagues, if the Warriors' alleged proscription against resale on StubHub gets replicated

11  elsewhere.  FAC ¶ 112 (emphasis added).

12          In a 187-paragraph amended complaint asserting eight claims for relief, there is not a

13  single intimation, let alone express assertion, that either StubHub or Ticketmaster's "Secondary

14  Ticket Services" for Warriors home games differs in any respect at all from the "Secondary

15  Ticket Services" both companies offer for all of the other events on their platforms.  *See*

16  *Invacare Corp. v. Respironics, Inc.,* 2006 WL 3022968, at *6 (N.D. Ohio Oct. 23, 2006) ("[A]

17  product market cannot be divided by type of customer unless the plaintiff can identify a

18  'difference in the product supplied to that group of customers.'").  And yet the market alleged to

19  have been harmed for legal purposes is limited to a subset of those "services" the parties provide

20  when people use their platforms to buy and sell Warriors tickets, and nothing else.  That is not a

21  "plausible" market in which the Defendants can be deemed to have injured competition.  To the

22  contrary, it is specifically manipulated to be coterminous with the sliver of the real market in

23  which StubHub claims to have been injured.  Courts are wise to this gambit of tautologically

24  defining a market to track one-for-one the harm allegedly incurred—and routinely reject it.  *See,*

---

25  [6] It makes no difference that StubHub dropped this allegation from the FAC.  *See, e.g., Fasugbe*
26  *v. Willms,* 2011 WL 2119128, at *5 (E.D. Cal. May 25, 2011) ("[P]laintiffs may alter their
    allegations in an amended complaint, but the court may properly consider the plausibility of the
27  FAC in light of the prior allegations."); *Cole v. Sunnyvale,* 2010 WL 532428, at *4 (N.D. Cal.
    Feb. 9, 2010) ("The court may also consider the prior allegations as part of its 'context-specific'
28  inquiry based on its judicial experience and common sense to assess whether the Third Amended
    Complaint plausibly suggests an entitlement to relief, as required under *Iqbal*[.]").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   *e.g.*, *Burns v. Cover Studios, Inc.*, 818 F. Supp. 888, 892 (W.D. Pa. 1993) ("The plaintiff's

2   definition of the relevant market as coextensive with the parties to his competitor's contract is

3   . . . patently invalid because it is tautological."); *Bridges v. MacLean-Stevens Studios*, *Inc.*, 35 F.

4   Supp. 2d 20, 29 (D. Me. 1998), *aff'd*, 201 F.3d 6 (1st Cir. 2000) (same holding and language);

5   *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) ("tautological"

6   market definitions "do not state a claim for Section 2 monopolization").

7          The concern underlying these decisions is that this method of market definition leads to

8   ubiquitous antitrust violations condemning conduct that is in reality pro-competitive.

9   Competition can be, and often is, for all (or a "monopoly" share) of an individual customer's

10  business, or for a status like the "official" or "authorized" supplier that may lead to a single-

11  customer "monopoly."  It is understood that this "competition for the contract is a vital form of

12  rivalry, and often the most powerful one, which the antitrust laws encourage rather than

13  suppress." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.,* 354 F.3d 661, 663 (7th Cir. 2004).

14  In that setting, foreclosure must be measured against all market opportunities, not each one—a

15  point that courts have frequently made in cases presenting the most extreme form of

16  "competition for the contract," exclusive dealing.  *See, e.g.*, *Omega Envtl.*, 127 F.3d at 1162

17  ("The relevant market for [measuring foreclosure] includes the full range of selling opportunities

18  reasonably open to rivals, namely, all the product and geographic sales they may readily compete

19  for, using easily convertible plants and marketing organizations."); *Barry Wright Corp. v. ITT*

20  *Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.) (cautioning that "virtually *every*

21  contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market,

22  namely the portion consisting of what was bought"); *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 456

23  (6th Cir. 2007) (en banc) ("When one exclusive dealer is replaced by another exclusive dealer,

24  the victim of the competition does not state an antitrust injury.").

25          Here, any Secondary Ticket Exchange service that actually struck a deal with an event

26  presenter, and thus gained an outsized share of tickets for that event, would by StubHub's

27  reasoning obtain monopoly power in the "market" for resale services for that particular event.  It

28  would almost certainly mean, for example, that StubHub has "monopolized" via its own deal

12

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  with Major League Baseball, pursuant to which it is the only authorized online ticket reseller for

2  28 participating teams, and by virtue of similar deals with the Philadelphia Flyers, the Los

3  Angeles Galaxy, the Los Angeles Kings, and the University of Texas football team, among

4  others.  *See* RJN Ex. A at 1 (MLB), Ex. C at 1 (Flyers), Ex. D at 1 (Galaxy and Kings), Ex. E at

5  1 (Texas Football); www.stubhub.com/partners.  This cannot be right as a matter of law—and it

6  isn't.  *Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 180 (2nd Cir. 1987) (market definition

7  "implausible as a theoretical matter" where "Plaintiffs' narrow definition" amounts to "an

8  awkward attempt to conform their theory to the facts they allege").

9          If StubHub wants to bring an antitrust claim against Ticketmaster over harm to a market

10  involving secondary exchange services, it has to assert harm to that market as a whole.  The FAC

11  does not.  Because the artificially limited market in which StubHub says competition has been

12  injured is "facially unsustainable" and implausible, it fails as a matter of law.  *Newcal Indus. v.*

13  *Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Twombly*, 550 U.S. at 556.

14          **B.     The Alleged Tying Product Market Also Fails Because It Is A Legally**
                     **Impermissibly Defined Single Brand Market**
15

16          StubHub's tying claim (the FAC's first claim for relief) necessarily involves *two* alleged

17  markets and products, known as the "tying market" and the "tied market."  Having already

18  addressed the infirmities in StubHub's contentions about the alleged tied market, we now address

19  the alleged tying market.

20          Tying is about leveraging power in a tying market to restrain a tied market.  *See generally,*

21  *United States v Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) (en banc).  A plaintiff must

22  prove three elements to prevail on an illegal tying claim:  (1) that there exist two distinct products

23  or services in different markets whose sales are tied together; (2) that the seller possesses market

24  power in the tying product market sufficient to coerce acceptance of the tied product; and (3)

25  adverse competitive effects in the tied market.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192,

26  1197 (9th Cir. 2012); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   2003).[7]  "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant

2   has market power in the tying product."  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46

3   (2006).  "And to prove it, [the market] must first be properly alleged."  *Rick-Mik Enters., Inc. v.*

4   *Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (affirming dismissal of tying claim for

5   failure to assert a viable "tying" product market).

6          The familiar rules of economic substitution and reasonable interchangeability determine

7   the boundaries of a tying product market (as they do any other market).  *See Newcal*, 513 F.3d at

8   1045; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Accordingly,

9   a properly defined product market "must encompass the product at issue as well as all economic

10  substitutes for the product."  *Newcal*, 513 F.3d at 1045.  As the U.S. Supreme Court has held,

11  that means that a market is unlawfully narrow unless it includes all products that are "reasonably

12  interchangeable" with each other.  *E.I. du Pont*, 351 U.S. at 395.  Here, the FAC defines the

13  "tying" product market as "the primary market for the sale of tickets to professional basketball

14  games in the Bay Area."  FAC ¶ 85.  In plain English, this means first-sale Warriors tickets sold

15  by the Warriors, *id.* ¶ 86, since they are the only seller of "tickets to professional basketball

16  games in the Bay Area" in the first instance, *id.* ¶¶ 3, 32, 101.  StubHub is thus alleging a

17  "single-brand market"—or more precisely a single-brand/single-seller market—that consists of

18  nothing but one product sold by the company that makes it.

19          StubHub's market definition presents an obvious danger:  if the Warriors selling

20  Warriors tickets are a market unto themselves, then what prevents every professional sports

21  team, along with hundreds or thousands of artists and other entertainers, from likewise being a

22  monopolist, subject to the "heavy artillery" of the Sherman Act?  *Cf. Sheridan v. Marathon*

23  *Petroleum Co., LLC.*, 530 F.3d 590, 595 (7th Cir. 2008) (rejecting effort to define a market based

24  on a trademark); *Formula One Licensing v. Purple Interactive*, 2001 WL 34792530 at *3 (N.D.

25  Cal. Feb. 6, 2001) (Chesney, J.) (same).  Are we prepared to find an antitrust "market" for

26

27  _____
    [7] *Paladin* addresses the increasingly rare *per se* unlawful tying claim, where the competitive
    effects requirement is that the tying arrangement affects a not insubstantial volume of commerce

28  in the tied product market.  *Paladin*, 328 F.3d at 1159.  *Brantley* is the more common "rule of
    reason" tying claim, in which the competitive effects bar is higher.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1    Warriors tickets, another one for Giants tickets, another one for Bruce Springsteen tickets (in

2    each geographic market in which he performs), another one for U2 tickets (again multiplied for

3    each location on their tour), and so on?  Because of the obvious dangers of starting down that

4    path (which would not just encompass entertainment products), the antitrust case law

5    overwhelmingly says "no" and to the contrary ensures that "single-brand markets are, at a

6    minimum, extremely rare."  *Psystar Corp.*, 586 F. Supp. 2d at 1198; *see also In re ATM Fee

7    Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009) ("[C]ourts have been extremely

8    reluctant to embrace . . . single-brand market theory[.]").  A leading treatise states:

9
> Relevant markets generally cannot be limited to a single
10 > manufacturer's products.  As the Supreme Court recognized in
> *United States v. E.I. duPont de Nemours & Co.,* manufacturers
11 > ordinarily should not be deemed to have "monopolized" their own
> products.  The Court explained that the "power that, let us say,
12 > automobile  or  soft-drink  manufacturers  have  over  their
> trademarked products is not the power that makes an illegal
13 > monopoly.  Illegal power must be appraised in terms of the
> competitive market for the product."
14

15   American Bar Association Antitrust Section, Antitrust Law Developments (7th ed.) at 603-04.[8]

16          StubHub appears to be making a direct challenge to this body of law.  It amended the

17   original Complaint principally to add reams of data ostensibly supporting the conclusion that to

18   die-hard Warriors fans, nothing else substitutes for going to a Warriors game.  But these

19   allegations just add volume to an argument that fails as a matter of law.

20

21   [8] *See also Tanaka*, 252 F.3d at 1065 ("By attempting to restrict the relevant market to a single
     athletic program in Los Angeles based solely on her own preferences, [plaintiff] has failed to
22   identify a relevant market."); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959
     F.2d 468, 479 (3d Cir. 1992) ("[P]laintiffs' basic theory is that the relevant . . . market consists
23   only of new Chrysler cars manufactured for sale in the United States.  If the market were so
     defined, of course Chrysler would have market power, being the sole seller.  But such a narrow
24   definition makes no sense in terms of real world economics, and as a matter of law we cannot
     adopt it."); *Spinelli v. Nat'l Football League*, 2015 WL 1433370, at *21 (S.D.N.Y. Mar. 27,
25   2015) ("[T]o define the market as that group of products over which a defendant exercises
     control would as an analytic matter read the market definition step out of the Sherman Act.");
26   *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1234 n.6 (C.D. Cal. 2013)
     ("[A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over
27   its own product.") (quotation marks omitted); *Williams v. Nat'l Football League*, 2014 WL
     5514378, at *4 (W.D. Wash. Oct 31, 2014) (dismissing antitrust claims for faulty market
28   definitions where "Plaintiff's . . . allegations do not relate to competition between firms in a
     market, but to the exercise of a natural monopoly on sales of tickets to a single stadium").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    Alleging intense "brand loyalty" or consumer preference is not enough to justify a single-

2    brand market. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th

3    Cir. 2004) ("Even where brand loyalty is intense, courts reject the argument that a single branded

4    product market constitutes a relevant market."); *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,

5    941 F. Supp. 2d 1227, 1234 n.6 (C.D. Cal. 2013) (same); *compare* FAC ¶¶ 33, 37-38, 74, 86, 88,

6    101 (describing the intense brand loyalty of Warriors fans). Courts reason that "[t]he consumers

7    do not define the boundaries of the market; the products or producers do." *Newcal*, 513 F.3d at

8    1045 (citing *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962)); *Tanaka*, 252 F.3d

9    at 1063 (holding that "strictly personal preference . . . is irrelevant to the antitrust inquiry"). So

10   to survive this Motion, StubHub needs to have alleged something more than just the truism that

11   Warriors' fans prefer Warriors tickets—no matter how much data supposedly supports that

12   truism. Even in this championship year, there are fans of countless entertainers who are every bit

13   as rabid for their team or favorite artist as Warriors fans are for the Warriors. That loyalty does

14   not "reward" the team or artist with the legal status of a monopolist. *Green Country Food Mkt.*,

15   371 F.3d at 1282; *cf. United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir.

16   1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned

17   upon when he wins.").

18   It is apparent that underneath the FAC's impressive detail, StubHub's market allegations

19   are generic—similar things could be pled and proven about any highly successful entertainment

20   product. Consider, for example, how a suit against Bruce Springsteen could mimic StubHub's

21   market definition theory:

22

23   //

24

25

26

27

28

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

| StubHub Allegations (FAC ¶86, 33) | Hypothetical Bruce Springsteen Allegations |
|---|---|
| The Primary Ticket Market is a relevant antitrust market in this case. This distinct and relevant market consists of the sale of "primary" or first-sale professional basketball tickets by **Golden State**. . . . There are no economic substitutes for **Warriors** tickets for **Warriors** fans. The Warriors have a strong local fan base in the Bay Area, and **Warriors** fans have demonstrated team loyalty that is well above-average, as observed by the media and opposing teams' coaches and players. | The sale of **Springsteen** tickets through Primary Ticket Platforms is a relevant market in this case. There are no economic substitutes for **Springsteen** tickets for **Springsteen** fans. **Springsteen** has a strong and loyal fan base with demonstrated loyalty that is well above-average. |
| Fans have strong allegiances to their local teams, and the **Warriors** are no exception. **Warriors** fans who root for the likes of particular **Warriors** players – such as Stephen Curry, Klay Thompson, or Draymond Green – do not consider other NBA team tickets to be a substitute for **Warriors** tickets. These fans primarily root for the success of the **Warriors** and watch the game itself specifically to see the **Warriors** perform. Fan preference for the **Warriors** is so great that the process for obtaining season tickets involves not only a waiting list, but a nonrefundable deposit of $100 per full season ticket just to join the waiting list. | Rock music fans have strong allegiances to particular bands and artists, and **Springsteen** fans are no exception. **Springsteen** fans who follow particular E Street Band Members – such as Bruce Springsteen, Nils Lofgren, and Steven Van Zandt – do not consider other rock band tickets, such as tickets for Coldplay, to be a substitute for **Springsteen** tickets. These fans primarily follow **Springsteen** and many only go to concerts specifically to see **Springsteen** perform. Fan preference for **Springsteen** is so great that fans will camp out overnight to buy **Springsteen** tickets, and tickets to **Springsteen** concerts on the secondary market are often many times face value. |

Courts rightly decline to go down the slippery slope of recognizing single-brand markets based on consumer preferences, no matter how intense. This Court should do the same.

Finally, it should be noted that even if StubHub could permissibly assert a "market" limited to Warriors tickets in general—and it cannot—that is not what the FAC actually does. The "tying" product market alleged in this case is not Warriors tickets, full stop; it is Warriors tickets *sold by the Warriors and not any other seller*, *i.e.*, it is a *single-brand/**single-seller*** market. But the possibility of a market limited to that product, and nothing else, is squarely

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   precluded by StubHub's admission elsewhere in the FAC that resale tickets to Warriors games

2   *compete* with remaining primary inventories.  *See id.* ¶ 52 (alleging that among the "reasons why

3   consumers might choose to purchase Warriors tickets by resale" is that "the purchaser might be

4   able to find a better price . . . on the secondary exchange"); *see also* ¶ 98 ("[R]esale ticket

5   purchases are often made because the primary tickets are . . . unavailable at the desired price[.]").

6   The FAC thus acknowledges that "primary" and "secondary" tickets compete on price.  This is

7   the very definition of two products that are in *the same market*, rather than *different* markets:  the

8   price for one "often" leads customers to substitute away to the other.  *Cf. Ticketmaster LLC v.*

9   *RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008) ("Why are retail and resale

10  tickets not acceptable economic substitutes for each other?  The Court is reasonably sure that . . .

11  [a consumer] would not care whether her ticket was purchased through Ticketmaster in the

12  'retail' market or from a ticket broker in the 'resale' market . . . as long as she is able to attend

13  the [event].").  So the "tying" product market is impermissibly narrow in this additional respect

14  as well.[9]

15       Because the "tying" product market alleged—"the sale of 'primary' or first-sale

16  professional basketball tickets by Golden State through a primary distribution network"—is

17  improperly limited to a single seller of a single brand, it fails as a matter of law, and the Court

18  should dismiss the FAC's tying claim.

19       **C.     StubHub's Conduct Allegations Do Not State A Claim**

20       The Court should also dismiss one full claim and portions of five claims that fail as a

21  matter of law because they assert liability for *conduct* that is not an antitrust violation.

22  StubHub's tying claim (the First Claim for Relief) actually fails to allege tying.  And StubHub's

23  first five Claims for Relief (all of the federal antitrust claims) all appear to attack Ticketmaster's

24  alleged refusal to permit "technological integration" between StubHub and Defendants' primary

25  ticketing platform and Defendants' allegedly "false advertising" campaign.  As pleaded, the FAC

---

26  [9] StubHub offers the conclusory assertion that there is no "economic substitute" for resold
27  Warriors tickets.  *See* FAC ¶ 96 ("[B]uyers of tickets in the Secondary Ticket Services Market do
    not consider the Primary Ticket Market to be a substitute[.]").  But it is the converse that matters
    for defining the tying product market, and the FAC admits, rather than denies, that the Warriors
28  must deal with competition from secondary tickets when *selling* primary tickets.  FAC ¶ 52.

18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    does not establish that this conduct unreasonably restrains competition (under Section 1) or

2    constitutes monopolization (under Section 2).[10]

3        **1.    The "Tying" Claim Fails Because It Involves Only One Product, And Not
                 Two**

4

5            A tying arrangement is a specific antitrust offense with a unique history and rules.  It is a

6    condition on the sale of a dominant product that requires the buyer to purchase something else—

7    a separate product—it would prefer not to buy from the seller.  *Brantley*, 675 F.3d at 1199.

8    Accordingly, "a tying arrangement cannot exist unless two separate product markets have been

9    linked."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984); *see also, Microsoft*,

10   253 F.3d at 85-89.  The "common core of the adjudicated unlawful tying arrangements" is "the

11   forced purchase of a *second distinct commodity* with the desired purchase of a dominant 'tying'

12   product."  *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953) (emphasis

13   added).  Courts and commentators have urged the importance of limiting tying analysis to true

14   "ties," warning of the potential for "plaintiffs to strain to make their agreements ties rather than

15   exclusive deals" or other practices subject to a full Rule of Reason analysis.  Areeda &

16   Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application §18.01b

17   (2014).

18           Here, StubHub is trying to plead tying when in reality the alleged "tie" is not an

19   obligation to buy an unwanted second product along with the product the consumer wants, but

20   instead a restriction *on the resale* of the first product—the Warriors ticket.[11]  The FAC's

21   _____

22   [10] "To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three
     elements:  (1) an agreement, conspiracy, or combination among two or more persons or distinct
     business entities; (2) which is intended to harm or unreasonably restrain competition; and (3)
23   which actually causes injury to competition[.] . . .  To establish a section 2 violation . . . a
     plaintiff must demonstrate four elements:  (1) specific intent to control prices or destroy
24   competition; (2) predatory or anti-competitive conduct; (3) a dangerous probability of success;
     and (4) causal antitrust injury."  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.
25   1988).

26   [11] Resale restrictions on tickets are quite common, reflecting that as a legal matter tickets are
     revocable licenses to attend the event.  *See, e.g.*, *In re Harrell*, 73 F.3d 218, 220 (9th Cir. 1996)
27   (addressing the issue under bankruptcy law); *In re Gorodess*, 2001 WL 1676939, at *3 (D. Co.
     Dec. 31, 2001) (same); *cf. Am. Airlines v. Christensen*, 967 F.2d 410, 413 (10th Cir. 1992)
28   (rejecting argument that contractual resale restriction on frequent flier miles was void as against
     public policy, specifically on the alleged ground that it violated Sherman Act § 1).

                                    19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   allegation is that the Defendants "are tying the sale of Warriors tickets sold in the Primary

2   Market [*i.e.*, the tying product] to Ticketmaster's Secondary Ticket Exchange services for the

3   resale of Warriors tickets [*i.e.*, the tied product]."  FAC ¶ 119.  But that is not "the forced

4   purchase of a second distinct commodity."  *Times-Picayune*, 345 U.S. at 614.  That is a restraint

5   allegedly imposed by the Warriors over the ways that buyers can resell Warriors tickets.  *See*

6   *Venzie Corp. v. U.S. Mineral Prods. Co.*, 521 F.2d 1309, 1317 (3d Cir. 1975) ("The critical

7   deficiency in plaintiffs' efforts to prove an illegal tie-in [based on an alleged unwritten resale

8   restriction] is that they have failed to establish a factual pattern that falls within the definition of

9   arrangements which the Supreme Court has declared illegal *per se*.").

10         There is, in fact, a body of antitrust law that addresses the legality of resale restrictions—

11   but it is not the law of "tying."  Courts have long considered a seller's contractual limitation on a

12   buyer's right to freely resell a product as a "vertical restraint" (*i.e.*, an agreement between entities

13   at different market levels), evaluated under the Rule of Reason (*i.e.*, a balancing of any proven

14   anti-competitive effects of the arrangement against its procompetitive effects).  *See, e.g.*, *Clairol,*

15   *Inc. v. Boston Disc. Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1123 (6th Cir. 1979) (analyzing

16   manufacturer's prohibition on resale of hair product as vertical restraint under the Rule of

17   Reason); *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 509 F. Supp. 357, 380 (N.D. Cal. 1981),

18   *aff'd*, 698 F.2d 1011 (9th Cir. 1983) (Rule of Reason applied to manufacturer's restrictions

19   against resale of beauty products); *Coca-Cola Co. v. Omni Pac. Co., Inc.*, 2000 WL 33194867, at

20   *6 (N.D. Cal. Sept. 27, 2000) (assessing the legality of territorial distribution restrictions as

21   vertical restraints under the Rule of Reason).  In all but the rarest cases, agreements that limit the

22   way a particular product can be resold are perfectly permissible; as one opinion from this District

23   explains, "there is no authority to support the understanding that a reduction of intrabrand

24   competition [caused by a resale restriction] is sufficient to constitute an unreasonable restraint on

25   trade."  *Coca-Cola*, 2000 WL 33194867, at *6.

26         The facts alleged in the FAC simply do not constitute a "tying" arrangement, so the Court

27   should independently dismiss the first claim for relief in its entirety on this ground.

28

20

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

### 2.   Each Claim Fails To The Extent It Asserts Liability From "Refusal To Ingrate" And "False-Advertising" Conduct

Under Rule 12(b)(6), courts may dismiss a claim to the extent that it asserts a violation from conduct that cannot as a matter of law yield liability.  *See USA Petroleum Co. v. Atl. Richfield, Co.*, 577 F. Supp. 1296, 1308 (C.D. Cal. 1983) (selectively dismissing legally infirm bases for antitrust claims); *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1079-83 (N.D. Cal. 2012) (same); *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, 1995 WL 150089, at *2 (N.D. Cal. Mar. 28, 1995) ("Although a complaint might include multiple claims for relief, a motion to dismiss may be directed against a single 'claim,'. . . effectively striking portions of a complaint where there is no viable theory or facts supporting recovery under that theory.").  We turn now to two types of conduct StubHub intersperses in all of the federal antitrust claims, but which are not actionable.

### a.   Ticketmaster Has No Duty To Let StubHub Integrate With Its Primary Ticketing System

First, the most audacious claim in the FAC:  StubHub's argument that "Defendants" refused to permit StubHub to integrate into Ticketmaster's primary ticketing system.  Since the Supreme Court's decision in *Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 411 (2004), it has been crystal clear that "[a]s a general matter," businesses are free to choose the parties with whom they will deal and have "no duty to aid competitors."  The sole exception to this doctrine is strictly "limited," and reflects the "outer boundary" of antitrust liability.  *Id.* at 409.  It addresses the unjustified *termination* of *existing* collaborations between competitors.  Specifically, for a party's refusal to deal with its competitor to violate the Sherman Act, the defendant must have "unilateral[ly] terminat[ed] . . . a voluntary (*and thus presumably profitable*) course of dealing."  *Id.* at 409 (emphasis in original); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).  Failure to plead facts establishing the predicate (1) *voluntary* and (2) *profitable* pre-existing relationship identified in *Trinko* is thus fatal to any refusal-to-deal claim.  *See, e.g.*, *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556-57 (9th Cir. 2008) (affirming dismissal of refusal-to-deal claim where Plaintiffs "failed

21

1  to allege either a voluntary arrangement . . . or that any such arrangement was profitable").

2       Technology integration cases fall within the rule of *Trinko* and its progeny.  *See Trinko*,

3  540 U.S. at 409-410 (refusal to allow competing "local exchange carriers" to use certain

4  elements of Verizon's technological infrastructure); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d

5  1064, 1076-77 (10th Cir. 2013) (refusal to share certain "application programming interfaces"

6  that would facilitate interoperability with Microsoft's operating system); *LiveUniverse*, 304 F.

7  App'x at 557 (refusal to allow links to plaintiff's website on MySpace's social media platform).

8       Here, the FAC asserts that Ticketmaster has violated the antitrust laws (or "reinforced"

9  other violations of antitrust law) by refusing to allow its competitor, StubHub, to integrate into

10  Ticketmaster's primary sales platform.  *See supra* § II.C; FAC ¶¶ 66, 81, 120 (first claim), 125

11  (second claim), 134 (third claim), 140 (fourth claim), 156 (sixth claim).  In substance, that is a

12  refusal-to-deal claim, subject to the particular requirements courts have imposed for the assertion

13  of liability against a defendant who prefers not to open up its technological infrastructure to a

14  competitor.  *See Trinko*, 540 U.S. at 407.

15       But StubHub alleges none of the predicate facts necessary to make out a viable refusal-to-

16  deal claim.  Specifically, StubHub never contends that the parties had any prior course of dealing

17  in which Ticketmaster allowed StubHub to integrate into Ticketmaster's primary sales platform.

18  *Cf. Trinko*, 540 U.S. at 409.  Nor does the FAC allege a prior course of dealing that was

19  *profitable* for Ticketmaster, or that Ticketmaster unilaterally *terminated* that prior course of

20  dealing.  *Cf. id.*  In fact, far from saying that Ticketmaster has reversed course, StubHub alleges

21  that Ticketmaster will not permit integration in the first instance.  *See* FAC ¶¶ 66, 81, 120, 125,

22  134, 140.  As a matter of law, that makes this claim a non-starter.  *See LiveUniverse*, 304 F.

23  App'x at 557.  U.S. courts cannot order that "new systems . . . be designed and implemented" to

24  establish a competitor collaboration that did not previously exist.  *Trinko*, 540 U.S. at 410

25  ("Verizon's alleged insufficient assistance in the provision of services to rivals is not a

26  recognized antitrust claim[.]"); *Novell*, 731 F.3d at 1074-75 (holding that "unadulterated

27  unilateral conduct—situations in which no course of dealing ever existed—won't trigger antitrust

28  scrutiny," on the ground that this black-letter rule of law "keeps courts . . . out of the business of

1   *initiating* collusion" between competitors) (emphasis added); *MetroNet*, 383 F.3d at 1131

2   ("'[E]nforced sharing also requires antitrust courts to act as central planners, identifying the

3   proper price, quantity, and other terms of dealing—a role for which they are ill-suited.'")

4   (quoting *Trinko*, 540 U.S. at 408).

5          StubHub's refusal-to-integrate claims should be dismissed.

6                  b.     **The FAC's Allegations About Defendants' "Deceptive**

7                         **Advertising" Campaign Fail As A Matter Of Law**

8          Claims of false advertising are generally not the stuff of antitrust litigation.  Competitors

9   are expected to say negative things about one another's products; it is part and parcel of

10  competition itself.  So in antitrust there is an especially strong policy echoing Justice Brandeis'

11  teaching that the remedy for allegedly offensive speech is "more speech."  *Whitney v. California*,

12  274 U.S. 357, 377 (1927) (Brandeis, J., concurring).  The Ninth Circuit in *American Professional*

13  *Testing* established a presumption that statements by one competitor about another competitor—

14  even defamatory or false statements—cause only *de minimis* injury to competition and are,

15  therefore, insufficient to state a claim under Section 2 of the Sherman Act.  *See Am. Prof'l*

16  *Testing*, 108 F.3d at 1151 ("While the disparagement of a rival . . . may be unethical and even

17  impair the opportunities of a rival, its harmful effects on competitors are ordinarily not

18  significant enough to warrant recognition under § 2 of the Sherman Act.").  Indeed, the Ninth

19  Circuit "insist[s] on a 'preliminary showing of significant and more-than-temporary harmful

20  effects on *competition* (and not merely upon a competitor or customer)' before these practices

21  can rise to the level of exclusionary conduct."  *Id.* (citing 3 P. Areeda & D. Turner, Antitrust

22  Law ¶ 737b at 278 (1978)) (emphasis in original).

23         To overcome this presumption of *de minimis* effect, a plaintiff asserting an antitrust claim

24  based on deceptive statements must demonstrate that the representations were:  (1) clearly false;

25  (2) clearly material; (3) clearly likely to induce reasonable reliance; (4) made to buyers without

26  knowledge of the subject matter; (5) continued for prolonged periods; and (6) not readily

27  susceptible to neutralization or other offset by rivals.  *See id.* at 1152.  The Ninth Circuit requires

28  plaintiffs to prove "*all* six elements to overcome [the] *de minimis* presumption.  Otherwise, [a

1     plaintiff] fails to prove its claim." *Id.* (emphasis in original).

2        StubHub has made no effort to plead its claim consistent with *American Professional*

3   *Testing*. In an amended complaint full of conclusory allegations, there are none about the six

4   *American Professional Testing* factors. But two points stand out.

5        First, even though to give rise to antitrust liability, an allegedly deceptive advertisement

6   must include statements that are, *inter alia*, "clearly false," *Am. Prof'l Testing*, 108 F.3d at 1152,

7   the FAC alleges no facts about Defendants' advertising campaign that are even arguably

8   untruthful. *See Duty Free Ams. v. Estée Lauder Cos., Inc.,* 2014 WL 1329359, at *11 (S.D. Fla.

9   Mar. 31, 2014) (dismissing Section 2 claim based on misleading information because the

10   "[defendant's] challenged representations are truthful"). To the contrary, its main gripe is that

11   the parties have marketed Ticketmaster's secondary exchange as the source of "the only 100%

12   guaranteed official resale tickets." FAC ¶ 79. But that is plainly accurate: Ticketmaster *is* in

13   fact the Warriors' only official resale partner, which the FAC admits, *id*. ¶ 30, and thus as a

14   logical matter Ticketmaster is the only source of "100% guaranteed *official* resale tickets."

15        The FAC also includes one line alleging that "the Warriors issued a 'fraud alert' for the

16   2013-14 season 'warning fans about the potential dangers of purchasing single-game tickets for

17   the 2013-14 season from a non-verified third party.'" *Id*. ¶ 80. But the FAC elsewhere makes

18   clear that there *are* potential dangers from buying resold tickets via non-verified third parties.

19   Specifically, it admits that StubHub goes to great lengths to deal with the very real problem of

20   fraud on its website, including granting customers their "money back" when they show up at an

21   event and can't get in because the ticket was invalid. *Id*. ¶ 82. So the fraud alert—which is not

22   even alleged to be about StubHub in particular—is not "clearly false" as required. *Am. Prof'l*

23   *Testing*, 108 F.3d at 1152.[12]

24        Second, not only has StubHub failed to plead that any false statements are "not readily

25   susceptible to neutralization or other offset by rivals," *Am. Prof'l Testing*, 108 F.3d at 1152, they

26

27   [12] The remainder of the FAC's discussion of Defendants' "deception" consists of a series of conclusory assertions that they have said misleading things. *See, e.g.,* FAC ¶¶ 80, 171 (asserting

28   that Defendants "mislead consumers"), ¶¶ 134, 140 (asserting that Defendants "deceptively market and promote Ticketmaster"). These, too, do not satisfy *Twombly.* 550 U.S. at 557.

have pled *that they are*.  StubHub lays out its security-related marketing message in the FAC, arguing:

> StubHub, in fact, utilizes substantial and reliable mechanisms to protect purchasers on its site.  It is a moderated marketplace that ensures that resellers who have previously engaged in deception are blocked from using the StubHub site.  StubHub also provides kiosks at or near the venues where ticket purchasers can obtain alternative inventory if they encounter a problem.  Moreover, through its robust Fan Protect Guarantee, StubHub ensures that all buyers receive the ticket they purchased or their money back.  As a result of StubHub's consumer friendly practices, incidences of fraud on StubHub's [sic] are extremely minimal and consumers suffer the consequences of a fraud sale in only the rarest of cases.

FAC ¶ 82.  This argument is in fact evident on StubHub's website 24 hours a day.  *See* www.stubhub.com/guarantee; www.stubhub.com/fanprotect-guarantee-legal/#buyers.

StubHub has no right to try to use antitrust law to constrain a marketplace debate over which ticket exchange—StubHub or Ticketmaster—is the safest and most secure place to buy tickets.  It has a security "story" to counter Ticketmaster's.  And while we can certainly understand that "kiosks at or near the venues where ticket purchasers can obtain alternative inventory if they encounter a problem" may not be a very good story, the relevant legal "test refers to 'susceptible to neutralization' not 'successful in neutralization.'"  *Am. Prof'l Testing*, 108 F.3d at 1152.  StubHub thus fails to overcome the presumption of *de minimis* competitive effects, or the rule that quality claims must be adjudicated in the marketplace rather than the courtroom.  *See In re Apple iPod Antitrust Litig.*, 796 F. Supp. 2d 1137, 1145-46 (N.D. Cal. 2011).

## IV.   CONCLUSION

StubHub's amended Complaint is legally infirm and does not justify the tremendous expense of antitrust discovery.  For the foregoing reasons, Ticketmaster respectfully asks the Court to dismiss the action.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    Dated: July 31, 2015

2                                                LATHAM & WATKINS LLP

3

4                                                By    /s/ Daniel M. Wall
                                                      Daniel M. Wall
5                                                     Attorneys for Defendant Ticketmaster L.L.C.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NUMBER: 3:15-cv-01436-MMC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT