1   ARNOLD & PORTER LLP
    DANIEL B. ASIMOW (No. 165661)
2   Daniel.Asimow@aporter.com
    EMILY H. WOOD (No. 260382)
3   Emily.Wood@aporter.com
    Three Embarcadero Center, 10th Floor
4   San Francisco, CA 94111-4024
    Telephone:     415.471.3100
5   Facsimile:     415.471.3400

6   ARNOLD & PORTER LLP
    C. SCOTT LENT (Admitted *Pro Hac Vice*)
7   Scott.Lent@aporter.com
    399 Park Avenue
8   New York, NY 10022-4690
    Telephone:     212.715.1000
9   Facsimile:     212.715.1399

10  ARNOLD & PORTER LLP
    TIANA L. RUSSELL (No. 268682)
11  Tiana.Russell@aporter.com
    555 Twelfth Street, NW
12  Washington, DC 20004-1206
    Telephone:     202.942.5000
13  Facsimile:     209.942.5999

14  Attorneys for Defendant
    GOLDEN STATE WARRIORS, LLC

15                  UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                     SAN FRANCISCO DIVISION

18

19

20  STUBHUB, INC.,                          Case No.: 3:15-CV-01436-MMC

21                   Plaintiff,             **DEFENDANT GOLDEN STATE
                                            WARRIORS, LLC'S MOTION TO
22           v.                             DISMISS THE FIRST AMENDED
                                            COMPLAINT AND MEMORANDUM OF
23  GOLDEN STATE WARRIORS, LLC              POINTS AND AUTHORITIES IN
    AND TICKETMASTER, LLC,                  SUPPORT OF THE MOTION TO
24                                          DISMISS
                     Defendants.
25                                          Date:      October 16, 2015
                                            Time:      9:00 a.m.
26                                          Place:     Courtroom 7
                                            Judge:     Hon. Maxine M. Chesney
27

28

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on October 16, 2015 at 9:00 a.m., or as soon thereafter as the matter may be heard by the Court in the courtroom of the Honorable Maxine M. Chesney, Courtroom 7, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendant Golden State Warriors, LLC ("Warriors") will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with prejudice Plaintiff StubHub, Inc.'s ("StubHub") First Amended Complaint ("FAC") in its entirety.  This motion to dismiss is brought on the ground that the claims in the FAC fail to state a claim upon which relief can be granted against the Warriors.

The Warriors' motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the complete files and records in this action, oral argument of counsel, and such other and further matters as this Court may consider.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

INTRODUCTION ..................................................................................... 1

FACTUAL BACKGROUND ....................................................................... 3

    A.    The Parties. ............................................................................... 3

    B.    Distribution Of Warriors Tickets. ................................................. 3

    C.    Alleged Restrictions On Resale Of Warriors Tickets And Claims For Relief. ................................................................................... 4

LEGAL STANDARD FOR A MOTION TO DISMISS ...................................... 5

ARGUMENT .......................................................................................... 6

  I.    ALL OF PLAINTIFF'S ANTITRUST CLAIMS SHOULD BE DISMISSED BECAUSE STUBHUB HAS FAILED TO ALLEGE A RELEVANT MARKET. ................................................................. 6

    A.    StubHub Has Failed To Adequately Allege A Relevant Market That Includes All Reasonably Interchangeable Goods. .................... 7

    B.    Consumer Preferences Cannot Save Its Legally Insufficient Relevant Markets. ...................................................................... 8

    C.    StubHub Improperly Separates Tickets Sold Through Primary Ticket Platforms And Secondary Ticket Exchanges. ....................... 10

  II.    PLAINTIFF HAS NOT ALLEGED A TYING ARRANGEMENT IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT. ..................... 11

  III.    THE FAC FAILS TO ALLEGE ANY AGREEMENT THAT UNREASONABLY RESTRAINS TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT. .............................................. 13

    A.    StubHub Has Failed To Allege The Existence Of An Agreement Between The Warriors And Their Fans. ......................................... 13

    B.    StubHub Has Failed To Allege That Any Agreement Between The Warriors And Their Fans Is Unlawful. ...................................... 14

    C.    StubHub Has Failed To Allege An Anticompetitive Agreement Between The Warriors And Ticketmaster. ...................................... 15

  IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY TO MONOPOLIZE UNDER SECTION 2 OF THE SHERMAN ACT. ............. 17

  V.    PLAINTIFF FAILS TO STATE A CLAIM OF EXCLUSIVE DEALING UNDER SECTION 1 OF THE SHERMAN ACT. ................................... 19

VI.   PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED.                    21

      A.   The Cartwright Act Claim Is Derivative Of StubHub's Sherman
           Act Claims And Fails For The Same Reasons.                     21

      B.   StubHub's Unfair Competition Law Claim Fails For The Same
           Reason Its Sherman Act Claims Fail.                            22

      C.   StubHub Has Failed To Adequately Allege Tortious Interference
           With Prospective Economic Advantage.                          22

           1.   StubHub Has Not Identified Any Existing Economic
                Relationships With Specific Third Parties.               23

           2.   StubHub Has Failed To Allege That The Warriors'
                Conduct Was Independently Unlawful.                      24

CONCLUSION                                                                25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*,
260 F. Supp. 2d 941 (N.D. Cal. 2003) ....................................................................... 25

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010)........................................................................... 15, 19

*Am. Airlines v. Christensen*,
967 F.2d 410 (10th Cir. 1992)................................................................................ 13

*Am. Prof'l Testing Servs. Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
108 F.3d 1147 (9th Cir. 1997)................................................................................ 18

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................. 7, 8, 9

*Apple Inc. v. Samsung Elecs. Co.*,
No. 11–CV–01846–LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) .................................. 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 5

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ............................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................ 5, 6

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999)................................................................................. 7

*Blind Doctor Inc. v. Hunter Douglas, Inc.*,
No. C–04–2678 MHP, 2004 WL 1976562 (N.D. Cal. Sep. 7, 2004) ............................ 14, 15, 16

*Blue Dolphin Charters, Ltd. v. Knight & Carver Yachtcenter, Inc.*,
No. 11-cv-565-L (WVG), 2011 WL 5360074 (S.D. Cal. Nov. 3, 2011) .................................... 24

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................................... 9

*Coca-Cola Co. v. Omni Pac. Co., Inc.*,
No. 3:98-cv-07, 2000 WL 33194867 (N.D. Cal. Sep. 27, 2000) ................................................ 15

*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*,
No. C–09–2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010)........................... 6, 7, 9, 18

*Cont'l T.V., Inc. v. GTE Sylvania Inc.,*
     433 U.S. 36 (1977) ........................................................................................................ 17

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
     906 F.2d 432 (9th Cir. 1990) ......................................................................................... 14

*Cowley v. Braden Indus., Inc.,*
     613 F.2d 751 (9th Cir. 1980) ......................................................................................... 12

*Digital Sun v. Toro Co.,*
     No. 10–CV–4567–LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ...................... 22

*DocMagic, Inc. v. Ellie Mae, Inc.,*
     745 F. Supp. 2d 1119 (N.D. Cal. 2010) ........................................................................ 24

*DocMagic, Inc. v. Ellie Mae, Inc.,*
     No. 3:09–CV–4017–MHP, 2011 WL 871480 (N.D. Cal. Mar. 11, 2011) ...................... 22

*Driskill v. Dall. Cowboys Football Club, Inc.,*
     498 F.2d 321 (5th Cir. 1974) ......................................................................................... 12

*E&L Consulting, Ltd. v. Domain Indus. Ltd.,*
     472 F.3d 23 (2d Cir. 2006) ............................................................................................ 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
     504 U.S. 451 (1992) ....................................................................................................... 11

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,*
     848 F.2d 976 (9th Cir. 1988) ......................................................................................... 19

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.,*
     789 F. Supp. 760 (S.D. Miss. 1992) .............................................................................. 16

*Gini v. Las Vegas Metro. Police Dep't,*
     40 F.3d 1041 (9th Cir. 1994) ......................................................................................... 21

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.,*
     960 F. Supp. 701 (S.D.N.Y. 1997) .................................................................................. 9

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC,*
     371 F.3d 1275 (10th Cir. 2004) ....................................................................................... 9

*Jack Wallers & Sons, Corp. v. Morton Bldg., Inc.,*
     737 F.2d 698 (7th Cir. 1984) ......................................................................................... 15

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
     466 U.S. 2 (1984) ........................................................................................................... 13

*Jobscience, Inc. v. CVPartners, Inc.,*
     No. C 13-04519 WHA, 2014 WL 93976 (N.D. Cal. Jan. 9, 2014) ............................... 23

*Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors*, *Ltd.*
    416 F.2d 71 (9th Cir. 1969)............................................................................................ 15

*Joyce Beverages of N.Y. Inc. v. Royal Crown Cola Co.*,
    555 F. Supp. 271 (S.D.N.Y. 1983).............................................................................. 19

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008).............................................................................. 5, 13

*Ky. Speedway v. NASCAR*,
    588 F.3d 908 (6th Cir. 2009).................................................................................... 7

*Kingray, Inc. v. Nat'l Basketball Ass'n, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ............................................................. 13, 16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ......................................................................................... 12, 14

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) ................................................................................ 9

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 Fed App'x 554 (9th Cir. 2008)........................................................................ 22

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988).................................................................................. 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008).................................................................................. 5

*Morton v. Rank Am., Inc.*,
    812 F. Supp. 1062 (C.D. Cal. 1993) ...................................................................... 23

*Murphy v. Bus. Cards Tomorrow, Inc.*,
    854 F.2d 1202 (9th Cir. 1988).................................................................................. 15

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978)................................................................................................ 14

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008)............................................................................ 6, 9

*nSight, Inc. v. PeopleSoft, Inc.*,
    296 Fed App'x 555 (9th Cir. 2008)........................................................................ 21

*Omega Envtl., Inc. v. Gilbarco*,
    127 F.3d 1157 (9th Cir. 1997)................................................................................ 20

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003)....................................................................... 11, 17, 19

*PNY Techs., Inc. v. SanDisk Corp.*,
  No. 11-cv-04689-WHO, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .................................... 20

*PNY Techs., Inc. v. SanDisk Corp.*,
  No. 11-cv-04689-WHO, 2014 WL 2987322 (N.D. Cal. Jul. 2, 2014)........................................ 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)........................................................................................... 7, 10

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2010) ............................................................................ 23

*Roland Machinery Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984)............................................................................................ 19

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987)............................................................................................ 16

*Ryko Mfg. Co. v. Eden Servs.*,
  823 F.2d 1215 (8th Cir. 1987).......................................................................................... 20

*Sidibe v. Sutter Health*,
  No. C 12-04854 LB, 2013 WL 2422752 (N.D. Cal. Jun. 3, 2013) ............................................. 21

*Soderholm v. Chi. Nat'l League Ball Club, Inc.*,
  587 N.E.2d 517 (Ill. App. 1992) ...................................................................................... 14

*Spinelli v. Nat'l Football League*,
  No. 13–Civ.–7398, 2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015)...................................... 7, 16

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001).............................................................................................. 5

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  782 F. Supp. 2d 1059 (E.D. Cal. 2011) .............................................................................. 18

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001)..................................................................................... 6, 7, 9

*Three Movies of Tarzana v. Pac. Theaters, Inc.*,
  828 F.2d 1395 (9th Cir. 1987)........................................................................................... 16

*Ticketmaster LLC v. Designer Tickets & Tours, Inc.*,
  No. CV 07–1092 ABC, 2008 WL 649804 (C.D. Cal. Mar. 10, 2008) ....................................... 11

*Ticketmaster LLC v. RMG Techs., Inc.*,
  536 F. Supp. 2d 1191 (C.D. Cal. 2008).......................................................................... 10, 11

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
  959 F.2d 468 (3d Cir. 1992)............................................................................................. 12

*TPS Utilicom Servs., Inc. v. AT&T Corp.*,
    223 F. Supp. 2d 1089 (C.D. Cal. 2002)..................................................................................23

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)............................................................................................................14

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)....................................................................................................10, 11

*Universal Grading Serv. v. eBay, Inc.*,
    No. C–09–2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012).............................21

*Venzie Corp. v. U.S. Mineral Prods., Co.*,
    521 F.2d 1309 (3d Cir. 1975)............................................................................................12

*Verizon Commc'n, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................................................18

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
    546 U.S. 164 (2006)............................................................................................................17

*Williams v. Nat'l Football League*,
    No. C14-1089 MJP, 2014 WL 5514378 (W.D. Wash. Oct. 31, 2014) ...................7, 13

**State Cases**

*Aryeh v. Canon Bus. Sols., Inc.*,
    55 Cal. 4th 1185 (2013) ....................................................................................................21

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
    52 Cal. App. 4th 867 (1997)...........................................................................................24

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ......................................................................................................22

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001).............................................................................................22

*In re Cipro Cases I & II*,
    61 Cal. 4th 116 (2015) ......................................................................................................21

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .............................................................................................23, 24

*Marin Cty. Bd. of Realtors, Inc. v. Palsson*,
    16 Cal. 3d 920 (1976) ........................................................................................................21

*NPS LLC v. StubHub, Inc.*,
    No. 06-06-4874-BLS1, 2009 WL 995483 (Mass. Super. Jan. 26, 2009) ...................13

*Roth v. Rhodes*,
    25 Cal. App. 4th 530 (1994)........................................................................... 21, 23, 24

*Tri-Growth Ctr. City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg*,
    216 Cal. App. 3d 1139 (1989) ................................................................................ 24

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996)................................................................................... 23

**STATUTES, RULES AND REGULATIONS**

28 U.S.C.
    §1367.......................................................................................................................... 21
    §1367(c)(3)................................................................................................................. 21

Fed. R. Civ. P. 12(b)(6)................................................................................... 5, 17, 21

Cal. Bus. & Prof. Code §17200 .............................................................................. 22


**OTHER AUTHORITIES**

Phillip E. Areeda, Herbert Hovenkamp, John L. Solow, *Antitrust Law* (3d ed. 2007)
    IIB ¶533e..................................................................................................................... 9
    IIB ¶570b1................................................................................................................. 20

ABA Section of Antitrust Law, *Antitrust Law Developments*, (7th ed. 2012) ................................. 13

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION

3      The Golden State Warriors, LLC ("Warriors") are committed to providing the best possible

4  product for their fans, both on and off the court.  On the court, the Warriors' record as 2014-15

5  NBA Champions speaks for itself.  Off the court, the Warriors seek to provide fans with the most

6  fan-friendly, secure, and technologically-advanced ticketing services available.  This antitrust action

7  by Plaintiff StubHub, Inc. ("StubHub") attempts to challenge a legitimate and pro-competitive

8  approach to secondary ticketing services, in which the Warriors selected defendant Ticketmaster

9  LLC ("Ticketmaster") as the club's authorized provider after a bidding process—a process in which

10 StubHub itself participated.

11     In an arrangement that is not challenged in this litigation, the Warriors have a contract with

12 Ticketmaster to help manage the sale of Warriors tickets.  Ticketmaster sells Warriors single-game

13 and season tickets directly to consumers and provides related services, such as the scanners used to

14 verify tickets at the gate.  This suite of services is sometimes referred to as "Primary Ticket

15 Services," and Ticketmaster provides the Warriors' "Primary Ticket Platform."  StubHub does not

16 offer a Primary Ticket Platform.  Instead, StubHub offers only *secondary* ticket services, providing

17 an exchange through which consumers can resell their tickets for a broad array of sporting and

18 entertainment events.  StubHub earns money through commissions or fees charged on these ticket

19 sales.  StubHub claims to have pioneered this business and is the dominant firm in secondary ticket

20 services; indeed, it is the authorized secondary ticket service for nearly all Major League Baseball

21 teams.

22     In 2013, the Warriors solicited bids for authorized secondary ticket services from numerous

23 providers, including StubHub.  The Warriors decided to appoint an authorized secondary ticket

24 platform in part because of problems with fraudulent secondary sales of Warriors tickets from

25 unauthorized sources.  At every game, the Warriors are forced to turn away disappointed fans who

26 unknowingly purchased fraudulent tickets from unauthorized sources.  After extensive discussions

27 and review of the submitted proposals, the Warriors concluded Ticketmaster offered the best

28 solution and appointed it as the team's authorized provider of secondary ticketing services.

In its First Amended Complaint ("FAC") (Dkt. No. 48), StubHub asserts that its failure to win the bid to provide authorized secondary ticket services somehow constitutes an antitrust violation by the Warriors and Ticketmaster. The antitrust laws, however, protect competition and are not a guarantee of business to any particular competitor. The events described in StubHub's FAC reflect ordinary competitive processes, not antitrust violations. It is therefore unsurprising that StubHub's claims suffer from numerous deficiencies.

Fundamentally, StubHub's FAC is improperly predicated on the assumption that tickets to Warriors home games constitute their own market (because they purportedly do not compete with any other sports or entertainment providers). But the law is properly skeptical of so-called single brand markets, which would turn every seller of a product or service into a monopolist of its own market. Even a seller of a highly attractive product (which, at this moment, Warriors tickets may be) must consider competition from reasonably interchangeable products. Despite its discussion of some data apparently gleaned from StubHub's own sales records, the FAC fails to plausibly allege that other forms of entertainment do not compete with Warriors home games. Moreover, to the extent the FAC depends on the existence of separate markets for the sale of Warriors tickets on primary and secondary ticket platforms, it fails to plausibly allege that distinct markets exist for each of these platforms. The failure to allege proper relevant markets is fatal to all of StubHub's antitrust claims. *See* Part I, *infra*.

The claims in the FAC also suffer from a number of more specific defects. The alleged tying arrangement in the FAC's First Claim is not a tie (a requirement that a buyer take one product as a condition of purchasing another) but instead, at most, a restriction on resale of the original product. *See* Part II, *infra*. The purported agreements in restraint of trade alleged in the Second Claim are not actionable because, as to the Warriors and their fans, there is no allegation of an *agreement*, but instead only a unilateral directive by the Warriors to season ticket holders as to how tickets may be resold. Even if the arrangement qualifies as an agreement, this directive constitutes a permissible restriction on a revocable license. To the extent the Second Claim challenges the Warriors' arrangement with Ticketmaster, the FAC fails to plead any facts to suggest that the Warriors lack the right to appoint an exclusive distributor. *See* Part III, *infra*. The FAC's Third

1    Claim for conspiracy to monopolize fails because the Warriors' restrictions on the sale of their own

2    product cannot constitute monopolization and because the antitrust laws do not require any firm to

3    design its distribution system to satisfy the preferences of potential distributors.  *See* Part IV, *infra*.

4    Nor do the Warriors' arrangements constitute exclusive dealing, as alleged in the Fifth Claim.  To

5    the contrary, the agreements are not exclusive at all (fans remain free to buy tickets for any other

6    event, and Ticketmaster remains free to offer ticketing services to any other entertainment

7    provider).  Nor is there any non-conclusory allegation of substantial foreclosure, as required for an

8    exclusive dealing claim.  *See* Part V, *infra*.  Finally, StubHub's state law claims fail for the same

9    reasons its federal claims fail and because the necessary elements of tortious interference are not

10   alleged.  *See* Part VI, *infra*.  The FAC should be dismissed with prejudice in its entirety.

**FACTUAL BACKGROUND**[1]

11

12   **A.     The Parties.**

13          StubHub is a corporation that offers "Secondary Ticket Exchange" services to resellers and

14   purchasers of tickets for "sporting events, concerts, and other forms of live entertainment."  FAC

15   ¶ 22.  The Warriors own the Golden State Warriors, a professional basketball team in the National

16   Basketball Association ("NBA") and the NBA's current champion.  *Id.* ¶ 27.  Ticketmaster provides

17   Primary Ticket Platform and/or Secondary Ticket Exchange services to various professional sports

18   teams and other entertainment events, including the Warriors.  *Id.* ¶¶ 29-30.  Primary Ticket

19   Services consist of "managing all aspects of the primary ticket sale and distribution process"—*i.e.*,

20   the sale of tickets "directly by the team to fans on a season ticket, block game, or individual game

21   basis."  *Id.* ¶ 40.

22   **B.     Distribution Of Warriors Tickets.**

23          Ticketmaster has served as the Warriors' Primary Ticket Platform for many years.  FAC

24   ¶ 30.  The FAC alleges that approximately 75% of Warriors tickets are sold as season ticket

25   packages and that almost all of these are sold through Ticketmaster's Primary Ticket Platform.  *Id.*

26

27   _____

28   [1] This factual background is based on the allegations of the FAC, which the Warriors accept as true for purposes of this motion only.

1  ¶ 41.  The remaining 25% of primary Warriors ticket sales allegedly occur through Ticketmaster as

2  part of limited packages, group sales, or individual ticket sales.  *Id*.  StubHub does not challenge the

3  Warriors' use of Ticketmaster as the team's Primary Ticket Platform—a service that StubHub does

4  not offer.

5       After the initial (or "primary") purchase of a ticket, some customers choose to resell their

6  tickets.  In fact, many season ticket holders are actually brokers in the business of reselling their

7  tickets at a markup.  FAC ¶¶ 68, 69.  By August 2012, the Warriors had appointed Ticketmaster as

8  the team's authorized Secondary Ticket Exchange partner.  *Id*. ¶¶ 30, 64.  As the FAC also

9  acknowledges, Ticketmaster offers a secondary ticket platform that is technologically integrated

10  with the Warriors' Primary Ticket Platform.  *See id.* ¶¶ 81, 83.  The benefit of this integration is

11  obvious:  Ticketmaster is the only third party able to confirm that a ticket offered for resale is a

12  valid ticket and to prevent an individual from reselling the same ticket multiple times.  As the FAC

13  acknowledges, before such innovations, buying unauthorized secondary tickets was an "unreliable

14  and economically dangerous activity" for fans.  *Id*. ¶57.

15       Although StubHub alleges that the Defendants have improperly advised fans that

16  Ticketmaster is the only Secondary Ticket Exchange option that can provide "guaranteed" or

17  "official" Warriors tickets, these allegations cut against StubHub's specific admission that

18  fraudulent ticket sales *are* a very real problem for Warriors fans.  *Id*. ¶¶ 30, 80.  StubHub also

19  acknowledges that Ticketmaster is the "official" Secondary Ticket Exchange for Warriors tickets,

20  so it can be hardly misleading to refer to Ticketmaster in that manner.  *Id*.  And while referencing

21  the riskiness of unauthorized secondary ticket sales (*see id.* ¶ 57), the FAC fails to acknowledge the

22  severity of the problem of fraudulent tickets for the Warriors, who must deal with upset and often

23  angry fans, and related customer relations issues, when an invalid ticket purchased from an

24  unauthorized source does not scan at the gate.

25       **C.**   **Alleged Restrictions On Resale Of Warriors Tickets And Claims For Relief.**

26       StubHub alleges that starting sometime after 2012, the Warriors began to require season

27  ticket holders to resell their tickets only through Ticketmaster's Secondary Ticket Exchange (FAC

28  ¶¶ 66-67), and began advising season ticket holders that they were at risk of cancellation or non-

1   renewal if they sold tickets on unauthorized sites.  *Id.* ¶¶ 68-73.  StubHub further contends that the

2   Warriors and Ticketmaster monitor where secondary ticket sales take place (*id.* ¶¶ 75-77), that they

3   advise the public that only Ticketmaster's site is authorized (*id.* ¶¶ 78-80), and that they have not

4   permitted StubHub to technologically integrate with the Ticketmaster platform.  *Id.* ¶¶ 81-83.  The

5   FAC nowhere alleges that the Warriors control the prices charged on secondary ticket platforms, or

6   that the Warriors have actually prevented any secondary ticket sales.

7                           **LEGAL STANDARD FOR A MOTION TO DISMISS**

8          A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon

9   which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Although a court must construe a complaint's

10  allegations of material fact in the light most favorable to the plaintiff, "a plaintiff's obligation to

11  provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and

12  a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*,

13  550 U.S. 544, 555 (2007) (alteration in original) (citation omitted).  "To survive a motion to

14  dismiss, a complaint must contain 'sufficient factual matter', accepted as true, to 'state a claim to

15  relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Factual

16  allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S.

17  at 555, and courts "'are not bound to accept as true a legal conclusion couched as a factual

18  allegation.'"  *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted); *see also*

19  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) (holding plaintiff who alleged

20  "only ultimate facts" and "legal conclusions," rather than "evidentiary facts," failed to state claim

21  under Sherman Act).  Courts generally disregard facts that are not alleged on the face of the

22  complaint and need not indulge in unwarranted inferences.  *Metzler Inv. GMBH v. Corinthian*

23  *Colls., Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d

24  979, 988 (9th Cir. 2001).

25         In an antitrust case, "[a] district court must retain the power to insist upon some specificity

26  in pleading before allowing a potentially massive factual controversy to proceed."  *Associated Gen.*

27  *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983).  As the

28  Supreme Court warned in *Twombly*:

[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.  (550 U.S. at 558.)

Consequently, courts should scrutinize claims "at the point of minimum expenditure of time and money by the parties and the court."  *Id.* (internal quotation marks and citation omitted).

**ARGUMENT**

**I.    ALL OF PLAINTIFF'S ANTITRUST CLAIMS SHOULD BE DISMISSED BECAUSE STUBHUB HAS FAILED TO ALLEGE A RELEVANT MARKET.**

In order to properly plead any of its antitrust claims, StubHub must identify and adequately allege the existence of a relevant antitrust market.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063, 1065 (9th Cir. 2001) ("Failure to identify a relevant product market is a proper ground for dismissing a Sherman Act claim.").  The market definition must be plausible on its face and supported by non-conclusory factual allegations.  *See Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, No. C–09–2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010), *aff'd*, 444 Fed App'x 937 (9th Cir. 2011) (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).  A product market is determined "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Colonial Med. Grp.*, 2010 WL 2108123, at *3.

StubHub attempts to allege two antitrust markets:  "(1) the primary market for the sale of tickets to professional basketball games in the Bay Area (the "Primary Ticket Market"); and (2) the market for the sale of Secondary Ticket Exchange services for tickets to professional basketball games in the Bay Area (the 'Secondary Ticket Services Market')."  FAC ¶ 85.  While StubHub has modified the wording of the market definitions from its original complaint—which expressly alleged relevant markets concerning Warriors tickets—this is a distinction without a difference.  There is only one professional basketball team in the Bay Area, at least as the FAC defines the region (as "the San Francisco - Oakland - Fremont Metropolitan Statistical Area (MSA)").  *Id.* ¶ 99.  This single brand market, defined by the identity of the seller and not the characteristics of the product, fails as a matter of law.

1

2

**A.    StubHub Has Failed To Adequately Allege A Relevant Market That Includes All Reasonably Interchangeable Goods.**

3      Courts consistently reject market definitions that fail to include all reasonably

4   interchangeable products or services.  *See, e.g.*, *Ky. Speedway v. NASCAR*, 588 F.3d 908, 917 (6th

5   Cir. 2009); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999)

6   (affirming dismissal of antitrust claim when plaintiff failed to allege that asserted market was the

7   "area of effective competition" and that "there are no other goods or services … reasonably

8   interchangeable"); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195-96 (N.D. Cal. 2008)

9   (granting motion to dismiss antitrust claims where parties alleged a relevant product market limited

10  to a single product).  Claims that are predicated on an unreasonably narrow market are "legally

11  insufficient and a motion to dismiss may be granted."  *Colonial Med. Grp.*, 2010 WL 2108123, at

12  *3 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *see*

13  *also Tanaka*, 252 F.3d at 1062-63 (affirming dismissal where plaintiff failed to allege any facts to

14  support "conclusory" assertion that market existed); *Queen City Pizza*, 124 F.3d at 436 (dismissing

15  antitrust claims "[w]here the plaintiff fail[ed] to define its proposed relevant market with reference

16  to the rule of reasonable interchangeability and cross-elasticity of demand, [and] allege[d] a

17  proposed relevant market that clearly does not encompass all interchangeable substitute products

18  even when all factual inferences are granted in plaintiff's favor.").

19      As with its original complaint, StubHub attempts to construct two artificial markets

20  composed of only Warriors tickets.  At bottom, these markets are defined by the seller and not by

21  the product, and are known as single-brand markets.  Single-brand market definitions are so "rare"

22  and "counterintuitive" that they may be dismissed at the pleading stage without further factual

23  inquiry.  *Psystar*, 586 F. Supp. 2d at 1197 (dismissing claims after noting that plaintiff was unable

24  to cite a single decision lending support to its single-brand product market theory).  Indeed, "to

25  define the market as that group of products over which a defendant exercises control would as an

26  analytic matter read[] the market definition step out of the Sherman Act."  *Spinelli v. Nat'l Football*

27  *League*, No. 13–Civ.–7398 (RWS), 2015 WL 1433370, at *21 (S.D.N.Y. Mar. 27, 2015)

28  (quotations omitted); *see also Williams v. Nat'l Football League*, No. C14-1089 MJP, 2014 WL

5514378, at *4 (W.D. Wash. Oct. 31, 2014) (dismissing antitrust claims because "[p]laintiff's threadbare allegations do not relate to competition between firms in a market, but to the exercise of a natural monopoly on sales of tickets to a single stadium.").

Given the extreme rarity of single brand markets, the FAC fails to allege facts plausibly supporting its counterintuitive claim that Warriors tickets are so unique that they "suffer[] no actual or potential competitors." *Psystar*, 586 F. Supp. 2d at 1195-96.  StubHub now acknowledges the existence of other forms of entertainment (FAC ¶ 35), and admits that 49% of its users who purchase Warriors tickets have also purchased tickets to other events.  FAC ¶ 37.  For the remaining 51%, StubHub merely alleges that tickets to other events have not been purchased *through StubHub*—not that these consumers do not purchase other tickets through other channels.  *Id.*  StubHub also makes the unsurprising but legally irrelevant assertions that the price of Warriors tickets varies with the quality of the opposition, and that, in light of the Warriors' great success in the last few years, demand for Warriors tickets is high.  *Id.* ¶¶ 33, 38-39.  But the fact that the price of a particular item varies in response to its own quality does not mean that the product faces no competition.  *Psystar*, 586 F. Supp. 2d at 1199 ("The mere existence of a price differential . . . does not necessarily mean that a product is unconstrained by competition.").  To the contrary, prices of any differentiated product in a competitive market may change with a variety of factors.  StubHub's core allegation—that "there is virtually no cross-elasticity of demand between Warriors tickets and tickets to other entertainment events" (FAC ¶ 34) is merely a legal conclusion that this Court need not accept.  *Psystar*, 586 F. Supp. 2d at 1198 (conclusory allegations regarding cross-elasticity of demand fail as a matter of law because they "merely restate a commonly used test for market definition without providing any factual basis for the claim").

**B.    Consumer Preferences Cannot Save Its Legally Insufficient Relevant Markets.**

Despite its reference to other competing forms of sports and entertainment, StubHub continues to rest its market definition on consumer preferences:  "Warriors' fans who root for the likes of particular Warriors players – such as Stephen Curry, Klay Thompson, or Draymond Green – do not consider other NBA team tickets to be a substitute for Warriors tickets."  FAC ¶ 33.  But "[e]ven where brand loyalty is intense, courts reject the argument that a single branded product

1    constitutes a relevant market." *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d

2    1275, 1282 (10th Cir. 2004); *see also Psystar*, 586 F. Supp. 2d at 1199 (rejecting a market defined

3    as the Apple Macintosh Operating System, even though the complaint alleged strong customer

4    loyalty and premium prices, because plaintiff failed to plausibly allege that Apple was "*wholly*

5    lacking in competition") (emphasis in original).  Put simply, market definitions based upon the

6    consumers of a product and not the product itself are "facially unsustainable." *Newcal Indus.*, 513

7    F.3d at 1045 ("The consumers do not define the boundaries of the market; the products or producers

8    do." (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)); *see also Colonial Med.*

9    *Grp.*, 2010 WL 2108123, at *3 (granting motion to dismiss where plaintiff "defined the market by

10   reference to a consumer"); *Tanaka*, 252 F.3d at 1063 ("[S]trictly personal preference is . . .

11   irrelevant to the antitrust inquiry.").[2]

12        StubHub's FAC fails to allege that Warriors tickets are different from other products, resting

13   instead on repeated assertions that Warriors' fans prefer Warriors tickets.  Such product

14   differentiation does not create a separate market.  *Global Disc. Travel Servs., LLC v. Trans World*

15   *Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("A consumer might choose to purchase a

16   certain product because the manufacturer has spent time and energy differentiating his or her

17   creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and

18   NBC is just another television network.").  While the Warriors value and appreciate their fan

19   loyalty, in the antitrust world, the Warriors are just another professional sports team and just another

20   form of entertainment.  In considering whether "the degree of power inherent in each differentiated

21   product [is] sufficient to make each brand a separate market," "[t]he answer is almost uniformly

22   negative." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 129 (C.D. Cal. 2007) (citing IIB

23   Phillip E. Areeda, Herbert Hovenkamp, John L. Solow, *Antitrust Law* ¶533e (3d ed. 2007)

24   ("Areeda").  That is the case here as well.

25

26

27   _____
     [2] StubHub's argument regarding consumer preference is plainly inapplicable to the many brokers
28   who purchase Warriors tickets (*see* FAC ¶¶ 68, 69).  Brokers purchase tickets not because they are
     rooting for a particular player, but in order to resell the tickets at a markup.

1

2
      **C.**    **StubHub Improperly Separates Tickets Sold Through Primary Ticket Platforms And Secondary Ticket Exchanges.**

3
      StubHub's market definition suffers from the further defect that it tries to carve out two

4
separate single brand markets of Warriors tickets:  those sold through Primary Ticket Platforms and

5
those sold through Secondary Ticket Exchanges.  This definition belies logic.  The primary and

6
secondary platforms for Warriors tickets cannot be legally separate "relevant product markets" for

7
antitrust purposes because tickets sold in those "markets" are identical and completely

8
interchangeable.  *See Queen City Pizza*, 124 F.3d at 437-38 ("Interchangeability implies that one

9
product is roughly equivalent to another for the use to which it is put."); *see also United States v.*

10
*E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (noting that "no more definite rule can be

11
declared than that commodities reasonably interchangeable by consumers for the same purposes

12
make up" the relevant market).

13
      Indeed, the FAC effectively admits that "primary" and "secondary" tickets compete with

14
each other on price.  *See* FAC ¶ 52 ("There are likewise many reasons why consumers choose to

15
purchase Warriors tickets by resale through a Secondary Ticket Exchange . . . the purchaser might

16
be able to find a better price. . . ."); *id.* ¶ 48 ("That this variance in price is generated by competitive

17
supply and demand characteristics reflects that tickets sold through a Secondary Ticket Exchange

18
are sensitive to supply and demand conditions, setting them apart from tickets sold through a

19
Primary Ticket Exchange, which are typically sold universally at face value or at some universally

20
discounted rate.").  This is the very definition of two products that are in the same market—the

21
price for one leads customers to substitute away to the other.

22
      In *Ticketmaster LLC v. RMG Technologies, Inc*., the Central District of California rejected a

23
similar attempt to distinguish between primary and secondary ticket distribution services,

24
rhetorically asking, "Why are retail and resale tickets not acceptable economic substitutes for each

25
other?  The Court is reasonably sure that . . . [a consumer] would not care whether her ticket was

26
purchased through Ticketmaster in the 'retail' market or from a ticket broker in the 'resale' market

27
. . . as long as she is able to attend the [event]."  536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008).

28
Similarly, StubHub offers no factual support for why retail and resale tickets are not economic

- 10 -

substitutes.  Absent such allegations, the FAC fails to sufficiently assert that there are two distinct markets involving the sale of Warriors tickets.[3]

## II. PLAINTIFF HAS NOT ALLEGED A TYING ARRANGEMENT IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

Plaintiff's First Claim for Relief asserts a tying arrangement.  A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992).  To prevail on its tying claim, StubHub must prove three elements:  (1) there exist two distinct products or services in different markets whose sales are tied together; (2) the seller possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market.  *See Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1159 (9th Cir. 2003).

Fundamentally, Plaintiff confuses a tying arrangement with a resale restriction.  The FAC alleges that "Defendants are tying the sale of Warriors tickets sold in the Primary Market to Ticketmaster's Secondary Ticket Exchange services for the resale of Warriors tickets."  FAC ¶ 119.

---

[3] Furthermore, Plaintiff's FAC confuses the relevant product markets between *tickets* and *ticket distribution services*.  In *RMG Techs., Inc.,* the court explained that "[i]t does not suffice to refer to the 'retail ticket sales market' or the 'ticket resale market'. . .because either of those terms could encompass both tickets and ticket distribution services."  536 F. Supp. 2d at 1196.  The Court concluded that such ambiguity in the complaint was "facially unsustainable."  *Id.*  Similarly, in *Ticketmaster LLC v. Designer Tickets & Tours, Inc.*, No. CV 07–1092 ABC, 2008 WL 649804, at *4 (C.D. Cal. Mar. 10, 2008), the court took issue with the "confusion as to what product is at issue in the alleged 'market for secondary ticket distribution services':  tickets, or ticket distribution services.  The two are not the same, and while one entity could theoretically sell both, tickets and ticket distribution services are not 'economic substitutes' that would belong in the same product market for antitrust purposes.  *Id.*  StubHub's FAC has similar problems.  The alleged "market for the sale of tickets" could encompass either the platforms selling such tickets or the tickets themselves.  Similarly, it is unclear whether the alleged "market for the sale of Secondary Ticket Exchange services for tickets" refers to the selling of exchange services, the exchange services themselves, or the tickets on such exchanges.  Certain allegations seem to pertain to the services provided by StubHub and Ticketmaster in the Secondary Ticket Exchange Market (*see, e.g.*, FAC ¶¶ 14, 66), some allegations refer to ticketholders' ability to resell of tickets over Secondary Ticket Exchanges (*see, e.g.*, FAC ¶¶ 10, 71), other allegations refer to the "Primary Ticket Market" (*see, e.g.*, FAC ¶ 117), while still others pertain to the tickets themselves (*see, e.g.*, FAC ¶ 93).  This lack of clarity is a further basis for dismissal.

1   In other words, StubHub alleges that the Warriors condition Warriors ticket sales on customers'

2   agreements not to resell the tickets on unapproved websites.  That is not a *per se* illegal tying

3   arrangement.  Rather, this is an instance where a product allegedly has been sold with contractual

4   restrictions on its further distribution—no different from any other vertical distribution restriction,

5   such as restrictions that limit a buyer to certain territories, customers, or prices—all of which are

6   judged under the rule of reason.  *Cowley v. Braden Indus., Inc.*, 613 F.2d 751, 755 (9th Cir. 1980)

7   (vertical non-price restrictions are properly governed under the rule of reason); *Leegin Creative*

8   *Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (vertical price restrictions are governed

9   by the rule of reason).  StubHub is attempting to impermissibly cast an ordinary vertical distribution

10  restriction subject to the rule of reason as a tying arrangement potentially subject to *per se*

11  treatment.  *See Venzie Corp. v. U.S. Mineral Prods., Co.*, 521 F.2d 1309, 1316-18 (3d Cir. 1975)

12  ("The critical deficiency in plaintiffs' efforts to prove an illegal tie-in [based on an alleged resale

13  restriction] is that they have failed to establish a factual pattern that falls within the definition of

14  arrangements which the Supreme Court has declared illegal per se.").

15      StubHub's tying allegations fail for several other independent reasons.  *First*, StubHub fails

16  to adequately plead any relevant antitrust market.  *See* Part I, *supra*; *see also Town Sound & Custom*

17  *Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir. 1992) (rejecting plaintiffs'

18  allegations that the relevant tying product market consisted of "new Chrysler cars manufactured for

19  sale in the United States" because "such a narrow definition makes no sense in terms of real world

20  economics").  *Second,* StubHub fails to allege that the Warriors had "sufficient economic power in

21  the tying market to coerce purchase of the tied product."  *See Driskill v. Dall. Cowboys Football*

22  *Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974) (holding that linkage of season tickets to preseason

23  tickets and stadium bonds did not constitute an illegal tying arrangement).  *Third*, even if StubHub's

24  Warriors-only market definition were allowable, the tying claim does not involve two separate

25  products.  StubHub's alleged relevant markets—"the sale of Warriors tickets sold through Primary

26  Ticket Platforms" and "Secondary Ticket Exchange Services for the resale of Warriors tickets"—

27  fail to meet the applicable test, which asks whether "sufficient demand" for the purchase of the tied

28  product exists separate from the demand for the tying product—*i.e.*, is there "a distinct product

- 12 -

market in which it is efficient to offer" the two separately.  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984).  Here, there is no separate "relevant product market" for the resale of tickets because Warriors tickets sold in the alleged primary and secondary markets are the same.

### III.   THE FAC FAILS TO ALLEGE ANY AGREEMENT THAT UNREASONABLY RESTRAINS TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

In its Second Claim for Relief, StubHub claims that the Warriors have entered into one or more unlawful agreements in restraint of trade.  The FAC is unclear as to what exactly this agreement is—is it a purported agreement between the Warriors and its fans or is it an agreement between the Warriors and Ticketmaster?  *See* FAC ¶ 125.  Either way, the claim fails and should be dismissed.  To state a Sherman Act Section 1 claim, a private antitrust plaintiff must plead facts showing that:  (1) the defendant was a party to an agreement ("contract, combination or conspiracy"); (2) that unreasonably restrained trade; and (3) proximately inflicted antitrust injury on the plaintiff.  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811-12 (9th Cir. 1988); *Kendall*, 518 F.3d at 1047; *see also Kingray, Inc. v. Nat'l Basketball Ass'n, Inc.*, 188 F. Supp. 2d 1177, 1187, 1198 (S.D. Cal. 2002).  StubHub has not adequately pled any of these elements.

### A.   StubHub Has Failed To Allege The Existence Of An Agreement Between The Warriors And Their Fans.

To the extent that StubHub's Section 1 claim is based on an alleged agreement between the Warriors and primary ticket purchasers (FAC ¶¶ 67-73 (alleging that Warriors informed season ticket holders that they might not be renewed if they listed their tickets for resale on an unauthorized site)), its claim cannot be sustained.  StubHub does not allege an actual agreement, as opposed to unilateral actions by the Warriors.  As an initial matter, a ticket to a sporting event is a revocable license, and licensors are generally permitted to impose restrictions on revocable licenses.  *See NPS LLC v. StubHub, Inc.*, No. 06-06-4874-BLS1, 2009 WL 995483, at *4 (Mass. Super. Jan. 26, 2009) (finding that "the purchase of a ticket to a sports or entertainment event typically creates nothing more than a revocable license"); *Am. Airlines v. Christensen*, 967 F.2d 410, 415 (10th Cir. 1992) (holding that "[r]ules restricting the transfer of contract rights such as the 'no-sale' rule are regularly enforced without inquiry into their reasonableness."); *see also Williams v. Nat'l Football League*,

No. C14-1089 MJP, 2014 WL 5514378, at *4 (W.D. Wash. Oct. 31, 2014) ("Tickets to a Seahawks

game are not tangible goods, but revocable licenses".).

As the issuer of a revocable license, the Warriors can unilaterally impose ticket limitations,

including resale restrictions. *Soderholm v. Chi. Nat'l League Ball Club, Inc.*, 587 N.E.2d 517, 520

(Ill. App. 1992) (finding that ticketholder only has the right to watch an event, "*subject to all terms,*

*conditions, and policies established by the [team]*") (emphasis added). Such unilateral conduct

does not constitute an agreement under Section 1 of the Sherman Act. To the extent the Warriors

informed fans that their season tickets would not be renewed if they engaged in unauthorized

secondary sales, there is no "agreement"—even if fans acceded to the team's wishes. Any seller of

goods or services is free to announce its policies and decline to do business with those who fail to

comply with those policies; such conduct by the seller is unilateral and entirely outside the purview

of Section 1 of the Sherman Act. *See In re Coordinated Pretrial Proceedings in Petroleum Prods.*

*Antitrust Litig.*, 906 F.2d 432, 440 (9th Cir. 1990) ("Under *United States v. Colgate & Co.*, 250 U.S.

300 (1919), it is clear that a manufacturer can have discretion over whom it wishes to deal with so

that it can maintain order in its distribution ranks."); *Blind Doctor Inc. v. Hunter Douglas, Inc.*, No.

C–04–2678 MHP, 2004 WL 1976562, at *5 (N.D. Cal. Sep. 7, 2004).

**B.     StubHub Has Failed To Allege That Any Agreement Between The Warriors And Their Fans Is Unlawful.**

Even if StubHub has successfully pled the existence of an actual agreement between the

Warriors and the fans, which it has not, the agreement would not be anticompetitive. Although

StubHub captions its Second Claim of Relief as "*Per se* or Rule of Reason," it makes no effort to

allege a *per se* violation. The *per se* rule is limited to a few categories of pernicious conduct—*e.g.*,

horizontal price fixing and horizontal market division—that are nowhere alleged in the FAC.[4]  *See*

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 682 (1978) (*per se* rule limited to

agreements that are "plainly anticompetitive" and "lack . . . any redeeming value"). In addition,

under current jurisprudence, only horizontal arrangements are subject to the *per se* rule. *See Leegin*,

---

[4] To the extent tying may be considered a *per se* violation, the Warriors have addressed why StubHub's purported tying claim fails in Part II, *supra*.

551 U.S. at 895 (overruling *per se* rule against vertical price fixing); *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("Consequently, 'an exclusive-dealing arrangement does not constitute a per se violation of section 1.'").  The allegations in the FAC focus entirely on vertical relationships between the Warriors, Ticketmaster and fans, to which the *per se* rule is inapplicable.

StubHub's allegations are equally insufficient under the rule of reason.  Nowhere does the FAC allege how a restriction limiting the manner of resale could hurt interbrand competition; nor could it plausibly do so.  There is nothing about such a restriction that forecloses competing entertainment providers from access to customers or suppliers.  Limitations on how a product is resold that do not impact interbrand competition are permitted under the rule of reason.  *See, e.g.*, *Murphy v. Bus. Cards Tomorrow, Inc.,* 854 F.2d 1202, 1205 (9th Cir. 1988) (territorial restriction's "effect on intrabrand competition 'is not relevant if there is intense interbrand competition.'"); *Coca-Cola Co. v. Omni Pac. Co., Inc.*, No. 3:98-cv-0787, 2000 WL 33194867, at *6 (N.D. Cal. Sept. 27, 2000); *Jack Wallers & Sons, Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984).  In essence, the alleged restriction is on how and to whom fans may sell their tickets, and, as one leading treatise notes, no court has found a vertical customer or territory restriction unlawful in over 25 years.  *See* ABA Section of Antitrust Law, *Antitrust Law Developments* 159 (7th ed. 2012).

**C.** **StubHub Has Failed To Allege An Anticompetitive Agreement Between The Warriors And Ticketmaster.**

The FAC references an "arrangement" between the Warriors and Ticketmaster pursuant to which they share revenue from secondary ticket sales (FAC ¶ 64), as well as a contract by which Ticketmaster is the only authorized provider of primary tickets for the Warriors.  *Id.* ¶ 44.  Read generously, the FAC alleges that the Warriors appointed Ticketmaster their exclusive distributor for primary and secondary ticket services.  As a general matter, a firm is permitted to choose with whom it wishes to deal,[5] and is equally free to appoint an exclusive distributor.  *See, e.g.*, *Rutman*

---

[5] *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors*, *Ltd.* 416 F.2d 71, 78 (9th Cir. 1969) ("We think it indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B."); *Blind Doctor Inc.*, 2004 WL 1976562, at *5 ("The Ninth Circuit has long held that manufacturers are able 'to choose with whom they wish to deal and
(Footnote Cont'd on Following Page)

*Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735-36 (9th Cir. 1987).  Because a firm could

choose to distribute its own products, the appointment of an exclusive distributor is unlikely to raise

any antitrust concern.  *See Three Movies of Tarzana v. Pac. Theaters, Inc.*, 828 F.2d 1395, 1399

(9th Cir. 1987) (movie distributors' grant of exclusive exhibition licenses to particular theaters not

an unreasonable restraint); *E&L Consulting, Ltd. v. Domain Indus. Ltd,* 472 F.3d 23, 30 (2d Cir.

2006) (appointment of exclusive distributor does not harm competition because same effects can be

achieved "without the aid of a distributor."); *Spinelli*, 2015 WL 1433370, at *25.  For instance, in

*Kingray*, the plaintiffs challenged the NBA's appointment of DirecTV as the exclusive distributor

of out-of-market NBA games, and alleged that they improperly excluded DirecTV's competitor,

Echostar.  188 F. Supp. 2d at 1196.  The court dismissed the claim, emphasizing that "[a]n

agreement between a manufacturer and a distributor to establish an exclusive distributorship is not,

standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect

competition in the market."  *Id.*  The court further noted that "[a] manufacturer can terminate

distributors and agree to an exclusive distributorship without implicating Section 1 . . . [and] such

termination does not create an inference that harm to competition was intended."  *Id.* at 1197.  The

mere fact that Echostar and other satellite providers were not authorized to broadcast NBA games

was insufficient to allege an antitrust violation.  *Id.*  Similarly, StubHub has alleged nothing more

than that it is not authorized to serve as a Secondary Ticket Exchange for the resale of Warriors

tickets.

Only in the very rare circumstance where an exclusive distributorship threatens competition

between brands—so-called interbrand competition—can there be an "anticompetitive effect" that

raises antitrust concern.  *See Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV

Corp.*, 789 F. Supp. 760, 767 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) (finding no

anticompetitive effect in a relevant market where impact was only on intrabrand competition and

holding that "a supplier's substitution of 'one distributor for another must allege anticompetitive

---

(Footnote Cont'd From Previous Page)

unilaterally may refuse to deal with a distributor or customer for business reasons without running
afoul of antitrust laws.'").

effect at the interbrand level' of competition to survive a Rule 12(b)(6) motion"); *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 180-81 (2006) (interbrand competition is the primary concern of antitrust law); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 51-52, n.19 (1977).

StubHub has not alleged any concrete harm to interbrand competition.  Instead, it alleges in general terms that the Warriors' conduct limited StubHub's ability to resell Warriors tickets.  *See, e.g.*, FAC ¶¶ 105-07.  These allegations of harm to intrabrand competition (*i.e.*, competition between sellers of Warriors tickets) are insufficient to survive a motion to dismiss.  The Supreme Court has emphasized that manufacturer-imposed vertical restraints on intrabrand competition are often pro-competitive, even when their "intent and competitive impact" is to "limit[] the freedom of the retailer to dispose of the purchased products as he desires[s]."  *Cont'l T.V.*, 433 U.S. at 46, 54-55.  Such restraints may increase interbrand competition by "induc[ing] retailers to engage in promotional activities or to provide service[s]" and protect "safety and quality" that "might not be provided by retailers in a purely competitive situation."  *Id.* at 55.  The same is true here.  By providing an efficient, secure mechanism for fans to resell tickets, the Warriors make their season ticket offerings more attractive and compete more effectively against other sports and entertainment providers.  As such, the alleged resale restraint promotes interbrand competition and does not raise antitrust concerns.

## IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY TO MONOPOLIZE UNDER SECTION 2 OF THE SHERMAN ACT.[6]

StubHub's Third Claim for Relief alleges a conspiracy to monopolize in violation of Section 2.  To prevail on this claim, Plaintiff must allege:  "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."  *Paladin.*, 328 F.3d at 1158.  The FAC alleges that "Defendants have coordinated their efforts to force season ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services; monitor, enforce and/or coerce

---

[6] StubHub also alleges an attempted monopolization claim only against Ticketmaster.

1   compliance with their restrictive policies; exclusively and deceptively market and promote

2   Ticketmaster; and/or preclude competitor Secondary Ticket Exchanges from integrating with [the

3   Warriors'] Primary Ticket Platform (i.e., Ticketmaster)."  FAC ¶ 134.  None of these allegations

4   amounts to a conspiracy to monopolize, and the claim should be dismissed.

5          As an initial matter, a monopolization claim of any sort requires the identification of a

6   relevant antitrust market.  *Colonial Med. Grp.*, 2010 WL 2108123, at *3.  As previously discussed

7   in Section I, StubHub has failed to plead any relevant market.  A monopolization claim must also be

8   based on exclusionary conduct, but StubHub fails to identify any.  StubHub complains that the

9   Warriors "preclude competitor Secondary Ticket Exchanges from integrating with Golden State's

10  Primary Ticket Platform."  FAC ¶ 134.  However, antitrust law does not require the Warriors (or

11  Ticketmaster, for that matter) to offer technological integration to StubHub.  *See Verizon Commc'n,*

12  *Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 411 (2004).  The Warriors have no

13  obligation to assist StubHub's business, and the FAC does not allege such an obligation.  Nor does

14  the FAC sufficiently allege false statements by the Warriors, let alone at a level pervasive enough to

15  amount to exclusionary conduct.  *See Am. Prof'l Testing Servs. Inc. v. Harcourt Brace Jovanovich*

16  *Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).  StubHub has failed to assert

17  sufficient allegations to overcome the presumption that the effect of such alleged statements was de

18  minimis.

19         Additionally, StubHub's conspiracy to monopolize claim fails to allege a "specific intent to

20  monopolize and anticompetitive acts designed to effect that intent."  *Stanislaus Food Prods. Co. v.*

21  *USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1078 (E.D. Cal. 2011).  StubHub's conclusory

22  allegations fail to plead facts indicating that defendants intended to exclude competition or control

23  prices, and the conspiracy to monopolize claim, therefore, should be dismissed.  *See id.* at 1079

24  (dismissing conspiracy to monopolize claim where plaintiff's "conclusory allegation of specific

25  intent does not allege the facts in which defendants intended and did drive out independent

26  competitors").  Finally, StubHub makes no showing of causal antitrust injury.  As previously

27  discussed in Part III, StubHub has failed to allege any injury to interbrand competition.  Where a

28  defendant's conduct harms a plaintiff without adversely affecting competition generally, there is no

antitrust injury.  *Paladin*, 328 F.3d at 1158 (dismissing conspiracy to monopolize claims for failure

to show antitrust injury).

## V.   PLAINTIFF FAILS TO STATE A CLAIM OF EXCLUSIVE DEALING UNDER SECTION 1 OF THE SHERMAN ACT.

StubHub's Fifth Claim asserts exclusive dealing in violation of Section 1 of the Sherman

Act.  It is not clear what this new count (which did not appear in the original complaint) is intended

to add; exclusive dealing is simply a particular type of restraint of trade (that may violate Section 1

of the Sherman Act) and the FAC already alleges in more general terms that the Warriors entered

into agreements in restraint of trade in violation of Section 1.  In any event, even analyzed under the

specific rubric of exclusive dealing, StubHub has failed to plead a valid claim.  "Exclusive dealing

involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a

given good from any other vendor."  *Allied Orthopedic Appliances*, 592 F.3d at 996.  Despite its

labels, the FAC alleges nothing of the kind.  Nowhere does the FAC assert that the Warriors require

fans not to buy tickets to other sporting events from any other seller.  Nor does it allege that the

Warriors have precluded Ticketmaster from dealing with whichever other sellers it pleases.

Whatever the FAC alleges, it is not exclusive dealing.[7]

Moreover, the FAC fails to plead the necessary elements of an exclusive dealing claim.  In

light of the well-recognized economic benefits of exclusive dealing arrangements, including

enhanced interbrand competition, they are evaluated under the rule of reason.  *Id.*; *see also Joyce*

*Beverages of N.Y. Inc. v. Royal Crown Cola Co.,* 555 F. Supp. 271, 277–78 (S.D.N.Y. 1983).

Under the rule of reason, short-term exclusive dealing arrangements are almost always lawful.  *See,*

*e.g.*, *Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 982 (9th Cir. 1988) (six-

year lease upheld); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 394-95 (7th Cir. 1984)

("contracts terminable in less than a year are presumptively lawful"); *PNY Techs., Inc. v. SanDisk*

---

[7] Exclusive dealing is distinct from the appointment of an exclusive distributorship, where a firm
appoints a single authorized distributor of its products.  *See* ABA Section of Antitrust Law,
*Antitrust Law Developments* 161 n.988 (7th ed. 2012).  As previously discussed, the complaint fails
to allege an unlawful exclusive distributorship.

1    *Corp.*, No. 11-cv-04689-WHO, 2014 WL 1677521, at *5 (N.D. Cal. Apr. 25, 2014) (noting that

2    even contracts with three-year terms were sufficiently short to negate arguments of unlawful

3    foreclosure).  StubHub has made no allegations at all about the *duration* of the alleged exclusive

4    dealing, much less claimed that the defendants are engaged in long-term exclusive dealing that

5    theoretically could raise competitive concerns.

6         Exclusive dealing arrangements are also problematic only when they "foreclose" a

7    substantial share of competition in a relevant market.  *Id.*  While the FAC points to three different

8    arrangements—an agreement between the Warriors and Ticketmaster concerning secondary

9    ticketing services, an agreement between the Warriors and Ticketmaster concerning primary

10    ticketing services, and an alleged arrangement between the Warriors and their fans (FAC ¶¶ 145-47)

11    —it fails to identify any substantial foreclosure of competition.  The FAC contains no allegations

12    about how the distribution market operates (*e.g.*, who are the competitors to StubHub and

13    Ticketmaster), much less what portion of it is foreclosed by the alleged agreements.  Nor does the

14    FAC allege that the Warriors prevent their fans from purchasing other teams' tickets or selling other

15    teams' tickets on StubHub.  *See supra* IIB Areeda ¶570b1 (noting that foreclosure calculation

16    "includes the full range of selling opportunities reasonably open to rivals, namely, all the product

17    and geographic sales they may readily compete for, using easily convertible plants and marketing

18    organizations").  With regard to the arrangements between Ticketmaster and the Warriors, courts

19    have found that exclusive dealing arrangements imposed on distributors rather than end-users are

20    generally less cause for anticompetitive concern.  *Omega Envtl., Inc. v. Gilbarco*, 127 F.3d 1157,

21    1163 (9th Cir. 1997) ("Where the exclusive dealing restraint operates at the distributor level, rather

22    than at the consumer level, we require a higher standard of proof of 'substantial foreclosure.'"

23    (*quoting Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1235 (8th Cir. 1987)).  "If competitors can

24    reach the ultimate consumers of the product by employing existing or potential alternative channels

25    of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition

26    *any* part of the relevant market."  *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689-WHO, 2014

27    WL 2987322, at *4 (N.D. Cal. Jul. 2, 2014) (citing *Omega Envtl.*, 127 F.2d at 1163).  Nothing in the

28

1    FAC suggests that competitors of the Warriors are unable to sell their products to potential

2    customers.

3    **VI.    PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED.**

4            StubHub's Sixth through Eighth Claims are asserted under state law.  As a threshold matter,

5    the only basis asserted by StubHub for jurisdiction over these claims is the supplemental

6    jurisdiction statute, 28 U.S.C. Section 1367.  *See* FAC ¶ 19.  Because StubHub's federal claims

7    should be dismissed, this Court should decline to exercise jurisdiction over its state law claims.  *See*

8    28 U.S.C. §1367(c)(3); *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994)

9    ("[I]n the usual case in which federal-law claims are eliminated before trial, the balance of

10   factors . . . will point toward declining to exercise jurisdiction over the remaining state law

11   claims.").  In any event, each of the state law claims is subject to dismissal in its own right.

12
13          **A.    The Cartwright Act Claim Is Derivative Of StubHub's Sherman Act Claims
                    And Fails For The Same Reasons.**

14          While the Cartwright Act is not directly modeled on the Sherman Act, interpretations of the

15   Sherman Act are, at a minimum, instructive to application of the Cartwright Act (*see Aryeh v.*

16   *Canon Bus. Sols., Inc.,* 55 Cal. 4th 1185, 1195 (2013)) and only rarely should the interpretation of

17   one depart from the other.  *See In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015); *Marin Cty. Bd. of*

18   *Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976).  Numerous courts have held that, as general

19   matter, the same analysis applies under either statute.  *See, e.g.*, *Roth v. Rhodes*, 25 Cal. App. 4th

20   530, 542 (1994); *Universal Grading Serv. v. eBay, Inc*., No. C–09–2755 RMW, 2012 WL 70644, at

21   *10 (N.D. Cal. Jan. 9, 2012) (holding that interpretation of the Sherman Act is "applicable to the

22   Cartwright Act.").  Thus, the Cartwright Act claim should be dismissed for the same reasons that

23   each of StubHub's Sherman Act claims fail.  *See nSight, Inc. v. PeopleSoft, Inc.*, 296 Fed. App'x

24   555, 558 n.3 (9th Cir. 2008) (affirming dismissal of Cartwright claim because plaintiff's Sherman

25   Act claim was deficient under Rule 12(b)(6)); *Sidibe v. Sutter Health*, No. C 12-04854 LB, 2013

26   WL 2422752, at *17 (N.D. Cal. Jun. 3, 2013) (holding that because plaintiffs' exclusive dealing

27   allegations failed to state a claim under Sherman Act Section 1, they "fail[ed] to state a Cartwright

28   Act claim for the same reasons").

1

2

**B.     StubHub's Unfair Competition Law Claim Fails For The Same Reason Its Sherman Act Claims Fail.**

3

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

4

& Prof. Code § 17200.  StubHub's UCL claim fails to identify which prong of the statute it invokes.

5

However, based on the allegations contained therein, it appears StubHub is relying on either the

6

"unlawful" or "unfair" prong to assert UCL claims against the Warriors.  *See* FAC ¶¶ 170-74.

7

A claim under the "unlawful" prong of the UCL must properly allege a violation of the

8

underlying law upon which the UCL claim is based.  *See Chavez v. Whirlpool Corp.*, 93 Cal. App.

9

4th 363, 374 (2001).  Here, the "unlawful" claim is derivative of the Sherman Act claims.  StubHub

10

asserts no new allegations against the Warriors in connection with this cause of action.  FAC

11

¶¶ 170-73.  Because StubHub's Sherman and Cartwright Acts claims fail for the reasons discussed

12

above, the "unlawful" Section 17200 claim also must be dismissed.  *See Digital Sun v. Toro Co.*,

13

No. 10–CV–4567–LHK, 2011 WL 1044502, at *5 (N.D. Cal. Mar. 22, 2011) ("Because the

14

Sherman Act violation is insufficiently pled, it follows that [plaintiff] has also failed to plead any

15

violation of the Unfair Competition Law.").

16

A claim under the "unfair" prong of Section 17200 must allege conduct that is at least an

17

incipient violation of the antitrust laws.  *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20

18

Cal. 4th 163, 187 (1999); *Chavez*, 93 Cal. App. 4th at 375.  Because StubHub's Section 17200

19

claims are not materially different from its federal and state antitrust claims, StubHub's Section

20

17200 claim based on the "unfair" prong also should be dismissed.  *See Apple Inc. v. Samsung*

21

*Elecs. Co.*, No. 11–CV–01846–LHK, 2011 WL 4948567, at *8-9 (N.D. Cal. Oct. 18, 2011);

22

*DocMagic, Inc. v. Ellie Mae, Inc.*, No. 3:09–CV–4017–MHP, 2011 WL 871480, at **12-13 (N.D.

23

Cal. Mar. 11, 2011); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. App'x 554, 557 (9th Cir. 2008).

24

25

**C.     StubHub Has Failed To Adequately Allege Tortious Interference With Prospective Economic Advantage.**

26

StubHub's claim for Tortious Interference with Prospective Economic Advantage fails for at

27

least two additional reasons—the failure to allege a specific, concrete business opportunity and the

28

failure to allege independently wrongful acts.

1

2

      **1.**    **StubHub Has Not Identified Any Existing Economic Relationships With Specific Third Parties.**

3

        Under California law, an economic relationship between the plaintiff and a third party with

4

the probability of future economic benefit to the plaintiff is an essential element to intentional

5

interference with prospective economic advantage. *Korea Supply Co. v. Lockheed Martin Corp.*, 29

6

Cal. 4th 1134, 1153 (2003) (listing intentional interference elements); *Morton v. Rank Am., Inc.*,

7

812 F. Supp. 1062, 1075 (C.D. Cal. 1993) (a claim for the "tort of interference with prospective

8

economic advantage does not exist unless the 'prospective economic advantage' takes the form of a

9

legal relationship between the plaintiff and a third party."). The mere "expectation of an economic

10

relation is not actionable. Rather, an expectation of economic advantage based on an ongoing

11

economic relationship is required." *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d

12

1089, 1106 (C.D. Cal. 2002). Accordingly, a plaintiff must allege that it expected to receive an

13

economic benefit from a specific third party, with whom it had a relationship. *See Jobscience, Inc.*

14

*v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 93976, at *4 (N.D. Cal. Jan. 9, 2014)

15

("[Plaintiff] must assert particularized factual allegations, including specific economic relationships

16

that defendants disrupted.").

17

        While StubHub claims in general terms that the Warriors unlawfully prevented "Warriors

18

season ticket holders" from using StubHub's Secondary Ticket Exchange services to resell tickets

19

(FAC ¶ 177), it fails to identify any specific third parties.[8] These allegations are insufficient. *See,*

20

---

21

[8] Nor does StubHub identify any existing economic relationship with these unnamed ticket holders.
*Roth*, 25 Cal. App. 4th at 546 ("an existing relationship is required"); *Reudy v. Clear Channel*

22

*Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1123 (N.D. Cal. 2010), *aff'd*, 430 Fed. App'x 568 (9th Cir.
2011) (pleadings are insufficient where allegations "at most express the hope for a future economic

23

relationship"). StubHub's FAC has not identified any Warriors season ticket holder with whom it
has had prior resale transactions or any ongoing interactions with those ticket holders that would

24

demonstrate a non-speculative probability of future ticket resale transactions. To the contrary,
StubHub only alleges generally that Warriors season ticket holders "regularly do use StubHub for

25

Secondary Ticket Exchange services." FAC ¶ 177. A mere reference to past use is insufficient to
allege an existing economic relationship. *See Reudy*, 693 F. Supp. 2d at 1122 (noting that Special

26

Master rejected plaintiffs' argument that "relationships with historic customers" would give rise to
"a reasonable expectation for future economic benefit with these customers"). The FAC's

27

allegations about unspecified past use of StubHub by unnamed Warriors ticket holders cannot
support a claim for tortious interference. Instead, these allegations represent the same type of claim

28

rejected by the Court of Appeal in *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal.
App. 4th 507 (1996). StubHub, like the plaintiff in *Westside Center*, "postulates an expansive view

(Footnote Cont'd on Following Page)

1    *e.g.*, *Roth*, 25 Cal. App. 4th at 546 (general allegations regarding "speculative 'future patients'"

2    failed to state a claim); *Blue Dolphin Charters, Ltd. v. Knight & Carver Yachtcenter, Inc.*, No. 11-

3    cv-565-L (WVG), 2011 WL 5360074, at *5 (S.D. Cal. Nov. 3, 2011) (allegations that plaintiff's

4    relations with "tourists" and the "general public" were disrupted failed to state a claim); *DocMagic,*

5    *Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1153 (N.D. Cal. 2010) (allegations regarding

6    relationships with "customers" and "users" were insufficient to state a claim).

7
8    **2.      StubHub Has Failed To Allege That The Warriors' Conduct Was Independently Unlawful.**

9          To state a claim for interference with prospective economic advantage, a plaintiff also must

10    plead that the defendant engaged in an act that is wrongful by some legal measure other than the

11    interference itself.  *Korea Supply Co.*, 29 Cal. 4th at 1153.  Specifically, StubHub must show a

12    violation of some constitutional, statutory, regulatory or other standard.  *See id.* at 1159-61.

13          "Under the privilege of free competition, a competitor is free to divert business to himself as

14    long as he uses fair and reasonable means.  Thus, the plaintiff must present facts indicating the

15    defendant's interference is somehow wrongful—i.e., based on facts that take the defendant's actions

16    out of the realm of legitimate business transactions."  *Tri-Growth Ctr. City, Ltd. v. Silldorf,*

17    *Burdman, Duignan & Eisenberg*, 216 Cal. App. 3d 1139, 1153-54 (1989); *see also Bed, Bath &*

18    *Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 881

19    (1997) ("Since the crux of the competition privilege is that one can interfere with a competitor's

20    prospective contractual relationship with a third party as long as the interfering conduct is not

21    independently wrongful (i.e., wrongful apart from the fact of the interference itself) . . . [i]t is now

22    the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's

23    conduct was independently wrongful and, therefore, was not privileged . . . .").  As set forth above,

24    StubHub has failed to adequately allege any antitrust violation or other wrongful conduct.  Its claim

25
26    _____
      (Footnote Cont'd From Previous Page)

27    of the tort" that protects StubHub's "economic relationship with the entire market of all possible but
      as yet unidentified [Warriors ticket resellers]."  *See id.* at 527.  Because StubHub fails to allege
      interference with any particular transaction and only identifies speculative future business

28    relationships with potential resellers, the Court should dismiss this claim.

- 24 -

1    for Tortious Interference with Prospective Economic Advantage therefore should be dismissed. *See*

2    *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003)

3    ("Given the court's dismissal of plaintiff's Lanham Act claim for false advertising with leave to

4    amend, plaintiff has not demonstrated that defendants were engaging in wrongful conduct.").

5                                    **CONCLUSION**

6        For the foregoing reasons, the Warriors respectfully request that the Court dismiss

7    StubHub's First Amended Complaint in its entirety.[9]

8

9    Dated: July 31, 2015                    Respectfully,

10                                ARNOLD & PORTER LLP

11

12                                By:   */s/ Daniel. B. Asimow*
                                       DANIEL B. ASIMOW

13                                        C. SCOTT LENT
                                       EMILY H. WOOD

14                                        TIANA L. RUSSELL
                                       Attorneys for Defendant GOLDEN STATE

15                                        WARRIORS, LLC

16

17

18

19

20

21

22

23

24

25

26

27    _____

28    [9] The Warriors also hereby adopt, and incorporate by reference, any arguments made by co-defendant Ticketmaster in its motion to dismiss.