Kevin J. Arquit (NY State Bar No. 1674811)
karquit@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: 212.455.2000 Fax: 212.455.2502

Matthew J. Reilly (admitted *Pro Hac Vice*)
matt.reilly@stblaw.com
Abram J. Ellis (admitted *Pro Hac Vice*)
aellis@stblaw.com
SIMPSON THACHER & BARTLETT LLP
900 G Street N.W.
Washington, DC 20001
Tel.: 202.636.5000 Fax: 202.636.5502

Matthew L. Cantor (admitted *Pro Hac Vice*)
mcantor@constantinecannon.com
Gordon Schnell (admitted *Pro Hac Vice*)
gschnell@constantinecannon.com
Allison F. Sheedy (admitted *Pro Hac Vice*)
asheedy@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel.: 212.350.2700 Fax: 212.350.2701

Stephen V. Bomse (State Bar No. 40686)
sbomse@orrick.com
Shannon C. Leong (State Bar No. 268612)
sleong@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel.: 415.773.5700 Fax: 415.773.5759

Counsel for Plaintiff StubHub, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STUBHUB, INC., | Case No. 3:15-cv-01436-MMC |
| Plaintiff, | STUBHUB'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| v. | |
| GOLDEN STATE WARRIORS, LLC AND TICKETMASTER L.L.C., | Date: October 16, 2015 |
| | Time: 9:00 A.M. |
| Defendants. | Place: Courtroom 7, 19th Floor |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ............................................................................................5

    I.    THE PARTIES .................................................................................5

    II.    THE RELEVANT MARKETS AND DEFENDANTS' MARKET POWER ..........6

        A.    The Primary Ticket Market ........................................................6

        B.    The Secondary Ticket Services Market ......................................7

        C.    Golden State Has Market Power In The Primary Ticket Market .................8

    III.    DEFENDANTS' ANTICOMPETITIVE CONDUCT ....................................8

        A.    Defendants Force Ticket Holders To Purchase Ticketmaster's Secondary Ticket Services Exclusively .......................................8

        B.    Defendants Have Monitored Secondary Sales On StubHub To Enforce Compliance With Their Restrictive Resale Policy .........................9

        C.    Defendants Have Engaged In Additional Conduct To Foreclose Competition And Eliminate Consumer Choice ...............................9

    IV.    DEFENDANTS HAVE CAUSED HARM TO COMPETITION AND STUBHUB .....................................................................................10

        A.    Defendants' Anticompetitive Conduct Harms Both Sellers And Buyers Of Warriors Tickets In The Secondary Ticket Services Market .....10

        B.    Defendants' Anticompetitive Conduct Harms StubHub ...........................10

STANDARD OF REVIEW ..........................................................................................11

ARGUMENT ...........................................................................................................12

    I.    DEFENDANTS CAUSED HARM IN A WELL-PLED MARKET .....................12

        A.    Consumer Purchasing Behavior Establishes The Relevant Product Market ....................................................................................12

        B.    Courts Routinely Affirm Product Markets Nearly Identical To The Primary Ticket Market And The Secondary Ticket Services Market .........14

        C.    The FAC's Factual Allegations Sufficiently Allege Two Distinct Product Markets ......................................................................17

(i)     The FAC Provides Detailed Allegations Supporting a Properly-Defined Primary Ticket Market ......................................................17

(ii)    Warriors Tickets Sold in the Primary Market Do Not Compete with Warriors Tickets Sold in the Secondary Market ....................18

(iii)   Ticketmaster's "Springsteen Chart" Does Not Refute the Plausibility of the Primary Ticket Market .....................................19

(iv)    The Secondary Ticket Services Market Is a Properly-Defined Product Market .......................................................................21

(v)     Product Markets Do Not Necessarily Include All of the Goods or Services Supplied by Competitors ...............................22

II.     DEFENDANTS' BEHAVIOR VIOLATES THE ANTITRUST LAWS ...............26

        A.      The FAC's First Claim For Relief Alleges A Section 1 Tying Claim ........27

                (i)     Defendants' Actions Are *Per Se* Illegal ..........................................27

                (ii)    The Alleged Tying and Tied Products Are Separate.......................30

                (iii)   Defendants' Behavior Is Not Justified as a Supposed "Revocable License" ....................................................................31

                (iv)    Defendants Inaccurately Label their Tying as a Resale Restriction ......................................................................32

        B.      The FAC's Second Claim For Relief Alleges A Section 1 Restraint Of Trade Claim...................................................................34

                (i)     Ticketmaster's Refusal to Technologically Integrate and its Deceptive Public Comments Support the FAC's Antitrust Claims......................................................................35

                (ii)    Golden State Is Not "Permitted to Choose" How to Unreasonably Restrain Trade ..........................................36

        C.      The FAC's Third And Fourth Claims For Relief Allege Conspiracy To Monopolize And Attempted Monopolization Claims ......................38

        D.      The FAC's Fifth Claim For Relief Alleges The Elements Of A Section 1 Exclusive Dealing Claim...............................................40

III.    STUBHUB HAS PROPERLY ALLEGED ITS STATE LAW CLAIMS...............41

CONCLUSION ......................................................................................43

1

2

3

## TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) ............................................................................................. 40, 47

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ......................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 11

*Bahrampour v. Lampert*, 356 F.3d 969 (9th Cir. 2004) ................................................................ 41

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 11

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ...................................... 15, 28, 45

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988) ................................................... 32

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2007) .............................. 28, 45

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ......................... 41, 42

*Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ....................................................................................... 29

*Clairol, Inc. v. Boston Disc. Ctr. of Berkley, Inc.*, 608 F.2d 1114 (6th Cir. 1979) ..................... 33

*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, No. C-09-2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010) ................................................................................. 16

*Coniglio v. Highwood Servs. Inc.*, 495 F.2d 1286 (2d Cir. 1974) ............................................... 15

*Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F. Supp. 689 (S.D. Tex. 1993) ........................... 36

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................................... 35

*Cowley v. Braden Indus., Inc.*, 613 F.2d 751 (9th Cir. 1980) ...................................................... 33

*Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) ............................................ 41

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010) .................... 26, 33

*Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321 (5th Cir. 1974) ........................... 15

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ........................... passim

*Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) ............................................... 3, 14, 15

*Formula One Licensing B.V. v. Purple Interactive Ltd.*, No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ....................................................................... 19, 20

28

*Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495 (1969)................................................ 29

*FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) ............................................................... 32

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008)................................... 13, 20, 23

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)............................ 18

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004)................................................................................................................ 17

*Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ................. 32

*In re Data Gen. Corp. Antitrust Litig.*, 490 F. Supp. 1089 (N.D. Cal. 1980) ............................. 33

*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012).............. 35, 41, 45

*In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012)................................. 22

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996 (N.D. Cal. 2013)................................................................................................... 32

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ............................................................ 41

*In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ............................................................................... 24

*In re Webkinz Antitrust Litig.*, No. C 08-1987 RS, 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010)................................................................................................... 11

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002 (C.D. Cal. 2011)................................................................................................... 41

*Int'l Boxing Club of N.Y. v. United States*, 358 U.S. 242 (1959) ...................................... 15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)........................................ 27, 29, 34

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009)................................................................................................................ 38, 46

*Kamakahi v. Am. Soc'y for Reprod. Med.*, No. C 11-01781 SBA, 2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ................................................................... 17

*Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F. Supp. 922 (E.D. Pa. 1972).................... 16

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) ................................................................................................... 32

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)................................. 42

*L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381 (9th Cir. 1984)................................ 15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ........................... 33

*Macquarie Grp. Ltd. v. Pac. Corp. Grp. LLC*, No. 08-cv-2113-IEG-WMC, 2009 WL 539928 (S.D. Cal. Mar. 2, 2009) .................................................................. 37

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008) ............................. 11

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ............................................... 14, 32

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) .............. 11, 12, 14, 26

*O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) .................................................................................................... 43

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440 (9th Cir. 1988) .................................................... 12

*Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) .......................................... 23

*Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ............................ 38, 46

*Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976 (N.D. Cal. 2009) ........................................ 18, 29

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................. 26

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26 (1998) .............................................. 41

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 1497821 (N.D. Ill. Apr. 2, 2015) ...................................................................... 15

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) .................................................................................................... 13, 18

*Schmidt v. Contra Costa Cnty.*, 310 F. App'x 110 (9th Cir. 2009) ............................................... 11

*Spinelli v. NFL*, No. 13-cv-7398 (RWS), 2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015) ............................................................................................................... 20

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005) ...................... 24, 25

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) .................................................................... 38

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ..................................................... 12

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) .......................................................... 16

*Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191 (C.D. Cal. 2008) .................... 30

*Ticketmaster LLC v. Designer Tickets & Tours, Inc.*, No. CV 07-1092 ABC (JCx), 2008 WL 649804 (C.D. Cal., Mar. 10, 2008) ...................................................... 30

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ..................................................................... 12

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992) .................................................................................................................... 17

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) .................................................................................................................. 29, 35

*Venzie Corp. v. U.S. Mineral Prods. Co.*, 521 F.2d 1309 (3d Cir. 1975) ..................................... 33

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ....................................................................................................................... 36

*Williams v. NFL*, No. C14-1089 MJP, 2014 WL 5514378 (W.D. Wash., Oct. 31, 2014)........................................................................................................................ 16

## STATUTES

15 U.S.C. § 1 .............................................................................................................. 12

15 U.S.C. § 13(a) ........................................................................................................ 16

15 U.S.C. § 2 .............................................................................................................. 12

Fed. R. Civ. P. 8(a)(2) .............................................................................................. 3, 11

## OTHER AUTHORITIES

11 Phillip E. Areeda, *Antitrust Law* (2015).............................................................. 32, 33

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2014)................................ 12

John D. Harkrider, *Operationalizing the Hypothetical Monopolist Test*, U.S. Dep't of Justice (last updated June 25, 2015), http://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test ............................ 6

Mot. of Ticketmaster L.L.C. & IAC/Interactivecorp to Dismiss Countercls. 1 through 4, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, No. 2:07-cv-02534-ABC (JCx) (C.D. Cal. Dec. 21, 2007), ECF No. 84 ....................................................... 31

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (2010).......................................... 13

1    Plaintiff StubHub, Inc. ("StubHub") respectfully submits this memorandum of

2    points and authorities in opposition to the motions to dismiss the First Amended Complaint

3    ("FAC") by Defendants Golden State Warriors, LLC ("Golden State") and Ticketmaster L.L.C.

4    ("Ticketmaster").

5                              **PRELIMINARY STATEMENT**

6    Like the rules governing competition on the basketball court, American antitrust

7    laws establish rules to ensure that the best team wins in the marketplace.  These rules prohibit

8    practices that artificially deprive consumers of choosing the lowest priced or highest quality

9    goods in the marketplace.  That is precisely what this antitrust case is about, and there is nothing

10   in the Defendants' motions to dismiss which remotely allows Defendants to declare victory

11   without even "playing the game."

12   Defendant Golden State is licensed exclusively by the National Basketball

13   Association ("NBA") to present professional basketball games at Oracle Arena in the San

14   Francisco Bay Area.  There is no other professional basketball team in the Bay Area, and the

15   number of fans who can personally attend a Warriors game is strictly limited by the number of

16   seats at Oracle Arena.  In addition, the Bay Area is filled with loyal Warriors supporters who

17   consider live Warriors basketball a unique product.  Loyalty to local sports teams (the "home"

18   team) is intense and abiding.  Those fans—a word, tellingly, derived from the term "fanatic"—

19   do not consider the games of other teams, let alone other forms of entertainment, to be substitutes

20   for attending a Warriors game.  This, as the FAC alleges, is demonstrated by the fact that Golden

21   State has increased Warriors tickets prices by 30% without losing any substantial sales:  despite

22   that price increase, Golden State enjoys a multi-year 10,000-person waiting list for season

23   tickets.

24   In addition to the primary ticket market for Warriors games, there is an

25   economically separate "secondary" market related to the resale of Warriors tickets.  That market

26   involves the buyers and sellers of Warriors tickets:  on the one hand are Warriors ticket holders

27   who, for a variety of reasons, wish to resell their tickets, and on the other hand are people who

28   lack tickets but, nonetheless, would like to attend a game and will pay for the privilege of doing

so.  Before the advent of the internet, transactions in this secondary market took the form of private sales—tickets were sold to friends or business associates, or through pre-game face-to-face transactions outside the stadium.  Now, these transactions largely occur over resale exchanges that are operated and maintained on the internet.  These exchanges—styled as Secondary Ticket Exchanges in the FAC—are the equivalent of a stock market for secondary ticket sales, in which sellers and buyers electronically "meet" and, if they can agree on terms, conduct a transaction resulting in the resale of the owner's ticket to a new buyer.  A key benefit of these exchanges is that they allow would-be sellers and buyers simultaneously to "meet up with" numerous other traders.  In the words of antitrust law and economics, there are substantial "network effects" that are key to the success of these Secondary Ticket Exchanges.  In plain English, the value of a resale exchange has to do with the number of "eyeballs" it attracts—the more prospective buyers and sellers looking to make a deal, the more valuable the network is to each of them.

Plaintiff StubHub has established its own Secondary Ticket Exchange, and its success has been derived from offering resellers and their customers a product they value based on price, quality and, consequently, "eyeballs."  StubHub competes with existing exchanges and with any potential new entrant that can provide a cheaper or better service.

Ticketmaster is one of the firms that competes with StubHub to create a Secondary Ticket Exchange for the sale of Warriors tickets.  Those services—*i.e.*, the services provided by a Secondary Ticket Exchange in the resale of Warriors tickets—are styled as the Secondary Ticket Services Market in the FAC.  And just as the NBA requires vigorous, but legitimate, competition, antitrust law requires Ticketmaster to compete in the Secondary Ticket Services Market through legitimate means—such as by offering lower prices or better services to its customers.

But that is not what happened here.  Instead, Golden State and Ticketmaster have concocted a scheme to force ticket holders to resell their Warriors tickets over only Ticketmaster's Secondary Ticket Exchange to the exclusion of all others.  In other words, Ticketmaster and Golden State agreed that they would collectively harness Golden State's power

over Warriors tickets in an attempt to create a wholly new, separate—and illegal—monopoly over resale exchange services for Warriors tickets.  They did so by, among other things, adding a contractual "term and condition" to Golden State's ticket subscription packages stating that, if purchasers did not resell their tickets through Ticketmaster's secondary exchange, their right to purchase ticket packages in the future would be rescinded.

These were not empty threats.  Defendants monitored transactions on competing Secondary Ticket Exchanges, such as StubHub, and contacted would-be violators, threatening them with the revocation of their current tickets or prohibitions on future season ticket eligibility.  Faced with the prospect of loss of access to Warriors tickets, large numbers of purchasers have been forced to purchase their resale services from Ticketmaster, thereby distorting competition in the Secondary Ticket Services Market and harming consumers by raising prices for those services.

All of these facts (and more) are set forth meticulously in StubHub's detailed FAC, even though the law requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Nonetheless, Defendants move to dismiss StubHub's claims under Sherman Act Section 1 (for tying and unreasonable restraint of trade) and Section 2 (for conspiring to monopolize), as well as under California antitrust, unfair competition and tortious interference law.  Defendants' motions are rife with meritless contentions.

First, Defendants argue that the relevant markets asserted in the FAC are "facially unsustainable" as a matter of law.  That erroneous proposition flies in the face of established precedent, academic literature, industry recognition, simple economic analysis, and fact.  Courts have repeatedly recognized the existence of sports product markets virtually identical to those alleged here after an evaluation of the merits.  *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531–32 (7th Cir. 1986) (affirming relevant market of "the presentation of live professional basketball . . . . [in] the Chicago metropolitan area").  Defendants' market definition attack also ignores that market definition is a quintessential factual issue reserved for the jury.  This alone establishes that Defendants' dismissal ploy should fail.

1    Nonetheless, Defendants' market definition arguments should also be rejected

2 because the FAC's detailed product market allegations more than meet mere notice pleading

3 requirements.  They identify numerous facts that show there are no economic substitutes for

4 professional basketball tickets sold in the Bay Area (the Primary Ticket Market) or secondary

5 ticket sale services for professional basketball tickets sold in the Bay Area (the Secondary Ticket

6 Services Market).  For instance, the FAC's contention that "no reasonable alternative" to

7 Warriors tickets exists in the Primary Ticket Market is supported by factual allegations,

8 including that:  (i) ticket sales data reflect no reasonable interchangeability between Warriors

9 tickets and other live entertainment tickets, (ii) a 30% price increase for Warriors season tickets

10 next season resulted in no drop in demand—indeed, there remains a multi-year list of 10,000

11 fans waiting to purchase tickets for Warriors games—and (iii) Warriors tickets sold by Golden

12 State have unique characteristics (such as being priced at face value, being available as season

13 ticket or group packages, and giving entitlements to playoff tickets).

14    Similarly, the FAC identifies the Secondary Ticket Services Market as a "separate

15 and distinct" product market with "no economic substitutes."  The FAC supports that market

16 definition with specific factual allegations stating that, among other things:  (i) the Secondary

17 Ticket Services Market has varied and unique pricing distinct from primary ticketing services for

18 professional basketball tickets, (ii) Secondary Ticket Exchanges are two-sided platforms and

19 primary ticketing distributors do not have the same economic characteristics, and (iii) the sale of

20 other non-Warrior tickets on a Secondary Ticket Exchange are not a substitute for the sale of

21 Warriors tickets on a Secondary Ticket Exchange.

22    Second, Defendants suggest that because this case concerns only one product

23 market in which StubHub and Ticketmaster compete, StubHub's claims fail.  But the law does

24 not require StubHub to show consumer harm or anticompetitive foreclosure in every market in

25 which Defendants operate in order to sustain an antitrust claim.  If that were the case, entities

26 would routinely be immunized from antitrust scrutiny, notwithstanding that their conduct caused

27 harm in a particular market.  Moreover, Defendants' suggestion that antitrust law fails to protect

28 particular groups of unique consumers is contrary to law and antitrust enforcement policy.

1    Third, Defendants brazenly posit the remarkable defense that this case concerns

2    nothing more than an everyday commercial licensing dispute.  In that vein, they suggest that

3    Defendants are free to leverage their power to force Warriors ticket holders to take whatever

4    action is most profitable for Defendants and that such leveraging could never violate antitrust

5    law.  This is just plain wrong.  The law holds that Defendants cannot (i) force consumers to

6    purchase secondary ticketing services from a single firm, (ii) foreclose and exclude from the

7    market Ticketmaster's competitors through a forced embargo of those competitors, or

8    (iii) monopolize a market and accompanying revenue stream that was not, and would not have

9    been, available to Defendants through ordinary competition.  This conduct easily sustains tying

10   and unreasonable restraint of trade claims under Section 1 of the Sherman Act and conspiracy to

11   monopolize and attempt to monopolize claims under Section 2 of the Sherman Act.

12   The FAC details, with factual support, why Defendants' behavior is condemned

13   under federal antitrust and state law.  It sufficiently alleges every element of each claim that

14   StubHub has brought.  For those reasons and those more fully discussed below, Defendants'

15   motions to dismiss, which ignore the FAC's detailed allegations and the axiomatic antitrust

16   principles at issue in this case, should be denied in their entirety.

17                              **STATEMENT OF FACTS**

18   **I.      THE PARTIES**

19   Plaintiff StubHub operates a Secondary Ticket Exchange for resellers and

20   purchasers of tickets.  FAC ¶ 22.  StubHub facilitates the resale of tickets for Warriors basketball

21   games—the only professional basketball games held in the Bay Area—by creating a platform

22   where buyers and sellers of Warriors tickets can electronically "meet" and, if terms are agreed to,

23   conduct the sale of a Warriors ticket.  *Id.* ¶¶ 3, 26, 53.

24   Defendant Golden State owns the Warriors professional basketball team.  *Id.* ¶ 27.

25   Defendant Ticketmaster is the dominant distributor of primary tickets in the U.S. and has been

26   the exclusive provider of Primary Ticket Platform services for Golden State for many years.  *Id.*

27   ¶¶ 29–30.  Ticketmaster also operates a Secondary Ticket Exchange and, since August 2012, has

28   been Golden State's exclusive Secondary Ticket Exchange.  *Id.* ¶ 30.  Under this arrangement,

1    Golden State receives a share of the revenue generated by sales of Warriors tickets on

2    Ticketmaster's Secondary Ticket Exchange.  *Id.* ¶¶ 4, 6, 9, 63–64, 102.

3    **II.     THE RELEVANT MARKETS AND DEFENDANTS' MARKET POWER**

4              StubHub's claims involve Defendants' conduct and consumer harm in two separate

5    product markets:  (i) the Primary Ticket Market and (ii) the Secondary Ticket Services Market.

6    FAC ¶ 85.  The relevant geographic scope of StubHub's claims is the Bay Area.  *Id.* ¶¶ 89, 99.

7              A.     **The Primary Ticket Market**

8              The Primary Ticket Market consists of the sale of "primary," or first-sale,

9    Warriors tickets.  *Id.* ¶ 86.  There are no economic substitutes for Warriors tickets, the only

10   professional basketball tickets available in the Bay Area.  *Id.* ¶¶ 3, 32, 101.  This lack of

11   substitutability is demonstrated by (i) the strong loyalty of Warriors fans, (ii) the multi-year

12   10,000-fan waiting list for Warriors season tickets, (iii) the lack of any cross-elasticity of demand

13   between Warriors tickets and tickets to other entertainment events, (iv) the fact that Warriors

14   ticket buyers who purchase via StubHub generally do not purchase tickets via StubHub to other

15   entertainment events, (v) the lack of any price correlation or constraint between Warriors tickets

16   and tickets to other entertainment events in the Bay Area, and (vi) the ability of Golden State to

17   impose a significant, non-transitory price increase for Warriors tickets without any shift in

18   demand.[1]  *Id.* ¶¶ 33–39, 88, 101.

19             There likewise are no reasonable substitutes for buying and selling Warriors

20   tickets through a Primary Ticket Platform.  *Id.* ¶¶ 87–89.  For fans, the Ticketmaster platform is

21   the only channel through which they can purchase tickets directly from Golden State.  *Id.* ¶¶ 40,

22   44, 87–88.  For season ticket holders and group ticket purchases in particular, buying directly

23

24   [1]    Since 1982, the U.S. Department of Justice and the Federal Trade Commission have
       defined relevant product markets, in part, by assessing the effects of a hypothetical
25     "significant, non-transitory increase in price" on consumer behavior.  *See, e.g.*, John D.
       Harkrider, *Operationalizing the Hypothetical Monopolist Test*, U.S. Dep't of Justice (last
26     updated June 25, 2015), http://www.justice.gov/atr/operationalizing-hypothetical-
       monopolist-test.  This test—referred to interchangeably as the "Hypothetical Monopolist
27     Test" or a "SSNIP"—approximates how consumers will respond to price increases (such
       as whether consumers will "switch" products) to determine what set of goods or services
28     are interchangeable with one another.  Courts, including the Ninth Circuit, have endorsed
       the use of this test in defining markets.  *See infra* Argument Section I.A.

1    from Golden State is the only option.  *Id.* ¶¶ 41, 88.  Moreover, fans are generally offered and

2    purchase primary Warriors tickets well before Warriors tickets become available on any

3    Secondary Ticket Exchange.  *Id.* ¶ 87.

4            B.      **The Secondary Ticket Services Market**

5            The Secondary Ticket Services Market consists of online services for consumers

6    to sell or buy Warriors tickets sold in the secondary market.  *Id.* ¶¶ 47, 53.  Providers of

7    Secondary Ticket Services, like StubHub, offer sellers an audience of prospective Warriors

8    tickets buyers.  *Id.*  There are no reasonable substitutes for Secondary Ticket Exchange services

9    for either the buyer or the seller of secondary Warriors tickets.  *Id.* ¶ 93–98.

10            Primary tickets and secondary tickets are separate and distinct products.  They

11    involve different sellers (the team versus the ticket holder), different pricing (uniform and at face

12    value versus highly variable depending on supply and demand), different rights (*e.g.*, most

13    primary tickets allow the consumer to purchase season and postseason tickets), and different

14    consumer demand (*e.g.*, the primary market cannot satisfy demand for sold-out or low-cost

15    tickets).  *Id.* ¶¶ 40–42, 47–49, 52, 91–92, 95.  Furthermore, primary tickets to a single game are

16    largely unavailable to general consumers because a super-majority are sold to season ticket

17    holders.  *Id.* ¶ 41.

18            The services provided by Primary Ticket Platforms and Secondary Ticket

19    Exchanges are likewise separate and distinct products:  (i) there is distinct demand for each type

20    of service which results in distinct suppliers of each type of service, (ii) ticket holders who wish

21    to resell their professional basketball tickets do not have access to Primary Ticket Platforms,

22    (iii) Secondary Ticket Exchanges are uniquely subject to the network effects of two-sided

23    markets,[2] (iv) Ticketmaster treats its Primary Ticket Platform distinctly from its Secondary

24    Ticket Exchange, and (v) the Department of Justice, the Federal Trade Commission, and the

25    NBA have all recognized the existence of separate and distinct markets for Primary Ticket

26    Platforms and Secondary Ticket Exchange services.  *Id.* ¶¶ 48, 54, 95–98.

27      [2]      "Network effects" is the term used to indicate that the value of the two-sided market
    increases as more users are added because as the number of buyers and sellers increases,

28    there is greater liquidity and lower transaction costs.  FAC ¶ 96.

C.     **Golden State Has Market Power In The Primary Ticket Market**

As the sole issuer of Warriors tickets, Golden State has monopoly power over the Primary Ticket Market. *Id.* ¶¶ 3, 32, 101. This power is evidenced by the following: (i) Golden State has an exclusive license from the NBA to present games in the Bay Area, (ii) other live entertainment options in the Bay Area are not substitutes for attending live professional basketball games, (iii) professional basketball games presented in other geographic areas are not substitutes for live Warriors games, and (iv) Golden State has substantially increased the prices it charges for Warriors tickets, including a 30% price increase for season tickets next year, without losing any substantial business from doing so. *Id.* ¶¶ 3, 32–36, 88, 101. Perhaps most vividly, Golden State's power in this market is evidenced by its ability to force consumers to purchase Secondary Ticket Services only from Ticketmaster. *Id.* ¶¶ 4, 6–7, 66–83, 102, 105.

## III.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

Defendants took numerous acts to force Warriors fans to purchase services from Ticketmaster's Secondary Ticket Exchange and thus increase the service fees they can extract from Warriors fans. FAC ¶¶ 6–9, 64–84, 102. The effect of this conduct was the forced embargo of StubHub and other Secondary Ticket Exchanges. *Id.* ¶¶ 10, 74, 105–08, 110, 113.

A.     **Defendants Force Ticket Holders To Purchase Ticketmaster's Secondary Ticket Services Exclusively**

Golden State contractually imposes on Warriors ticket holders a "Non-Transferability" rule mandating that secondary ticket sales be made only through Ticketmaster. *Id.* ¶ 67. As Golden State explicitly confirmed, this means any secondary ticket sales made outside Ticketmaster are barred. *Id.* ¶¶ 67–74.

Golden State threatens season ticket holders with cancelling their subscriptions if they do not abide by this exclusionary sales policy. *Id.* ¶¶ 68–69. These are not just threats; numerous season ticket holders have had their tickets revoked in retaliation for selling Warriors tickets on StubHub or other competing Secondary Ticket Exchanges. *Id.* ¶¶ 7, 66, 119. The message Golden State made sure to "hammer" home to ticket holders is clear: Purchase services from StubHub or other Secondary Ticket Exchanges, and we will cut you off. *Id.* ¶ 69. Golden

1  State has made equally clear that they "d[o]n't care" that Ticketmaster is inferior to StubHub and

2  ticket holders have difficulty selling Warriors tickets using Ticketmaster's Secondary Ticket

3  Exchange.  *Id.* ¶ 72.

### B.   Defendants Have Monitored Secondary Sales On StubHub To Enforce Compliance With Their Restrictive Resale Policy

6           To ensure Warriors season ticket holders comply with these improper

7  exclusionary rules, Defendants closely monitor secondary ticket transactions to identify and take

8  action against those selling through StubHub and other competing Secondary Ticket Exchanges.

9  *Id.* ¶¶ 66, 75–77, 104, 134, 140, 156, 170.  Golden State uses this monitoring effort of season

10  ticket holders to identify noncompliant ticket holders and take away their tickets.  *Id.* ¶¶ 7, 75–

11  76.

### C.   Defendants Have Engaged In Additional Conduct To Foreclose Competition And Eliminate Consumer Choice

14           Golden State and Ticketmaster took at least two additional steps to reinforce and

15  exacerbate their scheme.  *Id.* ¶ 78.  They engaged in deceptive promotional activity to steer

16  purchasers of secondary Warriors tickets to Ticketmaster by creating the false impression that it

17  is the only Secondary Ticket Exchange they have or can trust.  *Id.* ¶¶ 79–80.  And Defendants

18  have, without any legitimate purpose, collectively refused to allow StubHub or any other

19  Secondary Ticket Exchange to technically integrate with Golden State's Primary Ticket Platform

20  operated by Ticketmaster.  *Id.* ¶ 81.  Defendants have refused to allow technical integration—*i.e.*,

21  the process of connecting a Secondary Ticket Exchange with a Primary Ticket Platform—in

22  order to pretextually assert that Ticketmaster's fraud protections are superior to its competitors.

23  *Id.* ¶ 83.  If this were true, and if Golden State were genuinely concerned with security and

24  authenticity issues, Golden State could mandate and would have mandated that all Secondary

25  Ticket Exchanges integrate with the Primary Ticket Platform—but Golden State has not done

26  this.  *Id.*

27

28

## IV.     DEFENDANTS HAVE CAUSED HARM TO COMPETITION AND STUBHUB

Defendants' concerted efforts to prevent Warriors ticket holders from using any Secondary Ticket Exchange other than Ticketmaster have significantly limited the ability of StubHub and other Secondary Ticket Exchanges to compete.  FAC ¶¶ 104, 106–07, 111.  "This is of course an attempt to control the market."  *Id.* ¶ 105.

### A.     Defendants' Anticompetitive Conduct Harms Both Sellers And Buyers Of Warriors Tickets In The Secondary Ticket Services Market

Defendants' efforts to dominate the Secondary Ticket Services Market harm consumers.  Sellers of secondary Warriors tickets have no real option other than Ticketmaster for listing their tickets, lest they face draconian punishment from Golden State.  *Id.* ¶¶ 7, 68, 71, 105–07.  For sellers, this means higher service fees and significant lost sales because Ticketmaster's exchange attracts far fewer potential buyers.  *Id.* ¶¶ 10, 105–07.  For buyers of Warriors tickets, this also means higher service fees (because Ticketmaster charges higher fees than other Secondary Ticket Exchanges) and means significantly limiting—to just one—the available sources of secondary tickets.  *Id.* ¶¶ 10, 108–10.

### B.     Defendants' Anticompetitive Conduct Harms StubHub

Defendants' exclusionary conduct also harms StubHub and other Secondary Ticket Exchanges.  *Id.* ¶¶ 11, 111–14.  Sellers of secondary Warriors tickets are precluded from listing their tickets on StubHub (and other competing exchanges) despite superior pricing, service, and reputation.  *Id.* ¶¶ 10, 23, 105–07, 109–10, 112.  This, in turn, drives potential purchasers of Warriors tickets away from StubHub because of the smaller volume and variety of Warriors tickets it is able to offer.  *Id.* ¶ 112.  StubHub's inventory of Warriors tickets has decreased by roughly 80% in the last year alone, meaning decreased inventory on StubHub from which buyers can choose.  *Id.* ¶¶ 12, 113.  A smaller inventory results in less choice for consumers, and reduces the value of StubHub to all Warriors ticket buyers and sellers because of network effects.  *See id.* ¶¶ 54, 77, 113.

StubHub also experienced a roughly 45% decrease in the number of Warriors tickets sold, meaning that Warriors ticket sellers were forced to look elsewhere to sell their

1   tickets—and, in some cases, not selling their tickets at all.  *Id.* ¶¶ 13, 113.  The share of

2   secondary Warriors tickets sold through Ticketmaster has increased to more than 50%.  *Id.*

3   ¶¶ 103, 114.  This escalating spiral of negative network effects has substantially harmed

4   StubHub's business and consumers.

5   **STANDARD OF REVIEW**

6            In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept

7   factual allegations in the complaint as true and construe the pleadings in the light most favorable

8   to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

9   (9th Cir. 2008) (citing *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th

10  Cir. 2007)).[3]  Under *Twombly* and *Iqbal*, a complaint need only set forth plausible claims for

11  relief and need only contain "factual content that allows the court to draw the reasonable

12  inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.

13  662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Furthermore, the

14  *Twombly/Iqbal* standard and Rule 8's notice requirement are satisfied with a complaint that

15  provides "a short and plain statement of the claim showing that the pleader is entitled to relief."

16  Fed. R. Civ. P. 8(a)(2).  In antitrust cases, "heightened fact pleading of specifics" is "not

17  require[d]."  *Twombly*, 550 U.S. at 570; *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513

18  F.3d 1038, 1045 (9th Cir. 2008).

19           At the pleading stage, the bar for alleging a plausible market is low because

20  market definition is best decided by the trier of fact.  *Newcal*, 513 F.3d at 1045 (reversing

21  dismissal order on market definition grounds and holding that "the validity of the 'relevant

22  market' is typically a factual element rather than a legal element"); *see also In re Webkinz*

23  *Antitrust Litig.*, No. C 08-1987 RS, 2010 WL 4168845, at *3 (N.D. Cal. Oct. 20, 2010) (denying

24  motion to dismiss where alleged relevant market was not "unduly farfetched").  "Because market

25  definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure

26

27  _____

    [3]      A court cannot rely "on matters outside the pleadings" in a 12(b)(6) motion.  *Schmidt v.*
28  *Contra Costa Cnty.*, 310 F. App'x 110, 111 (9th Cir. 2009).  Accordingly, Plaintiff asks
    the Court to disregard Defendants' numerous forays outside the four corners of the FAC.

1    to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)

2    (Sotomayor, J.); *see also* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d2 (4th

3    ed. 2014) ("[T]he question of market definition . . . is typically left to economic experts . . . .").

4                                          **ARGUMENT**

5                The Sherman Act requires businesses to compete vigorously so that the economy

6    functions efficiently and consumer welfare is enhanced.  Section 1 of the Sherman Act prohibits

7    collective action that unreasonably restrains trade, and Section 2 of the Sherman Act prohibits

8    exclusionary conduct intended to establish, protect, or enhance monopolistic power.  15 U.S.C.

9    §§ 1, 2.  Defendants' conduct violates both Sections 1 and 2 of the Sherman Act.  Defendants

10   have collectively engaged in conduct that unreasonably restrains trade in the Secondary Ticket

11   Services Market, and have undertaken exclusionary conduct with the specific intent of

12   monopolizing the Secondary Ticket Services Market.  As reflected below and in the FAC,

13   StubHub has pled each element of each claim.  Defendants' motions, therefore, should be denied.

14   **I.     DEFENDANTS CAUSED HARM IN A WELL-PLED MARKET**

15         A.     **Consumer Purchasing Behavior Establishes The Relevant Product Market**

16                The parties agree that, with limited exceptions, antitrust claims must allege "both

17   a product market and a geographic market." *Newcal*, 513 F.3d at 1045 n.4.  The product market

18   includes the pool of goods or services that enjoy "reasonable interchangeability of use or the

19   cross-elasticity of demand," or, in other words, "the product at issue as well as all economic

20   substitutes for the product." *Id.* at 1045.  The geographic market includes "the area of effective

21   competition . . . where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty.*

22   *Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (ellipsis in original)  (quoting *Moore v. Jas. H.*

23   *Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)) (internal quotation marks omitted); *see*

24   *also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (defining the relevant

25   geographic market as "the market area in which the seller operates, and to which the purchaser

26   can practicably turn for supplies").  Defendants do not contest that the Bay Area is the proper

27   geographic market in this case.

28

1          A common method to determine the relevant market is to assess the impact on

2 consumer behavior of a "'small but significant nontransitory increase in price' ('SSNIP') in the

3 proposed market." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778

4 F.3d 775, 784 (9th Cir. 2015); U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines*

5 § 4.1.1 (2010), *available at* https://www.ftc.gov/sites/default/files/attachments/merger-

6 review/100819hmg.pdf.  If a substantial number of consumers would respond to a SSNIP by

7 purchasing an alternative product, the proposed market definition is too narrow.  *St. Luke's*, 778

8 F.3d at 784.  By contrast, if a substantial number of consumers would ***not*** shift their purchases to

9 an alternative product in response to a SSNIP, the proposed market is economically and legally

10 cognizable.  *Id.*

11          Additionally, it is well-settled that markets exist for "core group[s] of particularly

12 dedicated, 'distinct customers' . . . [that] find a particular product 'uniquely attractive.'"  *FTC v.*

13 *Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (citations omitted).  In *Whole*

14 *Foods*, the Federal Trade Commission challenged the merger of Whole Foods and Wild Oats,

15 two premium grocery store chains.  *Id.* at 1032.  The FTC argued that customers of premium

16 grocery store chains had unique consumer preferences, and this unique consumer group

17 supported the existence of a unique product market of premium, natural, and organic

18 supermarkets.  *Id.* at 1038–39.  The D.C. Circuit, in reversing the district court's decision,

19 agreed, reasoning that "a core group of particularly dedicated, 'distinct customers,' . . . may

20 constitute a recognizable submarket, [when] they are dedicated because . . . they find a particular

21 product 'uniquely attractive.'"  *Id.* at 1039 (citations omitted).  Key to the D.C. Circuit's holding

22 was that there was a dedicated group of consumers who shopped for organic foods, wanted the

23 high-end customer service offered by Whole Foods and Wild Oats, and who reinforced the "core

24 values" this group of customers espoused.  *Id.*

25          Thus, each alleged relevant market must be judged on standards of

26 substitutability, interchangeability, and unique consumer purchasing behavior.

27

28

B.     **Courts Routinely Affirm Product Markets Nearly Identical To The Primary Ticket Market And The Secondary Ticket Services Market**

Courts routinely recognize product markets that consist of a single product where that product lacks a viable substitute.  *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Kodak . . . contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act.  *We disagree*.") (emphasis added).  Similarly, the Ninth Circuit has unequivocally held that "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue." *Newcal*, 513 F.3d at 1048.

Indeed, in line with *Kodak* and *Newcal*, courts have specifically found that *professional sports in localized geographies are relevant antitrust markets*.  For example, in *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986), the Seventh Circuit affirmed a finding of the existence of a product market of "the presentation of live professional basketball," because "the demand function for professional basketball is not [a]ffected in any significant way by the existence of other amateur or professional sports or other forms of entertainment."  *Id.* at 531(internal quotation marks omitted).  Having defined the product market as live professional basketball, the Seventh Circuit further affirmed the district court's conclusion that the geographic market was limited to "the Chicago metropolitan area," because "[a]lmost all of the fans who buy tickets and attend NBA games come from a 35 mile radius of the home arena."  *Id*.  As a result of the product and geographic market definitions, the Seventh Circuit affirmed the district court's finding that the owners of the Chicago Bulls possessed monopoly power in a relevant antitrust market.  *Id.* at 532.

The result in *Fishman* is consistent with Supreme Court precedent recognizing the unique nature of sports, both professional and amateur, and holding that there are no economic substitutes for sporting events.  *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 111 (1984) (affirming relevant market of "college football broadcasts" and finding other programming not a substitute because of evidence that advertisers pay distinct prices to reach the unique audience for intercollegiate football telecasts); *Int'l Boxing Club of N.Y. v. United States*,

358 U.S. 242, 250–51 (1959) (affirming relevant market of "championship boxing contests" because championship boxing events are uniquely attractive to fans and hence constitute a market separate from that for non-championship events).

It is therefore not surprising that numerous other courts have held that individual sports franchises possess monopolies in their relevant geographic markets. *See Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1291 (2d Cir. 1974) (finding the "[Buffalo] Bills ha[ve] a monopoly over the presentation of regular season professional football games in . . . Buffalo"); *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974) (finding Dallas Cowboys had monopoly over Dallas Cowboy football tickets); *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (citing *Driskill* and recognizing holding that Cowboys had monopoly power over the market for preseason tickets); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) ("That NFL football has limited substitutes from a consumer standpoint is seen from evidence that the Oakland Coliseum sold out for 10 consecutive years despite having some of the highest ticket prices in the League.").[4]

On this pleading motion, which is limited to a plausibility analysis, *this authority should end any debate over whether the law recognizes markets like the Primary Ticket Market and the Secondary Ticket Services Market.*

The cases Defendants cite do not change this analysis. Those cases stand for nothing more than the unremarkable proposition that a relevant product market cannot be defined to *exclude* interchangeable products. For example, in *Apple Inc. v. Psystar Corp.*, 586 F. Supp.

---

[4]       Golden State cited *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 1497821 (N.D. Ill. Apr. 2, 2015), in its prior motion to dismiss, yet abandons that case in its current motion, which makes sense for several reasons. First, the court there addressed a preliminary injunction motion, and therefore considered evidence rather than assuming the truth of a complaint's allegations. Second, the Seventh Circuit in *Fishman* upheld a product market of professional *basketball* in Chicago, so a lower court rejecting a product market of professional *baseball* is not sound. 807 F.2d at 531–32. Third, the plaintiffs in *Right Field Rooftops* alleged a product market of "live-action Cubs games." 2015 WL 1497821, at *8. The court explicitly recognized that a single product market is proper where "there is no substitute" for the product, *id.*, and noted that the Chicago White Sox offer a local substitute for professional baseball. *Id.* at *9. Warriors tickets, as alleged in the FAC, have no such local substitute for professional basketball. Therefore, *Right Field Rooftops* is of no persuasion here.

2d 1190 (N.D. Cal. 2008), an alleged market limited to the Mac operating system was not plausible because the complaint did not include any facts regarding interchangeability or substitutability, and instead included the self-defeating allegation that Mac OS "performs the same functions as other operating systems." *Id.* at 1198–99.  Notably, the *Psystar* court observed there were no factual allegations to sustain the conclusory assertion that a *price increase* for Mac OS had occurred and, therefore, there were no facts to indicate whether consumers would buy other products if the price of Mac OS went up.  By contrast, the FAC alleges the exact type of facts that were missing from the *Psystar* counterclaim.  *See* FAC ¶ 38 ("Warriors fans . . . have paid a small, but significant, non-transitory increase in price for Warriors tickets.  Indeed, recently Golden State . . . imposed a 30% increase in prices for Warriors season tickets for the 2015–2016 season.  Notwithstanding this price increase, consumers still clamored for Warriors tickets . . . ."); *id.* at ¶ 33 (noting that approximately 10,000 fans continued to pay money just to be on the waiting list to purchase Warriors tickets).[5]  *Psystar* is wholly inapposite.

Defendants also cite to *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001), where the Ninth Circuit rejected as implausible the alleged relevant product market of "UCLA women's soccer program," because the defined market was "based solely on [the individual plaintiff's] own preferences" and not on the lack of reasonable economic substitutes, or even the preferences of a distinct *group* of consumers.  *Id.* at 1063, 1065.  By contrast, StubHub's claims are not based on the preferences of a single customer; they are based on StubHub's transaction data, evidence of demand from a rabid fan base, and a SSNIP that shows Warriors tickets are a unique market.  *Tanaka* is of no relevance here.[6]

---

[5]   Defendants' reliance on *Williams v. National Football League*, No. C14-1089 MJP, 2014 WL 5514378 (W.D. Wash., Oct. 31, 2014) is also off-base.  That was a *pro se* case with "threadbare allegations" of market definition.  *Id.* at *4.  There, the court mistakenly ruled the Clayton Act did not apply to ticket sales based on its misconception that the Clayton Act "applies solely to commodities."  *Id.*  In reaching this erroneous holding, the court relied on *Kennedy Theater Ticket Service v. Ticketron, Inc.*, 342 F. Supp. 922, 925–27 (E.D. Pa. 1972).  But *Kennedy* solely concerned price discrimination claims under the Robinson-Patman Act which, unlike the Sherman Act, does only apply to the sale of commodities.  *Id.*; *see also* 15 U.S.C. § 13(a).  *Williams* should thus be disregarded.

[6]   Golden State's reliance on *Colonial Medical Group, Inc. v. Catholic Healthcare West*, No. C-09-2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010) is similarly misplaced because *Colonial Medical Group* also involved the preferences of a single

C.   **The FAC's Factual Allegations Sufficiently Allege Two Distinct Product Markets**

(i)   **The FAC Provides Detailed Allegations Supporting a Properly-Defined Primary Ticket Market**

Ignoring all of the authority referenced above, Defendants argue that the Primary Ticket Market is facially unsustainable because professional basketball tickets—here Warriors tickets—are interchangeable with other forms of live entertainment, such as concerts and theater productions. *See, e.g.*, Golden State Motion to Dismiss, ECF No. 61 ("GSW MTD") at 9; Ticketmaster Motion to Dismiss, ECF No. 59 ("TM MTD") at 10. As an initial matter, this argument should be rejected because it fails to take the allegations in the complaint as true. *See, e.g.*, *Kamakahi v. Am. Soc'y for Reprod. Med.*, No. C 11-01781 SBA, 2013 WL 1768706, at *11 (N.D. Cal. Mar. 29, 2013) (denying motion to dismiss and reasoning "Defendants' factual contention [regarding substitute products] is not appropriate for resolution at the pleading stage").

In any event, the FAC provides specific factual allegations showing that there are no reasonable substitutes for tickets to professional basketball games in the Bay Area. First, the FAC explains that the Warriors are the only professional basketball team in the Bay Area; Warriors fans root primarily for the Warriors; and Warriors fans watch Warriors games more than they watch other teams' games. FAC ¶¶ 3, 32–33, 101; *see also Kodak*, 504 U.S. at 482 ("[P]roper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)). Second, the FAC provides economic evidence substantiating the alleged markets: When faced with a 30% price increase on Warriors season tickets for the 2015–2016 season—a significant, non-transitory price increase (SSNIP) if ever there was one!—consumer demand for Warriors tickets remained strong, as evidenced by the approximately 10,000 fans

---

consumer. *Id.* at *3–4. Several other cases cited by Defendants involve proposed markets that plainly excluded relevant competitors, and thus are of no significance. *See, e.g.*, *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004) (Pepsi branded beverages); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 474 (3d Cir. 1992) (Chrysler branded cars).

1   who continued to pay money just to be on the waiting list to purchase Warriors tickets.

2   FAC ¶¶ 33, 38, 88, 101.  These allegations satisfy the well-accepted economic tests used to

3   determine relevant antitrust markets and, thus, rebut Defendants' contentions that StubHub's

4   markets are "facially unsustainable."  *See St. Luke's*, 778 F.3d at 784 (affirming use of the

5   SSNIP analysis for defining the relevant market); *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d

6   976, 980–81 (N.D. Cal. 2009) (denying motion to dismiss where plaintiff defined market for

7   "interactive video football software" in accordance with SSNIP analysis).

8       Third, the FAC specifically alleges there is no correlation between the price of

9   Warriors tickets and the price of Golden State's closest professional basketball competitor, the

10  Sacramento Kings.  FAC ¶ 34.  Fourth, after explaining in detail why no *professional basketball*

11  substitute exists, the FAC further alleges that no reasonable *entertainment* substitute exists.  *Id.*

12  ¶¶ 34–35.  As set forth in the FAC, purchasing behavior on StubHub reflects no material

13  correlation between the price of a Warriors ticket and the price of tickets to other entertainment

14  events in the Bay Area, including amateur basketball, professional wrestling, country music,

15  professional baseball, professional football, professional hockey, and theater.  *Id.* ¶ 35.  The lack

16  of correlation between prices for Warriors tickets and prices for tickets to other events

17  demonstrates that the alleged Warriors ticket markets are economically sound.  *See, e.g.*, *Geneva*

18  *Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496–97 (2d Cir. 2004) (defining markets

19  for generic drugs separately from branded drugs based on price).

20      Fifth, the FAC alleges that, during a one year period, the majority of StubHub

21  customers who purchased a Warriors ticket purchased only Warriors tickets—and not any other

22  entertainment ticket—further demonstrating lack of interchangeability.  FAC ¶ 37.  Collectively,

23  these facts buttress the allegation that "there is virtually no cross-elasticity of demand between

24  Warriors tickets and tickets to other entertainment events."  *Id.* ¶ 34.

25          **(ii)    Warriors Tickets Sold in the Primary Market Do Not Compete with**
            **Warriors Tickets Sold in the Secondary Market**
26

27      Defendants erroneously argue that professional basketball tickets sold in the

28  Primary Ticket Market also compete with professional basketball tickets sold in the secondary

market.  To the contrary, the allegations in the FAC reflect a number of reasons why Defendants' position is false, including that (i) primary tickets to a single game are largely unavailable to general consumers because a super-majority of such tickets (75%) are sold to season ticket holders and demand for those tickets far outweighs supply (as evidenced by the wait list for Warriors tickets) (*id.* ¶¶ 41, 119); (ii) primary tickets are sold at face value set at the beginning of the season while secondary tickets are sold at prices based on supply and demand conditions unique to the particular game and the timing of the season (*id.* ¶¶ 40, 48); and (iii) primary and resale tickets provide differing rights, such as rights to season tickets and playoff tickets for primary tickets but not for secondary tickets (*id.* ¶¶ 44, 67).  Warriors ticket holders emphasized that they acceded to Defendants' attempts to force them to resell exclusively on Ticketmaster because they were told they would not be awarded season tickets from Golden State in future seasons if they did not do so.  *See, e.g.*, *id.* ¶ 68 (reseller noting that "we have stopped listing on StubHub" after receiving threats that Golden State would rescind their season ticket subscription if they continued to do so).  This would not be a concern at all if these ticket holders could have easily purchased tickets on the resale market.  Therefore, any argument that the FAC provides no support for the difference between primary and resale tickets is unfounded.

### (iii)   Ticketmaster's "Springsteen Chart" Does Not Refute the Plausibility of the Primary Ticket Market

In its motion, Ticketmaster offers a chart comparing *a few* of the many Primary Ticket Market allegations in the FAC with "Hypothetical Bruce Springsteen Allegations," as if this somehow suggests the FAC has not plausibly alleged the existence of the Primary Ticket Market.  Ticketmaster's argument is wrong, and in no way supports dismissal.

First, the argument itself is improper because it seeks to introduce facts not considered in the FAC.  It is also irrelevant because it does not matter one iota for StubHub's complaint if there is (or is not) a market for Bruce Springsteen concert tickets.[7]  The only

---

[7]   Ticketmaster cites *Formula One Licensing, B.V. v. Purple Interactive Ltd.*, No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001), for the proposition that "hundreds or thousands of artists and other entertainers" could be a monopolist if Golden State is a monopolist over Warriors tickets.  TM MTD at 14.  But *Formula One* is inapposite because in that case the Court found that the product market was improperly

question here is whether the FAC contains sufficient factual allegations to plausibly allege the existence of the Primary Ticket Market.  And, as shown above, the answer is a resounding yes.

Second, the law is clear that unique consumer group preferences—even preferences for a baby boomer American icon from New Jersey like Bruce Springsteen—are alone sufficient to sustain the existence of a product market under the antitrust laws.  This point is well illustrated by *Whole Foods*, discussed *supra* Argument Section I.A.  In that case, a *unique set of consumers was alone* dispositive to the existence of a product market for premium grocery stores.  548 F.3d at 1038–39.  Indeed, the existence of "a core group of particularly dedicated, 'distinct customers,' . . . may constitute a recognizable submarket, [when] they are dedicated because . . . they find a particular product 'uniquely attractive.'"  *Id.* at 1039 (citations omitted).  That is precisely the allegations that exist here, where the FAC reflects that Warriors fans—*i.e.*, Warriors *fanatics*—are unique and have unique and idiosyncratic preferences.  FAC ¶¶ 33, 74, 86, 101.

Third, and perhaps most importantly, Ticketmaster's Springsteen chart ignores *the numerous* specific allegations in the FAC regarding interchangeability and substitutability that eliminate any doubt as to whether the Primary Ticket Market has been adequately pled.  For example, Ticketmaster's chart ignores the FAC's allegations that (i) the majority of Warriors tickets buyers on StubHub do not buy any other tickets (*id.* ¶ 37), (ii) Warriors ticket prices increased significantly with no decrease in demand or in the waiting list (*id.* ¶¶ 38, 88), and (iii) there is no price correlation between Warriors tickets and other types of tickets sold in the

---

defined "in terms of trademarks"—which would indeed suggest that any owner of a trademark was a prospective monopolist.  2001 WL 34792530, at *3.  The FAC does not suffer the same defect found in *Formula One* because the FAC does not rely upon trademarks to sustain its allegations.  Rather, the FAC includes significant detailed factual allegations regarding interchangeability and substitutability of products, a rabid fan base, and other practical indicia.  Another case Defendants cite—*Spinelli v. National Football League*, No. 13-cv-7398 (RWS), 2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015) (publication forthcoming)—should be rejected for the same reason, because it involved branded products (the alleged market for "NFL-related stock photographs").  The *Spinelli* court granted the motion to dismiss because the complaint did not "make sufficient factual allegations that would justify a product market limited to NFL-related photographs to the exclusion of, at a minimum, other sports-related photographs."  *Id.* at *21.

secondary ticket market, including other professional basketball tickets and tickets to other forms of live entertainment (*id.* ¶¶ 35, 39).  These allegations, in addition to those referenced in the Springsteen chart, conclusively demonstrate the plausibility of the Primary Ticket Market.

> **(iv)     The Secondary Ticket Services Market Is a Properly-Defined Product Market**

The FAC sets forth detailed allegations explaining that the Secondary Ticket Services Market is distinct because those consumers who wish to buy or sell a professional basketball ticket in the secondary market have no reasonable economic substitutes to do so other than by using Secondary Ticket Services.  (As defined in the FAC, Secondary Ticket Services themselves are limited to resale services for professional basketball tickets in the Bay Area for the reasons outlined in this section.)  Indeed, secondary ticket platforms perform a "matchmaking" function between resellers and buyers of Warriors tickets.  *Id.* ¶ 53.  Secondary Ticket Exchanges thus facilitate the resale of professional basketball tickets, and their services remove the cost that would accrue to "prospective resellers and purchasers" of secondary Warriors tickets if they were forced to "locate one another or to assess overall supply and demand for the resale of tickets."  *Id.*

Whereas the products on the Primary Ticket Market are the tickets themselves, the products on the Secondary Ticket Services Market are the services provided by a Secondary Ticket Exchange to facilitate the resale of Warriors tickets.  The FAC points out that the Department of Justice, the Federal Trade Commission, the NBA, and Ticketmaster itself have all recognized this distinction.  *Id.* ¶ 98.

Furthermore, the FAC specifically explains why primary ticket distributors are not a reasonable economic substitute for Secondary Ticket Services.  First, primary ticket distributors are not available to ticket holders who wish to resell their professional basketball tickets.  *Id.* ¶ 95.  Second, fans seek particular features of a secondary ticket; for example, for fans looking to buy tickets to a "sold out game" or a ticket at a price other than at face value, primary ticket distribution services are not an economic substitute.  *Id.* ¶¶ 48, 52, 93–94.  Third, Ticketmaster itself treats the services separate as a matter of its own business practice, as

evidenced by Ticketmaster's "partnership" with Golden State.  *Id.* ¶ 30.  And fourth, the DOJ, the FTC, and *Ticketmaster itself* all recognize that Primary Ticket Platforms and Secondary Ticket Exchanges are in separate markets.  *Id.* ¶ 98 (citing, among other things, Ticketmaster's 2014 SEC Form 10-K identifying the existence of, and reporting separate financials for, a "secondary ticket sales market").  These recognitions constitute "practical indicia" that resale services are separate and distinct from primary distribution services, and therefore demonstrate that the Secondary Ticket Services Market has been adequately pled.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

### (v)   Product Markets Do Not Necessarily Include All of the Goods or Services Supplied by Competitors

Defendants' last argument for why the FAC's market allegations are not plausible is meritless, misstates the law and is wholly illogical:  Defendants erroneously contend that the Secondary Ticket Services Market "fails as a matter of law because it covers only a sliver of the actual competition in the broader real-world market for secondary ticket exchanges," TM MTD at 8, 10–13; GSW MTD at 7, and that "[i]f StubHub wants to bring an antitrust claim against Ticketmaster over harm to a market involving secondary exchange services, it has to assert harm to that market as a whole."  TM MTD at 13.  This argument suggests that a supermarket is free to violate the antitrust laws with respect to the sale of milk, or eggs, or diapers, all because that supermarket also competes with other supermarkets in the sale of a thousand or more other products.

This is not the law.  Indeed, it is blackletter law that the proper way to assess anticompetitive harm is to identify the *narrowest* product market possible.  U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 4.1.1 (2010) ("Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the [SSNIP] test."); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012) ("In order to define a relevant market, economists begin with the

*narrowest* definition of a product (or product group) and expand that definition until all reasonable substitutes are included.") (internal quotation marks omitted).[8]

Applying that principle here, the FAC identifies a product market—the resale services related to the sale of a Warriors ticket—and confirms there are no reasonable substitutes. Just as a fan looking to buy a professional basketball ticket does not care about the price of a ticket to a Taylor Swift concert, a fan looking to buy or sell a professional basketball ticket in the secondary ticket market does not care whether StubHub or Ticketmaster have buyers and sellers of Taylor Swift tickets. *See Kodak*, 504 U.S. at 482 ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines."); *see also* FAC ¶¶ 34–35. Moreover, this lack of substitutability is confirmed not just by the logic, but by the specific factual allegation that the majority of consumers who purchased a Warriors ticket from StubHub bought no other type of entertainment ticket on StubHub, which shows that those consumers had no interest in the secondary ticket services that StubHub offered for other tickets and that the Secondary Ticket Services for Warriors tickets is a discrete antitrust market. *Id.* ¶ 37 ("[O]f those StubHub customers who purchased a Warriors ticket between June 2014 and June 2015, 51% *purchased only Warriors tickets . . . .*"); *see also Whole Foods*, 548 F.3d at 1039 (confirming market definition where consumers had unique purchasing preferences).

---

[8]   Ticketmaster offers no real support for its position other than a citation to a case suggesting that market foreclosure—not market definition—should be tested using the full range of products for which the competitors may readily compete. *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). In *Omega*, the plaintiffs (Omega and others) alleged that the defendants' exclusive dealing arrangement foreclosed 24% of the available *distributors* of dispensing equipment, which accounted for (at most) only 38% of the total relevant market. *Id.* On appeal, the Ninth Circuit concluded that even if true that 38% of the market had been foreclosed, this would not be sufficient evidence to sustain a foreclosure claim because this market share "considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons," including that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern," that distribution to end-users directly was an available and commonly used alternative, and that there were other means of distribution. *Id.* at 1162–63 (citations omitted) (internal quotation marks omitted). Notably, the parties in *Omega* did not dispute the boundaries of the relevant market. *Id.* at 1162.

1          Moreover, a case with facts strikingly similar to those here specifically rejects

2    consideration of the full range of competitive services in assessing the validity of any particular

3    product market.  In *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-CV-5238 (JG),

4    2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003), the court rejected defendants' argument that the

5    relevant antitrust market should include both debit and credit card services offered by

6    MasterCard and Visa because MasterCard and Visa provide debit and credit card services to the

7    same sets of customers, and compete for both.  That case, like this one, concerned the services

8    offered by two-sided markets.  There, the court agreed with plaintiffs' argument that debit and

9    credit card services inhabit distinct product markets because (i) debit card services and credit

10   card services are "sold separately," (ii) "many merchants would refuse to use [MasterCard and

11   Visa] debit services if given the choice to do so," and (iii) "the defendants themselves . . .

12   repeatedly acknowledged in their business strategy and marketing activities the distinctive

13   attributes of their off-line debit services compared to their credit card services."  *Id.* at *2

14   (granting summary judgment to plaintiffs on market definition).  The same is true here, where

15   secondary ticket services for Warriors tickets are sold separately and apart from secondary ticket

16   services for other events and the majority of Warriors ticket-buyers on the secondary market do

17   not purchase tickets to any other event.  FAC ¶¶ 35–37, 47.  Additionally, that Ticketmaster

18   expressly entered into an exclusive arrangement with Golden State reflects that the Defendants

19   themselves acknowledged in their business strategy that services for Warriors tickets (and thus,

20   by extension, professional basketball tickets in the Bay Area) are a distinct offering for

21   Ticketmaster.  Thus, if MasterCard and Visa's debit and credit card services are separate

22   products, even where *the customers are the same*, it is sufficient at the pleading stage for

23   StubHub to allege that secondary ticket services for professional basketball tickets is distinct

24   from secondary ticket services for other forms of tickets where the customers for these tickets are

25   very much different.

26          Other courts have reached the same conclusion.  For example, in *Spirit Airlines,*

27   *Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005), the Sixth Circuit reversed the trial

28   court's grant of summary judgment in favor of defendant in a case between Northwest and Spirit

for similar reasons. That case concerned claims brought by plaintiff Spirit Airlines concerning point-to-point airline service between Detroit and a number of other cities, including Detroit-Boston and Detroit-Philadelphia. *Id.* at 921–23. However, Spirit challenged Northwest's predatory pricing tactics *only* with respect to leisure passengers on those routes. The district court granted Northwest summary judgment and rejected Spirit's definition of the relevant market as too narrow because it involved only a subset of consumers (low-fare or leisure customers) on those routes. *Id.* at 933. The Sixth Circuit reversed, concluding that "a reasonable trier of fact could find that a separate and distinct low-fare or leisure-passenger market existed" based on the analysis of expert evidence, the testimony of Northwest's own officials, and Northwest's own documents (which recognized the existence of low-fare and leisure customers).[9] *Id.* at 921, 933–34. Thus, just as low-fare or leisure consumers on specific routes can constitute a relevant market in the airline industry, buyers of resale services for Warriors tickets (*i.e.*, Secondary Ticket Services) can sustain the existence of a unique product market.

Finally, the Secondary Ticket Services Market is precisely the type of market recognized as a legally sufficient market by *Kodak* and *Newcal*. In *Kodak*, the Supreme Court recognized the existence of a market consisting of services for only Kodak-branded equipment; customers who had purchased Kodak equipment required services for only that particular equipment, and thus those consumers were "locked in"—they needed parts that worked with and services that were provided for Kodak machines. 504 U.S. at 496–97. To those consumers, parts and services for a Xerox machine were wholly irrelevant, and thus the Court recognized the existence of a market narrowly defined around services and parts for Kodak machines, even

---

[9]   Ticketmaster cites a single, unpublished opinion from a district court in the Sixth Circuit for its argument that "a product market cannot be divided by type of customer unless the plaintiff can identify a 'difference in the *product* supplied to that group of customers.'" TM MTD at 11 (quoting *Invacare Corp. v. Respironics, Inc.*, No. 1:04 CV 1580, 2006 WL 3022968, at *6 (N.D. Ohio Oct. 23, 2006)). In doing so, Ticketmaster ignores Supreme Court precedent in *Kodak*, as well as the Sixth Circuit's opinion in *Spirit Airlines* affirming that "a separate and distinct low-fare or leisure-passenger market existed"—a product market divided by the type of customer. 431 F.3d at 921. Further, the FAC does not divide the Secondary Ticket Services Market by customer type; it defines the market based on reasonable interchangeability and cross-elasticity of demand and other practical indicia. FAC ¶¶ 34–39, 49–50.

1   though Kodak competed with other firms to provide services and spare parts, and also had

2   competition from other manufacturers in the primary market.  *Id.* at 474 n.21; *see also Newcal*,

3   513 F.3d at 1049 (reversing dismissal order where derivative aftermarket was comprised of "buy

4   outs" or replacements for photocopier service contracts).  Just as consumers who bought Kodak

5   products were not interested in services offered for non-Kodak machines, fans looking to buy or

6   sell professional basketball tickets are not interested in secondary ticket services offered for other

7   types of tickets.  They are locked into the secondary ticket services that are offered for Warriors

8   tickets only.[10]

9   **II.   DEFENDANTS' BEHAVIOR VIOLATES THE ANTITRUST LAWS**

10           Defendants' anticompetitive conduct violates both Section 1 and Section 2 of the

11   Sherman Act.  These violations are all based on the same underlying facts:  (i) Defendants

12   entered into an exclusive Secondary Ticket Services contract, (ii) Golden State contractually

13   requires consumers to purchase Ticketmaster's Secondary Ticket Exchange to resell their

14   Warriors tickets (FAC ¶¶ 7, 64–74), (iii) Golden State enforces this requirement by cancelling or

15   threatening to cancel ticket subscriptions for regular season and post-season tickets if fans

16   purchase Secondary Ticket Exchange services from a competitor (*id.* ¶¶ 7, 66, 75), (iv)

17   Defendants took efforts to mislead consumers about the validity of tickets sold on competing

18   Secondary Ticket Exchanges (*id.* ¶¶ 8, 66, 78–84), (v) Defendants shared infrastructure and

19   revenue from secondary sales on Ticketmaster's Secondary Ticket Exchange (*id.* ¶¶ 9, 30, 63,

20

---

21   [10]   Defendants may argue that *Kodak* and *Newcal* do not apply because the latter and its
       progeny suggest that no relevant product market can exist when it is achieved through
22     contractual provisions in the primary market.  Any such argument is wrong.  First, the
       Secondary Ticket Services Market is not created through contract—while Golden State
23     may contractually require Warriors ticket holders to purchase secondary services from
       Ticketmaster, there is no contractual privity between Golden State and *buyers* of
24     Warriors tickets in the secondary market.  Second, the limitation on *Kodak* and *Newcal*
       exists only when the primary markets are competitive, and here the FAC plausibly alleges
25     that the primary market is not competitive but instead is dominated by Golden State and
       Ticketmaster.  *See Newcal*, 513 F.3d at 1046–47; *Queen City Pizza, Inc. v. Domino's
26     Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) (franchise agreements with one of numerous
       pizza chains); *see also* FAC ¶¶ 74, 101–02; *Datel Holdings Ltd. v. Microsoft Corp.*, 712
27     F. Supp. 2d 974, 988 (N.D. Cal. 2010).  Third, Golden State has employed far more than
       simple contractual terms to force Warriors ticket holders to use Ticketmaster's Secondary
28     Ticket Exchange, including the threat of and actual cancellation of tickets and refusal to
       offer future or premier (*e.g.*, playoff) tickets.  FAC ¶ 66.

66, 81, 102), and (vi) Defendants policed and monitored ticket holders using a competing

Secondary Ticket Exchange cumulating in an "unprecedented" scheme foreclosing competition

in the Secondary Ticket Services Market (*id.* ¶¶ 12, 66, 75–77, 111).  As a result of Defendants'

conduct, output was reduced (*id.* ¶¶ 10, 12–13, 85, 107, 151), consumer choice was limited (*id.*

¶¶ 11, 62, 74), consumers were forced to pay higher fees than necessary (*id.* ¶¶ 4, 11, 110),

StubHub was harmed (*id.* ¶¶ 111–13), and Ticketmaster gained a market share of more than 50%

of the Secondary Ticket Services Market (*id.* ¶¶ 103, 114).  These allegations form the bedrock

of each of StubHub's antitrust claims, and rebut Defendants' claim that their conduct does not

warrant antitrust scrutiny.[11]

A. **The FAC's First Claim For Relief Alleges A Section 1 Tying Claim**

(i) **Defendants' Actions Are *Per Se* Illegal**

The FAC's First Claim for Relief focuses on a type of vertical agreement that

creates a restraint known as "tying."  The Supreme Court explained:

> [T]he essential characteristic of an invalid tying arrangement lies
> in the seller's exploitation of its control over the tying product *to
> force the buyer into the purchase of a tied product* that the buyer
> either did not want at all, or might have preferred to purchase
> elsewhere on different terms. *When such 'forcing' is present,
> competition on the merits in the market for the tied item is
> restrained and the Sherman Act is violated.*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added).  Forcing

buyers is exactly what Defendants have done here.  Defendants leveraged the Warriors' power

over the Primary Ticket Market to compel ticket holders to exclusively purchase Secondary

Ticket Services from Ticketmaster if they wish to resell their tickets in the secondary market

even if they would "have preferred to" deal with StubHub on "different terms."  It is that

coercion or "forcing," and the consequent foreclosure of "competition on the merits" in the

market for Secondary Ticket Services, that is the crux of why tying law—unlike all other vertical

restraints—continues to be singled out for condemnation and, indeed, remains unlawful *per se*.

As explained below, the conduct engaged in by Defendants fits precisely with the description

---

[11]     Appendix A summarizes how the FAC satisfies each element of each claim.  Defendants'
have not and cannot identify any deficiency in any of the elements of StubHub's claims.

and rationale of unlawful tying, and Defendants' efforts to suggest otherwise not only are insufficient to support dismissal of StubHub's tying claim, but are, in fact, wholly mistaken.

A *per se* illegal tying arrangement arises when (1) a "defendant tied together the sale of two distinct products or services," (2) "that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product," and (3) "the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2007) (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)) (reversing summary judgment granted to defendant on tying claim).[12]  The FAC clearly satisfies all three elements.

First, by requiring buyers of Warriors tickets in the Primary Ticket Market to purchase Secondary Ticket Services only from Ticketmaster, Defendants have tied together the sale of two distinct products or services:  Warriors *tickets* (the product in the Primary Ticket Market) are the "tying" product and secondary sales *services* (the product in the Secondary Ticket Services Market) are the "tied" product.  *See* FAC ¶¶ 4, 6–10, 64–84, 102–03, 115–23.

Second, the FAC specifically alleges that Golden State possesses and exercises economic power in the Primary Ticket Market.  *See id.* ¶¶ 74, 100–02.  As explained in Argument Section I.B. *supra*, due to its exclusive license from the NBA, Golden State is the *only* seller of professional basketball tickets in the relevant geographic area.  *Id.* ¶¶ 3, 32, 101.  This is the source of Golden State's market power.  And that market power is evidenced by Golden State's ability to set a 30% price increase on Warriors season ticket packages for the 2015–2016 season without experiencing any corresponding decrease in demand (*id.* ¶¶ 38, 88, 101); by a multi-year wait list for Warriors season tickets that is over 10,000 fans long (*id.* ¶ 33, 38); and

---

[12] To establish a "rule of reason" tying claim, plaintiff must allege (1) "a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition;" and "(4) that [plaintiffs] were harmed by the defendant's anti-competitive" actions.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (citations omitted).  StubHub's FAC meets the requirements of the *per se* standard for a tying claim, but also would be successful (as shown herein) under the rule of reason standard.

Golden State's ability to force so many consumers to resell exclusively on Ticketmaster's secondary exchange (*id.* ¶¶ 4, 6–7, 66–74, 103, 113–14).  *See Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969) ("[T]he proper focus of concern is whether the seller has the power to raise prices, *or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market*.") (emphasis added).

Third, the FAC details significant foreclosure and antitrust injury.[13]  The FAC alleges that Defendants' anticompetitive conduct has had a demonstrable effect on the sale of Warriors tickets in the Secondary Ticket Services Market.  FAC ¶ 10 ("[Consumers] have been forced into [Ticketmaster's] Secondary Ticket Exchange that charges both ticket buyers and sellers higher prices than they would pay if they had competitive choices.").  And it adds that Defendants' conduct "has resulted in fewer Warriors tickets being resold and reduced output in the Secondary Ticket Services Market."  *Id.*  This alone would be sufficient.  But the FAC supplements these allegations by averring that Defendants' conduct has caused "the number of listings for Warriors tickets on StubHub to decrease by approximately **80%** during the period that corresponds to and reflects the results of Defendants' anticompetitive conduct," *id.* ¶ 12, and that the "daily number of Warriors tickets sold on StubHub has declined . . . by approximately 45% in aggregate." *Id.* ¶ 13.

Unsurprisingly, Defendants do not argue that the FAC fails to allege consumer harm or foreclosure.  That is because the independent, concrete allegations of forcing, foreclosure, and causal injury are more than sufficient to survive a motion to dismiss.  When, as here, "'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.[14]

---

[13]   The allegations as to antitrust injury apply to all of StubHub's antitrust allegations.  *See Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *7 (N.D. Cal. Apr. 1, 2011) ("causal antitrust injury" in Section 2 claims); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982) ("substantial share" of commerce for exclusive dealing claims).

[14]   Courts in this circuit have been particularly reluctant to engage in a factual analysis of foreclosure at the pleading stage.  *See, e.g.*, *Pecover*, 633 F. Supp. 2d at 983 ("[A] factual inquiry [into the line of commerce] is improper at this stage in the proceedings.").

1

(ii)     The Alleged Tying and Tied Products Are Separate

2          In response to these well-pled allegations, Ticketmaster argues that StubHub's

3   tying claim should be dismissed because it "involves only one product, and not two."  TM MTD

4   at 19.  This is not remotely correct, and Ticketmaster knows it.  StubHub's tying claim

5   challenges "tying the sale of *Warriors tickets* sold in the Primary Market to Ticketmaster's

6   *Secondary Ticket Exchange services* for the resale of Warriors tickets."  FAC ¶ 119 (emphasis

7   added).  These are two distinct products, and the FAC is replete with allegations making clear

8   that distinction.  *See id.* ¶ 117 ("Warriors tickets sold in the Primary Ticket Market and

9   Secondary Ticket Exchange services are distinct products."); *id.* ¶ 85 (defining the two distinct

10  product markets: one for "*tickets* to professional basketball games" and one for "the sale of

11  Secondary Ticket Exchange *services*") (emphases added); *see also id.* ¶¶ 1, 5, 47, 79, 94.

12          Ticketmaster knows these are distinct markets because Ticketmaster itself has

13  made this distinction in its SEC filings, and has been a party in cases where the courts have

14  concluded that tickets and ticket services are distinct and separate products.  *See Ticketmaster*

15  *L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1196 (C.D. Cal. 2008) ("[T]he Court has no

16  difficulty whatsoever in finding, as a matter of law, that ticket distribution services and tickets *do*

17  *not* belong in the same market.  What happens in one market may be relevant to what happens in

18  the other market, but in no sense whatsoever are 'ticket distribution services' a viable substitute

19  for tickets themselves.") (emphasis added); *Ticketmaster LLC v. Designer Tickets & Tours, Inc.*,

20  No. CV 07-1092 ABC (JCx), 2008 WL 649804, at *4 (C.D. Cal. Mar. 10, 2008) ("[T]ickets and

21  ticket distribution services are not 'economic substitutes' that would belong in the same product

22  market for antitrust purposes.").  In *RMG Techs.*, Ticketmaster *itself* argued that tickets and

23  ticket resale services are in separate products because they have separate buyers and sellers.

24  Mot. of Ticketmaster L.L.C. & IAC/Interactivecorp to Dismiss Countercls. 1 through 4 at 7:11–

25  8:8, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, No. 2:07-cv-02534-ABC (JCx) (C.D. Cal. Dec. 21,

26

27

28

1    2007), ECF No. 84 ("Ticket-buying software, for example, obviously is no substitute for a Los

2    Angeles Clippers basketball game.") ("TM RMG Brief").[15]

3            Not that more support is needed, but it is notable that the Antitrust Division of the

4    Department of Justice, the Federal Trade Commission, and the NBA have also all recognized the

5    distinction between the market for tickets and the market for services to resell tickets.  FAC ¶ 98.

6            **(iii)    Defendants' Behavior Is Not Justified as a Supposed "Revocable**

7                      **License"**

8            Unable to defeat the FAC's tying claim, Defendants argue that StubHub's tying

9    claim should be dismissed because Defendants' behavior is somehow insulated from antitrust

10   challenge because a Warriors ticket is a "revocable license."  GSW MTD at 13; TM MTD at 19

11   n.11.  This argument is wrong factually and contrary to basic antitrust law.

12           First, the FAC challenges far more than any "revocation" of Warriors tickets by

13   Golden State.  Indeed, the FAC challenges as unlawful the fact that Golden State mandates and

14   has taken coercive action to ensure that Warriors ticket holders purchase all secondary ticket

15   services from Ticketmaster's Secondary Ticket Exchange (FAC ¶¶ 4, 6–7, 66–74), thereby

16   granting Golden State (and Ticketmaster) additional revenue that Golden State (and

17   Ticketmaster) would not earn if the ticket were simply revoked (*id.* ¶¶ 6, 64, 74).  Golden State

18   requires that consumers purchase resale services from Ticketmaster.  This is not a revocation, but

19   a forced "tie" that the antitrust laws condemn.  *See supra* Argument Section II.A(i).

20           Second, contractual licenses, like all contractual rights, are subject to antitrust

21   scrutiny because a right to license does not convey a right to violate the antitrust laws.  Thus,

22   even where a license is a legally protected monopoly—such as a patent or copyright—that

23   license does not grant antitrust immunity to its holder.  *See, e.g.*, *FTC v. Actavis, Inc.*, 133 S. Ct.

24   ---

15       In *RMG*, plaintiff alleged that Ticketmaster had monopolized the "ticket resale market,"
25       which Ticketmaster argued was too broad because the plaintiff alleged that the market
         included the ticket, the services for selling the ticket, and any accompanying software or
26       other goods used to sell the ticket.  TM *RMG* Brief at 4–5.  In support of its motion to
         dismiss, Ticketmaster argued that each of the three components of the alleged market—tickets, the service of selling the ticket, and ticket-
27       buying software—has different buyers and sellers, and were thus not substitutes for one
         another.  *Id.* at 7.
28

2223, 2232 (2013) (affirming that antitrust law applies to exclusionary acts that nonetheless fall within the scope of an intellectual property right); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996, 1008–09 (N.D. Cal. 2013) (denying motion to dismiss plaintiff's Sherman Act claims because licensing under the Copyright Act does not preempt federal antitrust law). Thus, even if Golden State does have some "rights" to revoke its tickets, it cannot do so with impunity.

Third, this is exactly the type of case where courts impose antitrust liability on a company that has foreclosed competition by abusing its own legitimate licenses. *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1215 (9th Cir. 1997); *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 113–20 (1984) (affirming anticompetitive nature of Section 1 price fixing and output restrictions born from broadcast licensing agreements); *see also King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 407 (3d Cir. 2015) ("[E]ven exclusive licenses cannot avoid antitrust scrutiny where they are used in anticompetitive ways.").

### (iv) Defendants Inaccurately Label their Tying as a Resale Restriction

Defendants also mislabel the FAC's allegations as a challenge to nothing more than a "resale restriction." TM MTD at 19–20; GSW MTD at 11–12. This argument is baseless because this case does not concern a resale restriction, but instead concerns a consumer mandate. A *resale* restriction is one in which the seller limits a *distributor's* ability to engage in certain conduct; it does not apply to a restraint of the end-user. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement . . . between firms at different levels *of distribution* [have traditionally been denominated] as vertical restraints.") (emphasis added); 11 Phillip E. Areeda, *Antitrust Law* ¶ 16A-1 (2015) (a vertical restraint is a restriction generally agreed to by commercial actors along a vertical distribution chain such as exclusive dealing arrangements between a manufacturer and distributer, outright bans on product resale, pricing requirements, and allocations of customers and markets). This makes sense because "[r]estrictions imposed on customers often produce greater competitive harm than restrictions

1   imposed on intermediaries, for restrictions of the latter permit customers to continue to make

2   substitutes." *Id.* ¶ 1800b.

3           Further clarifying this distinction, the cases Defendants cite in support of their

4   "resale restriction" arguments relate to limitations on distributors only.  *See, e.g.*, *Cowley v.*

5   *Braden Indus., Inc.*, 613 F.2d 751, 755 (9th Cir. 1980) (upholding vertical restraint between

6   manufacturer and distributor that instituted territorial restrictions on selling the relevant product

7   in another distributor's territory); *Clairol, Inc. v. Bos. Disc. Ctr. of Berkley, Inc.*, 608 F.2d 1114,

8   1115, 1125 (6th Cir. 1979) (upholding vertical restraint between manufacturer and "various retail

9   and wholesale drug and cosmetic outlets" that prohibited the latter from selling Clairol's "salon"

10  as opposed to retail products to the general public); *Leegin Creative Leather Prods., Inc. v.*

11  *PSKS, Inc.*, 551 U.S. 877, 908 (2007) (remanding for further proceedings a case involving a

12  vertical restraint between manufacturer and retailers that prohibited discounting manufacturer's

13  goods below certain suggested prices).  All of this law is inapposite because the FAC asserts that

14  Golden State (the seller) restrained *consumer* behavior, not the behavior of its distributor

15  (Ticketmaster).[16]  *See* FAC ¶¶ 66–74.  Thus, Defendants' argument is unfounded.

16          Moreover, even if Defendants' behavior somehow limited Ticketmaster (Golden

17  State's distributor) and not consumers,[17] it still would not be justified because vertical

18  _____

19  [16]   To the extent that Defendants attempt to rely on *Venzie Corp. v. U.S. Mineral Products*
          *Co.*, 521 F.2d 1309 (3d Cir. 1975), to argue that vertical restraints can apply to end-users,

20        such reliance is misplaced.  Although the court labeled contractors, such as the one whose
          resale restriction formed the basis of the controversy, as "consumers, not distributors, of

21        fireproofing products," *id.* at 1316, it immediately clarified that those products are
          "purchase[d] for use in connection with the *sale of their application services.*" *Id.*

22        (emphasis added).  The contractors, therefore, were not end-users.  Instead, the property
          owners whose building would contain the material were the end-users, and there is no

23        mention of any such restriction upon them in *Venzie*.

24  [17]   Even if Golden State could lawfully restrict use of tickets by end-users, that restriction
          cannot include a requirement for consumers to buy something else because that violates

25        the antitrust laws.  *See, e.g.*, *Datel*, 712 F. Supp. at 999 (upholding *per se* tying claim on
          motion to dismiss where Microsoft used a software update to its Xbox 360 gaming

26        console, a product that comes with several permissible end-user restrictions, to coerce its
          customers into purchasing Microsoft brand add-ons); *In re Data Gen. Corp. Antitrust*

27        *Litig.*, 490 F. Supp. 1089, 1106 (N.D. Cal. 1980) (denying summary judgment on tying
          claim reasoning "existence of a tying scheme is virtually undisputed" when defendant

28        tied the licensing of its software to the purchase of its central processing units).

restrictions are typically only justified when they promote *interbrand* competition—*i.e.*, competition between Golden State and other sellers of professional basketball tickets in the Bay Area. But that justification is irrelevant here because there are no other competitors in the Primary Ticket Market in the Bay Area, and thus any restriction on distributors (or consumers) does not promote interbrand competition in the market for professional basketball tickets sold in the Bay Area. *Id.* ¶¶ 3, 32, 101. To wit, the allegations in the FAC demonstrate that, rather than promote the resale of Warriors tickets, Defendants' restrictions have actually led to a decrease in the resale of Warriors tickets at higher prices (the exact opposite of what one would expect from interbrand competition). *Id.* ¶¶ 10–11, 85, 107, 120, 151.

Finally, in all events, the restriction imposed by Golden State is the type that the antitrust laws are designed to protect against because the restriction both (1) reduces output and increases prices to consumers and (2) eliminates competition from the market. *See Jefferson Parish*, 466 U.S. at 14–15 ("[T]he law draws a distinction between the exploitation of market power by merely enhancing the price[s] . . . and by attempting to impose restraints on competition in the market . . . . But if that power is used to impair competition . . . a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product and can increase the social costs of market power . . . .") (citations omitted). As described above, the FAC alleges harm to competition, harm to consumers, and harm to StubHub arising out of the so-called "vertical restriction" challenged by the FAC. Defendants' suggestion that their tying claim is a permissible vertical restraint is therefore incorrect as a matter of law.

B.     **The FAC's Second Claim For Relief Alleges A Section 1 Restraint Of Trade Claim**

The FAC pleads an independent Section 1 Restraint of Trade Claim. The elements of a Section 1 Restraint of Trade Claim are that "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected

interstate commerce." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1114–15 (N.D. Cal. 2012) (citations omitted) (internal quotation marks omitted).

The FAC establishes all three elements:  (1) Defendants have agreed to and have engaged in coordinated conduct to eliminate competition in the Secondary Ticket Services Market by forcing Warriors ticket holders to purchase only Ticketmaster's Secondary Ticket Exchange services (FAC ¶¶ 4, 6–10, 66–84, 102, 104, 125); (2) these agreements and coordinated conduct have harmed competition in the Secondary Ticket Services Market (*id.* ¶¶ 1, 10–13, 16, 74, 84, 104–14, 125); and (3) Defendants are engaged in interstate commerce and have substantially impacted interstate commerce (*id.* ¶¶ 10–13, 20, 62, 65, 74, 104–14, 120).

### (i)    Ticketmaster's Refusal to Technologically Integrate and its Deceptive Public Comments Support the FAC's Antitrust Claims

Ticketmaster does not contest the sufficiency of the allegations regarding the existence of an agreement between Ticketmaster and Golden State, but instead argues only that "*portions of*" StubHub's claims against Ticketmaster fail as a matter of law on the basis of its (1) refusal to integrate its Primary Ticketing Platform with other Secondary Ticket Exchanges or (2) false advertising.  TM MTD at 18 (emphasis added), 21–24.

Ticketmaster's argument faces a fundamental problem:  It asks the Court to disregard years of settled law that Defendants' conduct should be viewed as a whole and not in isolation.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962). Courts routinely reject Defendants' attempt to piecemeal defend each specific action they took to implement the scheme.  "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Id.* at 699 (internal quotation marks omitted); *see also Twin City*, 676 F.2d at 1302 (concluding the district court correctly assessed "aggregate pattern of conduct").[18]  When viewed in its totality, the FAC plainly and indisputably alleges each element of a Section 1 claim against Ticketmaster and

---

[18]    For this same reason, Defendants' arguments defending certain of the challenged behaviors as independently lawful are of no merit.  Regardless of whether such conduct, isolated and standing alone might be lawful, Defendants' motions can be granted only if the entirety of Defendants' conduct overall fails to state a claim under the antitrust laws.

1    Golden State, and Ticketmaster's refusal to allow technical integration and its public comments

2    support that finding.

3           Moreover, Ticketmaster's reliance on *Verizon Communications Inc. v. Law*

4    *Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), in an effort to suggest that its refusal to

5    integrate with StubHub cannot be the basis for a Section 1 claim, is misplaced.  The Supreme

6    Court's decision in *Trinko* does not apply to Ticketmaster's refusal to integrate because the

7    Supreme Court explicitly cabined its holding to "anticompetitive conduct by a single firm."  *Id.*

8    at 408.  Here, Ticketmaster's conduct is challenged as part of collective action.

9           Finally, Ticketmaster's argument that it cannot be held liable for its misleading

10   public statements is not correct.  The cases Ticketmaster cites to support that contention only

11   deal with Section 2 unilateral conduct claims.  They do not hold that allegations of deceptive and

12   misleading statements should be ignored when assessing the allegations as a whole and when

13   assessing the plausibility of an alleged conspiracy.[19]

14           **(ii)    Golden State Is Not "Permitted to Choose" How to Unreasonably**
                       **Restrain Trade**
15

16           For its part, Golden State argues that StubHub has failed to allege an

17   "anticompetitive agreement" with Ticketmaster because Golden State is "permitted to choose

18   with whom it wishes to deal," GSW MTD at 15 (citations omitted), and because "StubHub has

19   alleged nothing more than that it is not authorized to serve as a Secondary Ticket Exchange for

20   the resale of Warriors tickets."  *Id.* at 16.  Golden State's suggestion that this is somehow a case

21   about "unilateral" action is mystifying.  This is a case based on the express "Terms and

22   Conditions" of a contract between Golden State and ticket holders, FAC ¶ 67, enforced by

23   coordinated surveillance heavily reliant on actions by Ticketmaster, and threats of termination

24   and actual acts of reprisal by Golden State against Warriors ticket holders.  *See, e.g., id.* ¶¶ 66–

---

[19]   Regardless, public statements by competitors are routinely cited as evidence of
       conspiratorial intent, which is certainly relevant to whether there is an unreasonable
       agreement in violation of Section 1.  *See Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F.
       Supp. 689, 702–03 (S.D. Tex. 1993) (affirming that public statements "may serve as
       additional evidence of [a Sherman Act] conspiracy" where a plaintiff also alleges
       evidence of the conspiracy).

77. The law is clear that agreements of all stripes, whether horizontal or vertical agreements, are subject to antitrust scrutiny if they harm competition and harm consumers. *See, e.g.*, *Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*, No. 08-cv-2113-IEG-WMC, 2009 WL 539928, at *8 (S.D. Cal. Mar. 2, 2009) ("In general, courts find vertical agreements 'among traders at different marketing levels, designed to exclude from the market direct competitors' to be impermissible.") (internal quotation marks omitted); *see also* Argument Section II.A(iv). The agreements at issue are thus supported by specific factual allegations that demonstrate that Defendants have coordinated their conduct and, per well-established law, form the backbone of a well-stated antitrust claim.

Moreover, Golden State's argument that it is free to contract with Ticketmaster instead of StubHub is a complete *non sequitur*: The salient question is not whether Golden State is permitted to contract with Ticketmaster, but whether Golden State's contract and coordinated conduct with Ticketmaster to force consumers to purchase Secondary Ticket Services only from Ticketmaster unreasonably restrains trade. The FAC more than sufficiently sustains the claim of a Section 1 violation. *See* Argument Section II.A. *supra*.

As to Golden State's contention that the FAC reflects only the complaints of a spurned loser, this is both irrelevant and patently untrue. First, it is irrelevant because it is supported only by evidence from outside the complaint. *See* TM MTD at 2, 11, 13; GSW MTD at 1; Ticketmaster's Req. for Judicial Notice, ECF No. 60. This evidence can be tested only after discovery, and must be ignored at the pleading stage. Second, and more importantly, the FAC's allegations show that Ticketmaster is far more than just an "authorized" venue for the selling of Warriors tickets in the secondary market—Ticketmaster was, by force and coercion, the only Secondary Ticket Exchange available to Warriors ticket holders—and Golden State and Ticketmaster took steps expressly to ensure that Ticketmaster would be the exclusive venue for such sales, thereby guaranteeing Ticketmaster and Golden State exclusive revenues from such sales. The FAC alleges in great detail how Golden State and Ticketmaster engaged in conduct intended to have and that indeed has had the effect of limiting consumer choice, eliminating

competition, reducing output, and increasing prices. FAC ¶¶ 4, 7, 10–13, 62, 74, 85, 107, 151. This is not at all what StubHub does with its partners.

StubHub has adequately pled a Section 1 claim.

C.      **The FAC's Third And Fourth Claims For Relief Allege Conspiracy To Monopolize And Attempted Monopolization Claims**

A conspiracy to monopolize claim must plead: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–25 (1947)). To sustain claims for a conspiracy to monopolize, a plaintiff need not even allege a relevant market. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2010 WL 3521979, at *29 (E.D. Cal. Sept. 3, 2010). Similarly a successful attempted monopolization claim must establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044 (9th Cir. 2009) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)).

All four elements of a conspiracy to monopolize are alleged in the FAC: (1) Defendants have agreed to and have engaged in coordinated conduct to force all buyers and sellers in the Secondary Ticket Services Market to purchase services from Ticketmaster's Secondary Ticket Exchange (FAC ¶¶ 4, 6–10, 61–84, 133–34); (2) Defendants took overt acts in furtherance of this agreement (*id.* ¶¶ 4, 6–10, 66–84, 133–34); (3) Defendants engaged in this agreement and coordinated conduct with specific intent to monopolize the Secondary Ticket Services Market (*id.* ¶¶ 4, 6–10, 66–84, 103, 133–34); and (4) this conduct foreclosed competition and reduced output in the Secondary Ticket Services Market, harming competition and Plaintiff StubHub (*id.* ¶¶ 10–13, 62, 65, 74, 104–14, 136–37).

The attempted monopolization claim against Ticketmaster is supported by the allegations that (1) Ticketmaster engaged in specific predatory and anticompetitive conduct,

including policing and monitoring ticket holder behavior to ensure Ticketmaster is the exclusive Secondary Ticket Exchange used for the resale of Warriors tickets, sharing revenues with Golden State in order to ensure that Golden State likewise forces Warriors ticket holders to exclusively use Ticketmaster's Secondary Ticket Exchange, refusing to integrate with other Secondary Ticket Exchanges, and promulgating false statements about StubHub and other Secondary Ticket Exchanges; (2) Ticketmaster engaged in this behavior with the specific intent of monopolizing the Secondary Ticket Services Market (*id.* ¶¶ 4, 6–10, 66–84, 103, 139–40); and (3) Ticketmaster's attempt to monopolize resulted in Ticketmaster gaining 50% market share and thus has a dangerous probability of achieving monopoly power (*id.* ¶¶ 103, 114, 140–41).[20]

Golden State's only unique argument as to why no Section 2 claim has been pled is Golden State's conclusory contention that the FAC fails to plead factual allegations sufficient to establish specific intent to monopolize. GSW MTD at 18. This argument is wrong. First, the FAC expressly includes factual allegations reflecting the view of industry participants that Golden State and Ticketmaster purposefully and expressly sought to monopolize the Secondary Ticket Services Market. FAC ¶¶ 68–72, 76, 105, 108. Second, these allegations are buttressed by the allegations that Defendants had motives to reap and have in fact reaped artificially inflated revenues from the Secondary Ticket Services Market. Indeed, prior to undertaking the acts described in the FAC, Golden State derived no revenue from the Secondary Ticket Services Market or from secondary sales of Warriors tickets generally; yet, as a result of the behavior complained of in the FAC, Golden State has been able to extract revenues and profits that they would never have gained had they not attempted to shift all the secondary sales to Ticketmaster's Secondary Ticket Exchange. *Id.* ¶¶ 6, 9, 64, 74.

Ticketmaster's only challenge is that Ticketmaster is not obligated to integrate its ticketing operations with StubHub and that false advertising is "generally not the stuff of antitrust litigation." TM MTD at 21–23. These arguments miss the mark because StubHub does not challenge this conduct alone, but rather challenges this conduct as part of the broader activity

---

[20]   *See* Argument Section II.A(i) *supra* detailing the specific allegations in the FAC that plausibly allege antitrust injury.

1  by Ticketmaster to monopolize the Secondary Ticket Services Market.  *See* Argument Section

2  II.B. *supra*.

3      D.      **The FAC's Fifth Claim For Relief Alleges The Elements Of A Section 1
4              Exclusive Dealing Claim**

5              "Exclusive dealing involves an agreement between a vendor and a buyer that

6  prevents the buyer from purchasing a given good from any other vendor."  *Allied Orthopedic*

7  *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Such an

8  arrangement violates Section 1 of the Sherman Act when "its effect is to foreclose competition in

9  a substantial share of the line of commerce affected."  *Id.* (internal quotation marks omitted).

10 Thus the elements of an exclusive dealing claim are (1) an agreement to sell a product on

11 condition that the counterpart not deal with rivals in that same product, (2) with a substantial

12 market share foreclosed by the agreement.  *See id.* at 997.

13             The FAC alleges both elements of an exclusive dealing claim:  (1) Defendants

14 collectively dictate and coerce an exclusive relationship between Warriors ticket holders and

15 Ticketmaster's Secondary Ticket Exchange, and use exclusive dealing agreements between

16 Golden State and Warriors ticket holders for this purpose (FAC ¶¶ 4, 6–10, 66–84, 102, 147–48);

17 and (2) these exclusive dealing relationships have foreclosed a substantial share of the market as

18 Ticketmaster has secured 50% market share (*id.* ¶¶ 10–13, 65, 103–14, 149–52).

19             In response to this claim, Golden State denies any agreement with its fans

20 claiming instead that it merely offers them a revocable license.  That is just wrong.  The FAC

21 specifically alleges that Golden State's contracts with ticket holders to prohibit ticket holders

22 from purchasing services from StubHub and other vendors.  *Id.* ¶ 67.

23

24

25

26

27

28

## III.     STUBHUB HAS PROPERLY ALLEGED ITS STATE LAW CLAIMS[21]

StubHub's Cartwright Act claim should not be dismissed just as StubHub's Sherman Act claims should not be dismissed. *Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1103 (N.D. Cal. 2013) (upholding plaintiff's Sherman Act and Cartwright Act claims under the same analysis); *In re High-Tech*, 856 F. Supp. 2d at 1114 ("[I]f Plaintiffs plead a valid Sherman Act claim, they likewise plead a valid Cartwright Act claim.").

Additionally, StubHub's Unfair Competition Law ("UCL") claim is properly pled. California's UCL prohibits unfair competition, in the form of "any unlawful, unfair or fraudulent business act or practice." *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009) (quoting Cal. Bus. & Prof. Code ¶ 17200). Because StubHub's antitrust claims are well pled, so too is StubHub's UCL claim. *See, e.g.*, *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 50 n.10 (1998) ("[A]ny violation of the Cartwright Act may form the predicate for a UCL action."); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1049 (C.D. Cal. 2011) (upholding UCL claim based on Sherman Act violation).

Moreover, Defendants' conduct is also unfair and fraudulent. Defendants' conduct falls squarely under these two prongs of the UCL because Defendants took steps to deceive consumers about the nature and security of StubHub's Secondary Ticket Exchange (FAC ¶¶ 8, 66, 78, 80, 171), to deprive consumers of choice as a result of that message (*id.* ¶¶ 8, 80), and to foreclose StubHub and other competitors from the secondary market (*id.* ¶¶ 12–13, 103, 113–14). Thus, StubHub alleges that Defendants' conduct "violates the policy or spirit of [antitrust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). *Cel-Tech* makes it clear that the "unfairness" standard under the UCL creates a separate, and somewhat broader, test of illegality, to include

---

[21] As StubHub has properly pled its federal antitrust claims, Defendants' assertion that this Court should decline to exercise jurisdiction over StubHub's state law claims is unavailing. StubHub's state law claims stem from the very same conduct underlying its federal claims and thus are part of a "common nucleus of operative fact" such that "the state and federal claims would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (citation omitted).

1   not only actual violations of antitrust laws, but also "conduct that threatens an incipient" antitrust

2   offense, as well as conduct that "violates the policy or spirit" of the antitrust laws which

3   "threatens . . . competition." *Id.*  Additionally, Ticketmaster has engaged in practices identified

4   in the FAC—such as delaying delivery of tickets and the issuance of paperless tickets (FAC

5   ¶¶ 163–66)—that independently support a claim for a violation of the UCL, but when

6   collectively viewed with the other conduct alleged in the FAC, confirm the viability of the

7   FAC's UCL claim.

8         Finally, StubHub sufficiently pleads tortious interference with prospective

9   economic advantage.  To plead a claim of intentional interference with a prospective economic

10  advantage, a claimant must allege (1) an economic relationship between plaintiff and some third

11  party, with the probability of future economic benefit to plaintiff; (2) the defendant's knowledge

12  of the relationship; (3) intentional acts on the part of the defendant to disrupt that relationship;

13  (4) actual disruption; and (5) economic harm to plaintiff.  *Korea Supply Co. v. Lockheed Martin*

14  *Corp.*, 29 Cal. 4th 1134, 1153 (2003).  The "third element also requires a plaintiff to plead

15  intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship."  *Id.* at

16  1154.  Each element is met here: StubHub had and anticipates future business relations with

17  buyers and resellers of Warriors tickets in the secondary market; Ticketmaster and Golden State

18  knew of these relationships and expressly and intentionally took wrongful acts to disintermediate

19  StubHub from those relations, which conduct has resulted in a decrease in the number of listings

20  and sales of Warriors tickets on StubHub's Secondary Ticket Exchange; and StubHub suffered

21  the loss of revenues as a result.  FAC ¶¶ 12–13, 113.  Thus, StubHub's tortious interference

22  claim is adequately pled.  Golden State's argument that the FAC does not specifically allege any

23  economic relationships that have been harmed is untenable because the FAC expressly alleges

24  that Defendants' anticompetitive conduct has "caused resellers to list a substantially smaller

25  number of Warriors tickets on StubHub" which, in turn, has caused sales of Warriors tickets

26  through StubHub to decrease by a staggering 45 percent.  *Id.* ¶¶ 68, 112–13.  This striking

27  change in the percentage of sales of Warriors tickets made through StubHub's exchange shows

28  more than a mere expectation of an economic relationship.  Rather, it gives rise to an inference

1     that it is probable that more sales would be completed through StubHub but for Defendants'

2     interference. *See O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534, at

3     *15 (N.D. Cal. Dec. 5, 2013).

4                           **CONCLUSION**

5            For the reasons stated in this memorandum, Plaintiff StubHub respectfully

6     requests that Defendants' Motions to Dismiss be denied in their entirety.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  September 4, 2015                  /s/ Kevin J. Arquit

Kevin J. Arquit
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
212.455.2000
212.455.2502 (fax)
karquit@stblaw.com

Matthew J. Reilly (admitted *Pro Hac Vice*)
Abram J. Ellis (admitted *Pro Hac Vice*)
SIMPSON THACHER & BARTLETT LLP
1155 F Street NW
Washington, DC 20004
202.636.5500
202.636.5502 (fax)
matt.reilly@stblaw.com
aellis@stblaw.com

Matthew L. Cantor (admitted *Pro Hac Vice*)
Gordon Schnell (admitted *Pro Hac Vice*)
Allison F. Sheedy (admitted *Pro Hac Vice*)
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
212.350.2738
212.350.2701 (fax)
mcantor@constantinecannon.com
gschnell@constantinecannon.com
asheedy@constantinecannon.com

Stephen V. Bomse
Shannon C. Leong
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
415.773.5700
415.773.5759 (fax)
sbomse@orrick.com
sleong@orrick.com

Attorneys for Plaintiff StubHub, Inc.


**Attestation**:  Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from the signatories hereto.

**APPENDIX A**

| CLAIM | ELEMENTS OF CLAIM | FACTUAL ALLEGATION |
|---|---|---|
| **Unlawful Tying (Per Se or Rule of Reason) (against both Defendants)** | **Per Se:**<br><br>(1) A "defendant tied together the sale of two distinct products or services," (2) "that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product," and (3) "the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2007) (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)).<br><br>**Rule of Reason:**<br><br>(1) an arrangement among distinct entities (2) that causes an actual adverse effect on competition and (3) injury to the plaintiff. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). | (1) Golden State and Ticketmaster tied together the sale of Warriors tickets sold in the Primary Market to Ticketmaster's Secondary Ticket Exchange services for the resale of Warriors tickets.  (FAC ¶¶ 4, 6–10, 64–84, 102–03, 119.)  (2) Golden State and Ticketmaster have monopoly power in the Primary Ticket Market, enabling them to coerce customers into purchasing the tied product.  (*Id.* ¶¶ 2, 32–33, 38, 41, 44–45, 100–01, 118.) (3) This tie adversely affects the secondary ticket services market for the sale of Warriors tickets—a not insubstantial volume of commerce—by reducing consumer choice, restricting output, increasing prices, and causing damage suffered by StubHub. (*Id.* ¶¶ 10–13, 62, 65, 74, 103–14, 120–23.) |
| **Restraint of Trade (Per Se or Rule of Reason) (against both Defendants)** | "(1) [A], agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1114–15 (N.D. Cal. 2012) (internal quotation marks omitted). | (1) Defendants agreed to and coordinated their activities in furtherance of an agreement to cause the embargo of StubHub and others in the Secondary Ticket Services Market. This agreement is evidenced by the exclusive authorized relationship between Golden State and Ticketmaster, the joint monitoring of ticket holder behavior, the forcing of ticket holders to purchase secondary ticket services from only Ticketmaster, the refusal to allow other secondary ticket exchanges to integrate with Ticketmaster, and the dissemination of deceptive and misleading statements about StubHub's secondary platform.  (FAC ¶¶ 4, 6–10, 66–84, 102, 125.) (2) This coordinated conduct has unreasonably diminished and |

| CLAIM | ELEMENTS OF CLAIM | FACTUAL ALLEGATION |
|---|---|---|
| | | eliminated competition in the Secondary Ticket Services Market. (*Id.* ¶¶ 1, 10–13, 16, 74, 84, 104–14, 104, 125.) (3) Defendants are engaged in interstate commerce and have substantially impacted interstate commerce. (*Id.* ¶¶ 10–13, 20, 62, 65, 74, 104–14, 120.) |
| **Conspiracy to Monopolize (against both Defendants)** | "(1) [T]he existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–25 (1947)). | (1) Defendants agreed to and coordinated their activities in furtherance of an agreement to cause the embargo of StubHub and others in the Secondary Ticket Services Market, which embargo was intended to give Ticketmaster and Golden State a monopoly over the Secondary Ticket Services Market. (FAC ¶¶ 4, 6–10, 61–84, 100–03, 133–34) (2) This agreement is evidenced by Defendants' overt acts including the exclusive authorized relationship between Golden State and Ticketmaster, the joint monitoring of ticket holder behavior, the forcing of ticket holders to purchase secondary ticket services from only Ticketmaster, the refusal to allow other secondary ticket exchanges to integrate with Ticketmaster, and the dissemination of deceptive and misleading statements about StubHub's secondary platform. (*Id.* ¶¶ 4, 6–10, 66–84, 133–34.) (3) Golden State and Ticketmaster have exhibited specific intent as evidenced by statements of those in the industry and by their conduct (*e.g.*, the mandate that any reseller of Warriors tickets purchase secondary ticket services from only Ticketmaster). (*Id.* ¶ 4, 6–10, 66–84, 103, 133–34.) (4) This conduct has foreclosed competition and reduced output in the Secondary Ticket Services Market, harming competition and Plaintiff StubHub. (*Id.* ¶¶ 10–13, 62, 65, 74, 104–14, 136.) |
| **Attempted Monopolization (against Ticketmaster)** | "(1) [T]hat the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044 (9th Cir. 2009) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)). | (1) Ticketmaster has policed and monitored ticket holders to ensure they purchase the relevant services only from Ticketmaster, Ticketmaster has refused to allow technical integration with others, has spread misleading and deceptive comments about competitors, and has entered into an exclusive arrangement to become the only provider of services in the Secondary Ticket Services Market. (FAC ¶¶ 4, 6–10, 66–84, 103.) This conduct is anticompetitive and has harmed competition. (*Id.* ¶¶ 10–13, 65, 104–14, 143.) (2) Ticketmaster's specific intent to monopolize the Secondary Ticket Services Market is |

| CLAIM | ELEMENTS OF CLAIM | FACTUAL ALLEGATION |
|-------|-------------------|---------------------|
| | | evidenced by statements by those in the industry, Ticketmaster's conduct (*e.g.*, refusing to integrate, spreading misleading and deceptive communications, and entering into agreements with Golden State to make Ticketmaster the only seller of services in the Secondary Ticket Services Market. (*Id.* ¶¶ 4, 6–10, 64–84, 103, 139–40.) (3) Ticketmaster's attempt to monopolize has resulted in Ticketmaster gaining 50% market share and thus has a dangerous probability of achieving monopoly power. (*Id.* ¶¶ 101–03, 104–14, 141.) |
| **Exclusive Dealing (against both Defendants)** | (1) "[A]n agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." (2) The arrangement's "effect is to foreclose competition in a substantial share of the line of commerce affected." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (internal quotation marks omitted). | (1) Defendants have an arrangement whereby Ticketmaster serves as the exclusive secondary ticket exchange for Warriors tickets and Golden State agrees to exclusively market and promote Ticketmaster, exclusively integrate Ticketmaster's secondary platform, and both Defendants engage in deceptive marketing about StubHub's secondary platform. (FAC ¶¶ 6–10, 66–84, 102, 148.) Additionally, Golden State has entered into agreements with Warriors ticketholders whereby the ticketholders are forced to resell tickets exclusively on Ticketmaster. (*Id.* ¶ 147.) (2) These exclusive dealing relationships have foreclosed a substantial share of the market as Ticketmaster has secured 50% market share while StubHub has lost 45% of sales. (*Id.* ¶¶ 10–13, 65, 103–14, 149–52.) |