1

2

3

4

5

6

7                              IN THE UNITED STATES DISTRICT COURT

8                           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11    STUBHUB, INC.,                                No. C 15-1436 MMC

12                      Plaintiff,                  **ORDER GRANTING DEFENDANTS'**
                                                    **MOTIONS TO DISMISS; AFFORDING**
13         v.                                       **PLAINTIFF LEAVE TO AMEND;**
                                                    **CONTINUING CASE MANAGEMENT**
14    GOLDEN STATE WARRIORS, LLC, and               **CONFERENCE**
      TICKETMASTER, LLC,
15
16                      Defendants.
                                              /
17

18         Before the Court are two motions:  (1) defendant Golden State Warriors, LLC's

19    ("Warriors") "Motion to Dismiss the First Amended Complaint," filed July 31, 2015, and

20    (2) defendant Ticketmaster L.L.C.'s ("Ticketmaster") "Motion to Dismiss the First Amended

21    Complaint," filed July 31, 2015.  Plaintiff StubHub, Inc. ("StubHub") has filed a single

22    opposition, to which the Warriors and Ticketmaster have separately replied.  Having read

23    and considered the papers filed in support of and in opposition to the motions, the Court

24    rules as follows.[1]

25                                        **BACKGROUND**

26         For purposes of the instant motion, the Court assumes the following factual

27    allegations, made in StubHub's First Amended Complaint ("FAC"), are true.

28    _____

           [1]By order filed October 13, 2015, the Court took the matters under submission.

*United States District Court*

*For the Northern District of California*

A person who wishes to attend an event for which a ticket is required, such as a Warriors game played at Oracle Arena in Oakland, California, obtains either a "primary" or "secondary" ticket thereto.  (See FAC ¶¶ 1, 2, 28.)

"Primary" tickets, also known as "first-sale" tickets (see FAC ¶ 2), are sold by "Primary Ticket Platform providers," who "typically enter into multi-year contracts with the leagues, teams or venues hosting the events" (see FAC ¶ 43).  The "majority" of primary ticket sales are made "over the Internet, but they may also be made through the phone, mobile devices, ticket outlets, or the box office."  (See FAC ¶ 40.)  The price a consumer pays for a primary ticket consists of the "face value" of the ticket plus fees charged by the Primary Ticket Platform provider.  (See FAC ¶ 42.)  Ticketmaster is "the dominant provider of Primary Ticket Platform services in the U.S." (see FAC ¶ 30), and, with respect to Warriors games, is the "exclusive provider of Primary Ticket Platform services" (see FAC ¶ 30), i.e., "Warriors fans cannot purchase primary tickets to Warriors regular season or playoff season games without conducting the transaction through Ticketmaster" (see FAC ¶ 44).

"Secondary" tickets are sold on a "Secondary Ticket Exchange," which is an "[e]xchange" that "'match[es]' holders of tickets to sporting events, concerts and other forms of live entertainment who wish to resell their tickets with individuals looking to purchase such tickets."  (See FAC ¶ 22.)  The price a consumer pays for a secondary ticket is the amount "determined by the reseller and the buyer, and not by the Exchange" (see FAC ¶ 47), although Secondary Ticket Exchange service providers do charge fees to "the buyer and/or seller" (see FAC ¶ 47).  Secondary Ticket Exchange services are provided by Ticketmaster (see FAC ¶ 59), Stubhub (see FAC ¶ 47), and other entities, such as "Vivid Seats" (id.).

"Among the types of tickets sold and purchased on StubHub's Secondary Ticket Exchange are tickets for Warriors basketball games at the Oracle Arena in Oakland, California."  (See FAC ¶ 26.)  Beginning in August 2012, however, Ticketmaster became "the exclusive Secondary Ticket Exchange partner of [the Warriors]."  (See FAC ¶ 30.)  As

2

1  part of the "partnership" between Ticketmaster and the Warriors, the Warriors "promote[ ]

2  Ticketmaster as its only 'official' Secondary Ticket Exchange and refuse[ ] to allow any

3  other Secondary Ticket Exchange to integrate technically with Ticketmaster's Primary

4  Ticket Platform."  (See FAC ¶ 30.)  Also, the Warriors "contractually require[ ] that the

5  resale of Warriors tickets be effectuated only through Ticketmaster's Secondary Ticket

6  Exchange," and "enforce this requirement by cancelling or threatening to cancel ticket

7  subscriptions for regular season and post-season tickets if fans choose to resell their

8  Warriors tickets on a Secondary Ticket Exchange that competes with Ticketmaster's, such

9  as the one operated by StubHub."  (See FAC ¶ 7.)  Further, Ticketmaster and the Warriors

10 have engaged in certain "joint marketing activities" that "mislead consumers into believing

11 that Ticketmaster is the only safe or effective Secondary Ticket Exchange option they have,

12 or the only one that can be trusted to provide a 'guaranteed' or 'official' Warriors ticket."

13 (See FAC ¶ 80.)

14     As a result of the above-referenced conduct by Ticketmaster and the Warriors,

15 "[n]umerous Warriors ticket holders have foregone using competitive Secondary Ticket

16 Exchanges" (see FAC ¶ 102), and StubHub's "inventory of Warriors tickets has decreased

17 by approximately 80% compared to last year and the number of Warriors tickets sold

18 through StubHub has decreased by approximately 45%" (see FAC ¶ 113).  Additionally,

19 Ticketmaster has raised its service fees and now charges "a 33 percent higher service fee

20 than competing platforms."  (See FAC ¶ 65.)

21     Based on the above-referenced allegations, StubHub asserts eight Claims, five of

22 which are brought under federal antitrust law and three under state law.

23                              **LEGAL STANDARD**

24     Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based

25 on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

26 cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

27 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim

28 showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  See Iqbal, 129 S. Ct. at 1950 (internal quotation and citation omitted).

## DISCUSSION

In their respective motions, defendants argue that each of StubHub's claims is subject to dismissal for failure to state a claim.

### A.  First through Fifth Claims (Sherman Act)

StubHub asserts five federal claims, each arising under either § 1 or § 2 of the Sherman Act.  In the First Claim, StubHub alleges defendants have violated § 1 by engaging in "illegal tying," specifically, by mandating that persons who purchase primary Warriors tickets cannot resell them other than through Ticketmaster.  (See FAC ¶¶ 119, 122-23).  In the Second Claim, StubHub alleges defendants have violated § 1 by engaging in "a series of coordinated agreements and acts to limit competition" in the "Secondary Ticket Services Market."  (See FAC ¶ 125.)  In the Third Claim, StubHub alleges defendants have violated § 2 by entering into a "conspiracy to monopolize the Secondary Ticket Services Market."  (See FAC ¶ 133.)  In the Fourth Claim, StubHub alleges Ticketmaster has violated § 2 by "attempt[ing] to monopolize the Secondary Ticket

Services Market." (See FAC ¶ 140.) In the Fifth Claim, StubHub alleges defendants have

violated § 1 by "enter[ing] into exclusive dealing arrangements with respect to the

Secondary Ticket Services Market" and the "Primary Ticket Market," and that, as a result,

they have "exclud[ed] StubHub and other Secondary Ticket Exchange services providers

from the Secondary Ticket Services Market." (See FAC ¶¶ 145-46, 149.)

Defendants argue that each of the Sherman Act claims is subject to dismissal for

failure to allege a cognizable relevant product market. As discussed below, the Court

agrees.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the

defendant has market power within a 'relevant market.'" Newcal Indus., Inc. v. Ikon Office

Solution, 513 F.3d 1038, 1045 (9th Cir. 2008), cert. denied, 557 U.S. 903 (2009).

Specifically, the plaintiff must allege "both a product market and a geographic market." See

id.[2] This requirement applies to claims under both § 1 and § 2 of the Sherman Act. See id.

at 1044 n.3.

A product market "must encompass the product at issue as well as all economic

substitutes for the product." See id. "The outer boundaries of a product market are

determined by the reasonable interchangeability of use or the cross-elasticity of demand

between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370

U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to

another for the use to which it is put," Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124

F.3d 430, 437 (3rd Cir. 1997) (noting "while there may be some degree of preference for

the one over the other, either would work effectively") (internal quotation and citation

omitted), while "[c]ross-elasticity of demand is a measure of the substitutability of products

from the point of view of buyers," id. at 438 n.6 (internal quotation and citation omitted). In

short, a cognizable product market consists of "commodities reasonably interchangeable

_____

[2]StubHub alleges the relevant geographic area is the "Bay Area" (see FAC ¶ 85), which it alternatively describes as "the San Francisco - Oakland - Fremont Metropolitan Statistical Area" (see FAC ¶¶ 89, 99.) Defendants have not argued that plaintiffs' allegation of a "Bay Area" market is insufficient to allege a geographic market.

1   by consumers for the same purposes." See United States v. E.I. du Pont de Nemours &

2   Co., 351 U.S. 377, 395 (1956).

3         Here, StubHub's Sherman Act claims are based on the theory that there exist two

4   separate product markets, specifically, (1) a "Primary Ticket Market," described as "the

5   primary market for the sale of tickets to professional basketball games in the Bay Area,"

6   and (2) a "Secondary Ticket Services Market," described as "the market for the sale of

7   Secondary Ticket Exchange services for tickets to professional basketball games in the

8   Bay Area." (See FAC ¶ 85.) StubHub further alleges that the only "tickets to professional

9   basketball games in the Bay Area" are "Warriors tickets." (See FAC ¶¶ 32, 85-86.) In sum,

10  StubHub's Sherman Act claims are based on a theory that there exist two separate product

11  markets for Warriors tickets to games played at Oracle Arena, the difference between

12  those markets being whether the purchaser obtains from the supplier a "primary" ticket or a

13  "secondary" ticket.

14        StubHub's proposed product markets are not cognizable as a matter of law, as

15  neither "encompass[es] all interchangeable substitute products even when all factual

16  inferences are granted in [StubHub's] favor." See Queen City Pizza, 124 F.3d at 436

17  (holding where plaintiff "alleges a proposed relevant market that clearly does not

18  encompass all interchangeable substitute products even when all factual inferences are

19  granted in plaintiff's favor, the relevant market is legally insufficient"). In particular, a

20  "primary" ticket to a Warriors game and a "secondary" ticket to a Warriors game are

21  "commodities reasonably interchangeable by consumers for the same purposes," see du

22  Pont, 351 U.S. at 395, as both primary and secondary tickets are used for the purpose of

23  obtaining entry to a Warriors game. Although StubHub alleges the price of a primary ticket

24  is its "face value" (see FAC ¶ 40) and the price of a secondary ticket varies (see FAC

25  ¶¶ 49, 98), any such price differential does not suffice to support the existence of two

26  separate markets, as "the scope of the relevant market is not governed by the presence of

27  a price differential between competing products." See Twin City Sportservice, Inc. v.

28  Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir. 1975) (noting, in du Pont, Supreme

Court included both "cellophane" and "glassine and grease-proof papers" in "flexible

wrapping market," even though price of cellophane was "two or three times as great"); <u>see

also</u> <u>Brown Shoe</u>, 370 U.S. at 326 (rejecting argument, made in support of antitrust claims

challenging merger of shoe manufacturers, that "medium-priced shoes do not compete with

low-priced shoes").

Moreover, the proposed "Primary Ticket Market" fails for the additional reason that

the sole products for sale in said market are Warriors tickets sold "directly by the team"

itself (<u>see</u> FAC ¶ 40), and the "natural monopoly every manufacturer has in the production

and sale of its own product cannot be the basis for antitrust liability."  <u>See</u> <u>Belfiore v. New

York Times Co.</u>, 654 F. Supp. 842, 846 (D. Conn. 1986), <u>aff'd</u>, 826 F.2d 177 (2nd. Cir.

1987); <u>see also</u> <u>Williams v. National Football League</u>, 2014 WL 5514378, at *1, 4 (W.D.

Wash. October 31, 2014) (dismissing antitrust claims based on theory Seattle Seahawks

limited "primary-market ticket sales for [an] NFC Championship game" to residents in

specified geographic locations; finding claims "[did] not relate to competition between firms

in a market, but to the exercise of a natural monopoly on sales of tickets to a single

stadium").

Lastly, the Court finds unpersuasive StubHub's allegation that its proposed markets

are cognizable because the Department of Justice, in bringing an action to block a merger

of Ticketmaster and Live Nation, another ticket distributor, recognized "primary ticketing

services" and the services provided by "secondary ticketing companies" as "relevant and

distinct markets."  (<u>See</u> FAC ¶ 98; <u>see also</u> FAC ¶ 45.)  The complaint on which StubHub

relies, however, is readily distinguishable, as the challenged merger was between two

primary ticketing servicers that competed in a nationwide market in which major concert

venues purchased those services.  (See <u>United States v. Ticketmaster Entertainment, Inc</u>,

Case No. 10-0139 RMC (D. D.C. filed January 25, 2010), ECF No. 1 ¶¶ 1, 35, 36).  Nothing

in the cited complaint suggests the Department of Justice is of the view that primary tickets

to a single team's games played at a single arena are not reasonably interchangeable with

secondary tickets to the same games.

1    Accordingly, the First through Fifth Claims are subject to dismissal for failure to

2    allege a cognizable product market.[3]

3    **B.  Sixth Claim (Cartwright Act)**

4    In the Sixth Claim, StubHub alleges defendants have violated California's Cartwright

5    Act.  The claim is based entirely on the same conduct alleged in support of StubHub's

6    Sherman Act claims (see FAC ¶¶ 153-58), and "[t]he analysis under California's antitrust

7    law mirrors the analysis under federal law because the Cartwright Act . . . was modeled

8    after the Sherman Act."  County of Tuolumne v. Sonora Community Hosp., 236 F.3d 1148,

9    1160 (9th Cir. 2001); see also Marin County Board of Realtors, Inc. v. Palsson, 16 Cal.3d

10   920, 925 (1976) (holding "federal cases interpreting the Sherman Act are applicable to

11   problems arising under the Cartwright Act").

12   Accordingly, for the reasons stated above with respect to the First through Fifth

13   Claims, the Sixth Claim is subject to dismissal for failure to allege a cognizable product

14   market.

15   **C.  Seventh and Eight Claims**

16   In the Seventh Claim, StubHub alleges defendants have violated § 17200 of the

17   California Business & Professions Code, and, in the Eighth Claim, StubHub alleges

18   defendants have wrongfully interfered with StubHub's prospective economic advantage.

19   As pleaded, the Seventh and Eighth Claims appear to be based in large part on conduct

20   differing from that alleged in support of the First through Sixth Claims.  (See, e.g., FAC

21   ¶¶ 163-68, 175.)

22   The Court's jurisdiction over the Seventh and Eighth Claims, however, is

23   supplemental in nature.  (See FAC ¶ 19.)  Where a court has dismissed the claims over

24   which it has original jurisdiction, it may decline to exercise supplemental jurisdiction.  See

25   28 U.S.C. § 1367(c)(3).  Given the dismissal of StubHub's federal claims and the early

26

27   [3]In light of the Court's finding as to StubHub's failure to allege a cognizable product
28   market, the Court does not reach the additional arguments made by defendants with
     respect to the Sherman Act claims.

1   stage of the proceedings, the Court declines to exercise supplemental jurisdiction over the

2   Seventh and Eighth Claims.

3          Accordingly, the Seventh and Eighth Claims will be dismissed, without prejudice to

4   refiling in state court, or, if StubHub elects to amend any of its Sherman Act claims, without

5   prejudice to refiling in this action.

6                                    **CONCLUSION**

7          For the reasons stated above, the First Amended Complaint is hereby DISMISSED

8   in its entirety.  If StubHub seeks to amend to cure the above-described deficiencies in the

9   First through Sixth Claims, StubHub shall file its Second Amended Complaint no later than

10  November 30, 2015.[4]

11         In light of the above, the Case Management Conference is hereby CONTINUED

12  from December 4, 2015, to February 26, 2016, at 10:30 a.m.  A Joint Case Management

13  Statement shall be filed no later than February 19, 2016.

14         **IT IS SO ORDERED.**

15

16  Dated:  November 5, 2015

17                                                          MAXINE M. CHESNEY
                                                           United States District Judge

18

19

20

21

22

23

24

25

26

27  _____

28         [4]If StubHub files a Second Amended Complaint, it may, but is not required to, amend
    the Seventh and Eighth Claims.

                                          9